**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **NUVO GROUP USA, INC., *et al.*,[1]** | Case No. 24-11880 (MFW) |
| **Debtors.** | (Joint Administration Requested) |

## DECLARATION OF ROBERT POWELL, CHIEF EXECUTIVE OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY RELIEF

Pursuant to 28 U.S.C. § 1746, I, Robert Powell, hereby declare:

1.     I am the Chief Executive Officer ("CEO") of Nuvo Group USA, Inc. and its affiliates that are debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively, the "Debtors", "Nuvo" or the "Company"). I have served as the Company's CEO since February 2024, and have been a member of the Company's board of directors since September 2023.

2.     My experience in the medical industry spans over 40 years. Before joining the Company in February 2024, I served as chief executive officer and chairman of the management board of Fresenius Medical Care, one of the world's largest providers of products and services for people with chronic kidney failure. I previously held other executive positions at Fresenius for approximately 20 years, including serving as co-chief executive officer of Fresenius Medical Care North America, a board member, and Vice Chairman of the management board for the North

---

[1]. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are: Holdco Nuvo Group D.G Ltd. (5756); Nuvo Group Ltd. (3811); and Nuvo Group USA, Inc. (2727). The Debtors' mailing address for purposes of these Chapter 11 Cases is 300 Witherspoon Street, Suite 201, Princeton, New Jersey 08542.

American Region.  I have also held several senior positions with Baxter International Inc. and Biogen Inc. in the United States.

3.      I submit this declaration ("Declaration") in support of the Debtors' chapter 11 petitions and contemporaneously filed requests for relief in the form of motions and applications (such motions and applications, the "First Day Motions").  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the Chapter 11 Cases.  I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision at the Company, my discussions with the Debtors' senior management team and professionals, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

### Commencement of the Chapter 11 Cases

5.      On August 22, 2024 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors intend to continue in the possession of their respective assets and the management of their respective businesses as debtors in possession.  The Debtors, including parent company Holdco Nuvo Group D.G Ltd., a public company, commenced the Chapter 11 Cases because of liquidity issues to effectuate an orderly and value-maximizing recapitalization and restructuring for the benefit of its stakeholders.  These issues are discussed in further detail below.

2

6.  The Debtors maintain operations in the U.S. and Israel, and also utilize full-time contractors based in Ukraine.  The Debtors maintain one office lease in Tel Aviv, Israel, while most of the rest of the Debtors' employees work remotely.  Debtor Nuvo Group USA, Inc. is a Delaware corporation.

7.  Part I of this Declaration describes the Debtors' corporate history and business operations; Part II provides the Debtors' corporate and prepetition capital structure; Part III details the circumstances leading to the filing of these Chapter 11 Cases and the Debtors' path forward; Part IV outlines the Debtors' proposed debtor-in-possession financing, and restructuring process; and Part V describes the First Day Motions.

## I.    THE DEBTOR'S BUSINESS

8.  This section provides context for the circumstances surrounding the Chapter 11 Cases and covers three topics:  the Debtors' history and corporate structure, operations, and employee population.

A.      **History and Corporate Structure**

**Corporate Structure**

9.      Debtor Holdco Nuvo Group D.G Ltd. is a public company whose stock is presently traded on the NASDAQ under the symbol NUVO.  On the Petition Date, Holdco Nuvo Group D.G Ltd. received a delisting notification from NASDAQ shortly after commencing these Chapter 11 Cases.  Holdco Nuvo Group D.G Ltd. is a non-operating holding company that directly owns 100% of Debtor Nuvo Group Ltd., which is an Israeli operating company based in Tel Aviv, Israel.  Nuvo Group Ltd. owns 100% of Debtor Nuvo Group USA, Inc, which is the Debtor's U.S. based operating company. Thus, the Debtor's corporate organizational structure is as follows:



**History**

10.      In June 2006, Debtor Nuvo Group Ltd. was incorporated under the laws of Israel and commenced operations.  It operates in one line of business and is engaged in research, development and marketing of innovative medical devices and services for remote pregnancy monitoring, which are described in further detail below.

11.      In 2009, Nuvo Group Ltd. incorporated Debtor Nuvo Group USA, Inc., a wholly-owned subsidiary, under the laws of the State of Delaware.  Nuvo Group USA, Inc. provides distribution services under an intercompany distribution agreement with Nuvo Group Ltd.

12.      Holdco Nuvo Group D.G Ltd., a limited liability company incorporated under the laws of Israel on July 20, 2023, solely for the purpose of effectuating the Business Combination (defined and discussed below), which was consummated on May 1, 2024.  Prior to the Business Combination, Holdco did not conduct any material activities other than those incidental to its formation and the matters contemplated by the Business Combination Agreement, such as the making of certain required securities law filings and the establishment of certain subsidiaries. Upon the closing of the Business Combination, Holdco became the parent of, and conducts its business through, its subsidiaries, Nuvo Group Ltd. and Nuvo Group USA, Inc.

**The De-SPAC Transaction**

13.      On May 1, 2024, the Company completed a de-SPAC merger transaction (the "Business Combination") with LAMF Global Ventures Corp. I ("LAMF"), a blank check public company that was incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, or reorganization or similar business combination with one or more businesses or entities.  A new entity, Nuvo Assetco Corp. ("Assetco") was incorporated in the Cayman Islands for the purpose of merging with LAMF, and was liquidated subsequent to the

closing of the Business Combination.  H.F.N. Insight Merger Company Ltd. was also incorporated in Israel to merge with the Company.  On April 30, 2024, LAMF merged with and into Assetco, with Assetco continuing as the surviving corporation.  On May 1, 2024, the date of the closing of the Business Combination, AssetCo merged into Holdco Nuvo Group D.G Ltd. with Holdco Nuvo Group D.G Ltd. as the surviving entity.  As a result of the closing of the Business Combination, Nuvo Group Ltd. became a wholly-owned subsidiary of Holdco Nuvo Group D.G Ltd.

14.    As part of a de-SPAC transaction, the investors in a blank check public company have the right to redeem their shares at a designated price.  The overwhelming majority of investors in LAMF chose to redeem their shares.  Thus, despite a nearly $300 million Business Combination, the Company was left with only approximately $400,000 and was unable to even pay the professionals who handled the Business Combination despite the closing of the transaction.

15.    Since the closing of the Business Combination, and despite substantial efforts to do so, the Company has not been able to secure any financing, which led to the extreme liquidity issues that necessitated the commencement of these Chapter 11 Cases just over three months after the closing of the Business Combination.

**B.    Business Operations**

16.    The Company is a cutting-edge manufacturer of a remote pregnancy monitoring band for women called INVU by Nuvo (the "Band" or "INVU")).  INVU is an FDA-cleared, prescription-initiated, remote pregnancy monitoring platform that enables the delivery of remote non-stress tests and maternal and fetal heart rate monitoring, helping expectant mothers adhere to their prescribed care plan from the comfort of their homes rather than having to take such tests at their OBGYN office or a hospital/healthcare facility.  The images below include images of the Band, as well as visual descriptions of the INVU patient experience.









17.     We believe that the Company has the potential to become a leader in remote fetal monitoring for pregnancy care. We believe that the Company is leading the transformation from a world where pregnancy care is limited by outdated technology and barriers to accessing care to a world where data-driven, clinically relevant, actionable insights can be accessed both at home and

in the clinic, during the 32nd week of pregnancy until the beginning of labor, by an expectant mother and her clinician. Current poor fetal and maternal health outcomes, limited accessibility to care, and soaring costs all indicate the need for a change in the way that pregnancies are monitored and managed, and the Company believes that its Band is an innovative solution that is positioned to address complete accessibility to care while looking significantly deeper into the pregnancy than standard of care solutions do today.

18.     Strategically, the Company's platform is currently being commercialized by tapping into a key part of the pregnancy journey, fetal non-stress tests ("NSTs"), by enabling these tests to be conducted remotely with clinical accuracy that has been demonstrated to be equivalent to the standard of care based on our clinical studies and consumer-grade ease of use.  NSTs are medically necessary pregnancy screening procedures that measure fetal heart rate and reaction to movement to assess fetal well-being. NSTs are most commonly conducted with cardiotocography machines, which were designed for intrapartum monitoring in clinics by experienced healthcare professionals.

19.     Through a combination of advanced wearable technology, AI & machine learning, and compelling user experiences (for expectant mothers and clinicians), INVU enables increased access to care, deeper insights into maternal-fetal health, reduced clinical staff burden, and improved patient satisfaction.  INVU is composed of a hardware component (wearable), with digital signal processing and cloud analytics, and interfaces for every participant involved in the pregnancy care.

20.     The hardware component of our INVU platform is a proprietary self-administered wireless sensor band that clinicians prescribe to expectant mothers who wear the sensor band during virtual visits to capture real-time data on key maternal and fetal health metrics.  During

these visits, a live reading allows the expectant mother to access simplified data and insights via the paired INVU application. Our wireless sensor band captures a unique set of in-depth physiological data from the expectant mother and unborn baby in a passive manner, without sending energy signals into the womb. Next, the data is digitized and sent wirelessly for analysis on our cloud-based servers by our sophisticated algorithms.

21.     Today, when obstetrics clinicians connect to our INVU platform, they have access to a digital dashboard that contains fetal and maternal heart rate and uterine activity tracings recorded during the session and data derived from these measurements for all expectant mothers and unborn babies in their care that use our INVU platform. This data is comparable to the fetal surveillance procedures that normally occur once or twice weekly in the last trimester of pregnancies that have some indication for risk. According to a study in the American Journal of Obstetrics and Gynecology analyzing approximately ten million pregnancies, 38% were identified as low risk and 62% were identified as high risk for unexpected complications.

22.     The Company is still at the early stages of the public rollout of INVU.  While the Company presently has over a dozen commercial customer agreements, including purchase orders, with health systems, large private practice groups and independent women's health practices in the United States and Israel, the Company has not generated significant revenues from its operations and has suffered recurring losses from operations and negative cash flows from operations.  In 2023, our revenue totaled approximately $176,000, with a cost of revenues totaling $191,000, resulting in a loss on these revenues.  The Company is presently operating at a deficit.

23.     Research and development (including ongoing software development) is a critical component of the Company's business.  The Company conducts its research and development primarily in-house, and also contracts with third-party vendors to conduct supplemental research

and to assist with preparation of certain publications.  Research and development expenses include costs directly attributable to the conduct of research and development programs, including the payroll costs, lab expenses, materials, consumables, and consulting fees.

24.    The Company derives its revenues through commercial contracts with customers including distributors, health systems, large private practice groups and independent women's health practices.  The Company has two revenue models: (1) the sales model and (2) the subscription model. Substantially all the Company's revenue is derived from the subscription model, under which the Company provides a monitoring service for high-risk pregnancy through the Band, which is leased to healthcare providers, using Company's cloud during the time period the expectant mother is using the service ("an episode period" which is eight weeks on average). The Band is cleaned and refurbished between each episode period and then sent to the next patient.

25.    Under the subscription model the Band remains with the expectant mother during the episode period and is then returned to the Company and prepared for use in the next episode. The Band remains the Company's property and responsibility, and the customer pays a fixed fee per the number of episode prescriptions.

26.    Under the sales model, healthcare providers purchase the Band as well as monitoring sessions, or episodes of care. Under this model, the healthcare provider owns the Band and utilizes it for monitoring sessions for its patients. Between each episode period, the Band is cleaned and refurbished and sent to the next patient. Revenue is allocated to the sale of the Band, each episode period, and each refurbishment. Revenue from the Band is recorded upon transfer of the Band to the healthcare provider, episode revenue is recorded over the eight-week period it is used, and a portion of the revenue is allocated to each refurbishment between episode periods. Generally, the Company will collect cash in advance.

27. As of June 1, 2024, the Company's innovative technology is protected by an extensive global patent portfolio consisting of 16 issued U.S. utility patents, 10 pending U.S. utility patent applications, 44 issued foreign utility patents, 13 pending foreign utility patent applications, and one PCT patent application. Our patent portfolio also includes three issued U.S. design patents and seven issued foreign design patents. Our patents cover various aspects of our INVU maternal/fetal monitoring platform.

### C. Employees

28. As of the Petition Date, the Debtors' collective workforce is comprised of approximately 9 employees in the United States, 37 employees in Israel (including 5 students/interns), and 14 full-time contractors in Ukraine (collectively, the "Employees"). All 5 of the students/interns are part-time workers who are paid hourly, with the possibility of overtime. 3 non-student employees are part-time, while the remaining employees are full-time workers. The Debtors' remaining Employees are salaried workers who do not earn overtime. The Debtors also use the services of independent contractors at any given time – presently approximately 5-10 – to fulfill critical employment needs and to address fluctuations in demand or provide special skills required by the Debtors.

29. The Employees perform a variety of critical functions for the Debtors' businesses, including, without limitation, accounting, administration, software development, engineering, finance, human resources, information technology, operations, marketing, purchasing, research, and sales. Their skills and specialized knowledge and understanding of the Debtors' infrastructure and operations, as well as their relationships with customers, vendors and other third parties, are essential to the Debtors' continuing business operations.

30.     The compensation offered to the Company employees provides a variety of additional benefits depending on employee classification, including health, dental, vision, life and disability, productivity bonuses, retirement plans and other benefits.

## II.     THE DEBTORS' PREPETITION CAPITAL STRUCTURE

31.     As of the Petition Date, the Debtors have an overall cash position of approximately $28,692.21.  Principal long-term loans and borrowings are described below.[2]

32.     Since November 2023 Nuvo has been engaged in a bridge financing (the "Bridge Financing"), which involves the issuance of secured convertible bridge notes (individually, a "Bridge Financing Note"; collectively, the "Bridge Financing Notes") (the holders of such Bridge Financing Notes, the "Bridge Financing Holders").   The Bridge Financing Notes carry a 15% annual interest rate and upon conversion on the applicable maturity date, (i) the Company is obligated to pay the Bridge Financing Holders all accrued interest on the Bridge Financing Notes up to the date of payment or conversion, and (ii) the Bridge Financing Holders in their sole discretion, may choose to either (a) receive the principal amount of the Bridge Financing Note in cash; or (b) convert the principal amount of the investment into Company shares at a price per share of $7.0265.

33.     Each Bridge Financing Note is secured by intellectual property of the Company.

34.     As of the date hereof, approximately $12.5 million in principal amount of Bridge Financing Notes has been received by Nuvo.  Together with interest, as of the Petition Date, the outstanding amount of all Bridge Financing Notes totaled approximately $12.8 million.

---

2.   The descriptions of these financings in this Declaration or any of the First Day Motions are provided for informational purposes only and the Debtors reserve all rights relating to the long-term loans and borrowings described herein, including but not limited to their priority, amount, and characterization.

35.     From March 24, 2024 through April 8, 2024, Nuvo entered into amendments to all of the existing Bridge Financing Notes representing $6.5732 million principal amount of the Bridge Financing Notes, to extend the maturity dates thereof (the "<u>Bridge Financing Notes Amendments</u>"). All new Bridge Financing Notes since April 8, 2024 include the amended maturity definition. Prior to the Bridge Financing Notes Amendments, the Bridge Financing Notes were scheduled to mature on the earlier of (i) twelve months from the issuance date thereof, (ii) the closing of the Business Combination, (iii) the closing of an initial public offering, or (iv) the closing of a bona fide financing by the Company for the principal purpose of raising capital, through the sale of Company securities in whatever form or type (whether debt or equity) that raises in excess of $10,000,000 in gross proceeds.

36.     Pursuant to the Bridge Financing Notes Amendments, the maturity date of the amended Bridge Financing Notes was revised to be the earlier of (i) twelve months from the issuance date thereof, (ii) six (6) months following the closing of the Business Combination, (iii) six (6) months following the closing of an initial public offering, or (iv) the closing of a bona fide financing by Nuvo for the principal purpose of raising capital, through the sale of Company securities in whatever form or type(whether debt or equity) that raises in excess of $25,000,000 in gross proceeds.

37.     The Company also issued a warrant to each Bridge Financing Holder, whereby the Bridge Financing Holder is given the right to purchase such number of Company shares equal to (2x) the principal amount of the Holder's Bridge Financing Note divided by the same price per share noted above (i.e., $7.0265), at an exercise price of NIS 0.01.

38.     The remainder of the Company's debt consists largely of unsecured trade debt.  The Company estimates that unsecured debt totals at least $11 million.

### III.    CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

39.    The Company had to commence these cases due to urgent strains on liquidity.  As stated above, the Company's liquidity position deteriorated substantially since the Business Combination.  The Company had anticipated raising up to $15 million following that transaction, but the financing fell through late in the process.

40.    The Debtors were ultimately unable to raise additional capital outside of bankruptcy.  Without any go forward funding source, and substantial operating costs, the Debtors simply ran out of money, and had to commence these Chapter 11 Cases.

41.    While the Debtors have the support of the DIP Lender, the DIP Lender was only willing to advance new money pursuant to a DIP Financing in a chapter 11 proceeding, and the Debtors had no other available funding sources.

42.    Against this backdrop, the Debtors ultimately commenced these Chapter 11 Cases to fully and fairly resolve their liabilities in an effective, efficient, expeditious, and centralized forum under the Bankruptcy Code.  The Debtors are singularly focused on preserving value for stakeholders enterprise-wide, preserving jobs, and maintaining the ability to deliver best-in-class services to enable their customers to maximize their businesses.

43.    The Debtors believe that utilizing the tools of the Bankruptcy Code to advance a restructuring process as expeditiously as possible, will enable the Debtors to address their liquidity issues and recapitalize their business.  The Debtors believe that doing so will enable them to implement their vision for their products that the Debtors believe can change women's healthcare and lives for the better and maximize the value of the Debtors' estates.

## IV.    <u>RESTRUCTURING ACTIONS</u>

### <u>Need for DIP Financing</u>

44.    The Debtors were forced to file these Chapter 11 Cases on an emergency basis – in a matter of just a few days – after they faced an urgent liquidity issue and concern about the possible termination of one of their most important contractual relationships that is vital to their business.  This created an urgent need to obtain the protections of the Bankruptcy Code, including but not limited to the automatic stay.  As a consequence of the factors described herein, the Debtors have insufficient cash to continue to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.  In order to complete their orderly recapitalization and restructuring process and maximize the value of their assets for the benefit of their creditors and estates, the Debtors have an immediate need for the proposed debtor-in-possession financing (such financing, the "<u>DIP Financing</u>").  In the absence of the DIP Financing, the orderly recapitalization and reorganization of the Debtors' businesses and assets would not be possible, and would cause serious and irreparable harm to the Debtors and their estates.

45.    Given the extremely limited timing within which the Debtors had to commence these Chapter 11 Cases, the Debtors did not have the ability to seek financing from anyone other than a lender who knew the business well enough to be willing to step up on such an expedited basis without the need to conduct substantial diligence and obtain credit approval.  The DIP Lender, on the other hand, is intimately familiar with the Debtors' operations.  Specifically, the DIP Lender is an entity that I understand will be funded by among others, the Company's founding investor, Laurence Klein, and other existing lenders/investors in the Company.  As a result, the DIP Lender was willing and able to step up and provide the Debtors with a lifeline by agreeing to provide the DIP Financing on an extraordinarily fast timeline in order to address the Debtors'

16

urgent liquidity needs and preserve value for the Debtors' stakeholders.  For these reasons, I believe that it would have been futile to seek debtor-in-possession financing from any alternative lenders.

46.     Absent immediate availability of new credit, the Debtors will be forced to cease operations and the going-concern value of their business will be lost.  Accordingly, the Debtors require the availability of working capital from the DIP Financing.  The DIP Financing will provide more than just the ability for the Debtors to operate their businesses; the financing will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders.  The Debtors critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

47.     The Debtors presently lack sufficient liquidity not only to support their operations, including payroll obligations, but also to pursue a value-maximizing recapitalization and restructuring process.  The DIP Facility thus serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly land into chapter 11 and continue to operate in the ordinary course of business while facilitating a robust restructuring process.  The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate an orderly restructuring process.

48.     The Debtors have thus concluded that they require postpetition financing to meet their ongoing working capital and general business needs during these Chapter 11 Cases as well as the costs of bankruptcy administration.

## V.    EVIDENCE IN SUPPORT OF FIRST DAY MOTIONS

49.    The Debtors filed the First Day Motions contemporaneously with the filing of their chapter 11 petitions.  I am generally familiar with the information contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to undertake certain postpetition activities in connection with their restructuring efforts, (b) constitutes a critical element for the Debtors to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtors' estates and creditors' interests.  In my opinion, the granting of each First Day Motion constitutes a critical element in achieving a successful and smooth transition to chapter 11.

50.    The First Day Motions seek relief aimed at, among other things: (i) maintaining employee morale; (ii) preserving customer relationships; (iii) obtaining access to use of cash collateral and debtor-in-possession financing; (iv) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; and (v) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process.  Overall, this relief is intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  The Debtors have filed or will be filing the following First Day Motions substantially contemporaneously herewith:

- **Joint Administration Motion.**  Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a), Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 Directing Joint Administration of the Debtors' Related Chapter 11 Cases.

- **DIP Motion.**  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (II) Granting Senior Secured Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.

- **Cash Management Motion.**  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Existing Cash

Management System, Bank Accounts, and Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Ordinary Course Intercompany Transactions, (II) Granting Administrative Expense Status to Ordinary Course Postpetition Intercompany Claims and (III) Granting Related Relief.

- **Employee Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, and (III) Postpetition Employee Obligations in the Ordinary Course, and (B) Authorizing Banks to Honor Related Transfers.

- **Critical Vendor Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors; (B) Lienholders, and (C) Foreign Vendors, (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief.

- **Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment.

- **Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.

- **Insurance Motion.** Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Programs and (B) Pay Certain Obligations in Respect Thereof and (II) Authorizing the Debtors' Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.

- **NOL/Trading Restrictions Motion.** Debtors' Motion Pursuant to 11 U.S.C. 362 & 105(a) for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures and Approving Restrictions on Certain Transfers in the Debtors' Estates.

- **PII Motion.** Debtors' Motion for an Order Authorizing the Debtors to Redact Individual Stakeholders' Personally Identifiable Information.

- **Claims Agent Application.** Debtors' Application Pursuant to 28 U.S.C. §156(c), 11 U.S.C. §§ 503 and 1107, and Fed. R. Bankr. P. 2002(f) for Entry of an Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent and (III) Granting Related Relief.

51. The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the

Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

This Declaration illustrates the factors that warrant the relief requested in the First Day Motions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2024.

*/s/ Robert Powell*
Robert Powell
Chief Executive Officer