**<u>EXHIBIT A</u>**

**Revised Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **NUVO GROUP USA, INC.,** *et al.*,[1] | Case No. 24-11880 (MFW) |
| **Debtors.** | (Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO**
**SECTIONS 105, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND**
**RULES 2002, 4001, 6004 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE (A) AUTHORIZING THE DEBTORS TO OBTAIN SECURED**
**SUPERPRIORITY POSTPETITION FINANCING AND GRANTING LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE CLAIMS, (B) SCHEDULING A FINAL**
**HEARING, AND (C) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") for entry of an order (this "**Interim Order**") pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**") and Rules 2002-1, 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (as amended, the "**Local Rules**") (A) authorizing the Debtors to obtain secured superpriority postpetition financing and granting liens and superpriority administrative claims, and (B) scheduling a final hearing, the Debtors sought, among other things, the following relief:

---

[1]. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are:  Holdco Nuvo Group D.G Ltd. (5756); Nuvo Group Ltd. (3811); and Nuvo Group USA, Inc. (2727).  The Debtors' mailing address for purposes of these Chapter 11 Cases is 300 Witherspoon Street, Suite 201, Princeton, New Jersey 08542.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Term Sheet (as defined below), as applicable.

(i)      the Court's authorization, pursuant to sections 363 and 364(c)(1), (2), and (3) of the Bankruptcy Code, for the Debtors, on a joint and several basis, to obtain a senior secured superpriority debtor-in-possession financing facility (the "**DIP Facility**") consisting of a multiple draw term loan credit facility pursuant to that certain *Debtor-In-Possession Financing Term Sheet* attached hereto as <u>Exhibit 1</u> (the "**DIP Term Sheet**"), this Interim Order and the Final Order (as defined below), as applicable, the DIP Budget (as defined below), and all other agreements, documents and instruments delivered or executed in connection therewith, in each case as amended, restated, supplemented or otherwise modified from time to time, (collectively, the "**DIP Loan Documents**") provided by Nuvo Investors DiP LLC, as the lender (including any successors and assigns and any agent appointed under the DIP Loan Documents, the "**DIP Lender**"), which shall be available, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents, including the DIP Term Sheet, amount of up to $10,000,000, consisting of: (1) in an aggregate principal amount not to exceed  $2,850,000 (the "**Initial DIP Term Loan**") during the period (the "**Interim Period**") from the date hereof through and including the date of the entry of a final order approving the DIP Facility on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Order**", as applicable) and (2) upon entry of the Final Order, in an additional aggregate principal amount not to exceed $7,150,000 (clauses (1) and (2) together, the "**DIP Loans**");

(ii)      the Court's authorization for the Debtors to execute the DIP Term Sheet and the other DIP Loan Documents to which it is party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(iii)    the Court's authorization for the Debtors to incur the DIP Loans and to use the DIP Loans in accordance with the DIP Budget (as defined below) prepared by the Debtors and attached hereto as <u>Exhibit 2</u>, subject to Permitted Variances (as defined below).

(iv)    the grant to the DIP Lender in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and valid, binding, enforceable, non-avoidable and fully-perfected senior liens on the DIP Collateral (as defined below), subject only to Permitted Prior Liens and the Carve-Out (each as defined below), pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code, on the terms, conditions and priorities set forth herein and in the DIP Loan Documents, including the DIP Term Sheet;

(v)    the modification or waiver by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim Order and the DIP Loan Documents, including the DIP Term Sheet, and to provide for the immediate effectiveness of this Interim Order; and

(vi)    the scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of a Final Order granting the relief requested in the Motion on a final basis and the transactions contemplated by the Motion.

The Court having considered the Motion, the terms of the DIP Facility and the DIP Loan Documents, including the DIP Term Sheet, the First Day Declaration, the DIP Declaration, and the evidence submitted at the hearing held before this Court on [●], 2024 (the "**Interim Hearing**") to consider entry of this Interim Order; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Rules, due and proper notice of the

Motion and the Interim Hearing having been given; and it appearing that approval of the interim

relief requested in the Motion is necessary to avoid immediate and irreparable harm to the

Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests

of the Debtors, their creditors and their estates, and essential for the continued operation of the

Debtors' business; and all objections, if any, to the entry of this Interim Order having been

withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and

for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.  **Petition Date**.  On August 22, 2024 (the "**Petition Date**"), the Debtors filed

voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware (the "**Court**").  The Debtors have continued in the

management and operation of their business and properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed

in these Chapter 11 Cases.

B.  **Jurisdiction and Venue**.  The Court has jurisdiction over these proceedings,

pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding under

28 U.S.C. § 157(b)(2).  Venue for these Chapter 11 Cases and the proceedings on the Motion is

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  **Committee Formation**.  As of the date hereof, no official committee of

unsecured creditors  (the "**Committee**") has been appointed in these Chapter 11 Cases.

D.  **Notice**.  The Debtors have represented that notice of the Interim Hearing and the

relief requested in the Motion has been provided by the Debtors, by telecopy, email, overnight

courier and/or hand delivery, to (a) the Office of the United States Trustee for the District of

Delaware, (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Lender; (d) Gaingels 10x Capital Diversity Fund I, LP, the Collateral Agent for the prepetition secured lenders; (e) the Office of the United States Attorney for the District of Delaware; (f) the Internal Revenue Service; (g) all parties that, to the best of the Debtor's knowledge, information, and belief, have asserted a lien in the Debtor's assets; (h) the Securities and Exchange Commission; (i) the Banks; (j) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (k) any such other party entitled to notice pursuant to Local Rule 9013-1(m).  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and the Local Rules.

E.    **Immediate Need for Postpetition Financing.**    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Interim Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations, to satisfy in full the costs and expenses of administering the Chapter 11 Cases and to preserve and maximize the value of thier estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the availability of the DIP Facility.  In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility.

F.  **No Credit Available on More Favorable Terms.**  The Debtors have been unable to obtain on more favorable terms and conditions than those provided in this Interim Order (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.  The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (as defined below) to the DIP Lender.

G.  **Use of Proceeds of the DIP Facility and DIP Collateral.**  All proceeds of the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under this Interim Order or the Final Order) shall be used and/or applied in accordance with the terms and conditions of this Interim Order, the DIP Budget (subject to the Permitted Variances (as defined below)) and the DIP Loan Documents, including the DIP Term Sheet, for the types of expenditures in the DIP Budget and for no other purpose.

H.  **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)  The extensions of credit under the DIP Facility, and the fees paid and to be paid thereunder before entry of the Final Order, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and consideration;

(ii)  the DIP Facility was negotiated in good faith and at arm's length among the Debtors and the DIP Lender; and

(iii)  the loans and credit to be extended under the DIP Facility will be so extended in good faith as that term is used in section 364(e) of the Bankruptcy Code, in express

reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

       I.      **Relief Essential; Best Interest.**  The relief requested in the Motion (and provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and property.  It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and incur the DIP Obligations as contemplated herein.

      **NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the declarations filed in support of the Motion and the record made during the Interim Hearing, and with the consent of the Debtors and the DIP Lender, and good and sufficient cause appearing therefor,

      **IT IS ORDERED** that:

      1.      **Motion Granted**.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order.  Any objections to the Motion with respect to entry of this Interim Order, to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled.

      2.      **DIP Facility**.

      (a)      **DIP Obligations, etc**.  The Debtors are expressly and immediately authorized and empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to this Interim Order (and, upon its entry, a Final Order) and the DIP Loan Documents, including the DIP Term Sheet, to execute and/or deliver all DIP Loan Documents, including the DIP Term Sheet, and all other related instruments,

certificates, agreements and documents, and to take all actions which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein. The Debtors are hereby authorized and directed to pay all principal, interest, fees (including, without limitation, the DIP Origination Fee and the Prepayment Fee) and expenses, guarantees, indemnities and other amounts described herein and in the DIP Loan Documents, including the DIP Term Sheet, as such shall accrue and become due hereunder or thereunder, including, without limitation, the reasonable and documented fees and expenses of the attorneys and other advisors of the DIP Lender as, and to the extent, provided for herein and in the other DIP Loan Documents, including the DIP Term Sheet (collectively, all loans, advances, extensions of credit, financial accommodations, plus the applicable rate of interest, fees (including, without limitation, the DIP Origination Fee and the Prepayment Fee), expenses and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Loans, the DIP Facility and the DIP Loan Documents, including the DIP Term Sheet, the "**DIP Obligations**"); *provided* that approval of the Prepayment Fee shall be subject to the entry of a final order; *provided further,* that payment of any invoices of the DIP Lender's professionals for fees and expenses incurred prepetition but not already paid and after entry of this Interim Order shall be subject to the notice and objection provisions of paragraph 17(b) of this Interim Order; *provided*, *further*, that payment of any invoices of the DIP Lender's professionals for fees and expenses incurred prior to entry of this Interim Order shall not be subject to the notice and objection provisions of paragraph 17(b) of this Interim Order. The DIP Loan Documents, including the DIP Term Sheet, and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates, and any

successor thereto in accordance with their terms.  No obligation, payment, transfer or grant of security under the DIP Loan Documents, including the DIP Term Sheet, as approved under this Interim Order shall be voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

(b)     **Authorization to Borrow, etc**.  In order to continue to operate their business, subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the DIP Term Sheet and the DIP Budget, the Debtors are hereby authorized to borrow under the Initial DIP Term Loan during the Interim Period.

(c)     **Conditions Precedent**.  The DIP Lender shall have no obligation to make any DIP Loan or any other financial accommodation hereunder or under the DIP Loan Documents, including the DIP Term Sheet (and the Debtors shall not make any request therefor), unless all conditions precedent to making DIP Loans under the DIP Loan Documents, including the DIP Term Sheet, have been satisfied or waived in accordance therewith.

(d)     **DIP Liens**.  As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors, the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by any DIP Secured Party, including the DIP Lender, of, or over, any DIP Collateral, the following security interests and liens are hereby granted by the Debtors to the DIP Lender (all property identified in (i) and (ii) below being collectively referred to as the "**DIP Collateral**," and all such liens and security interests granted to the DIP Lender

pursuant to this Interim Order and the DIP Loan Documents, including the DIP Term Sheet,

the "**DIP Liens**"), in each case subject and subordinate to the Carve-Out:

      (i)    First Lien on Previously Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, nonavoidable, fully perfected first priority senior security interest in and lien on all of the Debtors' rights, title and interests in all of their property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, insurance policies, supporting obligations and proceeds of all of the foregoing and, subject to entry of the Final DIP Order, the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law ("**Avoidance Actions**") but not such Avoidance Actions themselves, in each case to the extent such property is not otherwise subject to Permitted Prior Liens (as defined below).

      (ii)    Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3), valid, binding, enforceable, nonavoidable and fully-perfected security interests in and continuing liens on all of the Debtors' rights, title and interests in all of their property, whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable Permitted Prior Liens.

      (iii)    Cash Collateral. All of the Debtors' cash, including any cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other DIP Collateral, constitutes or will constitute "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

      (e)    **Other Provisions Relating to the DIP Liens**. The DIP Liens shall secure

all of the DIP Obligations. It shall be an Event of Default (as defined in the DIP Term Sheet) if

the DIP Liens are, without the consent of the DIP Lender, made subject to, or *pari passu* with,

any other lien or security interest, other than to the extent expressly provided herein, by any

Court order heretofore or hereafter entered in these Chapter 11 Cases. The DIP Liens shall be

valid and enforceable against any trustee appointed in these Chapter 11 Cases, upon the conversion of any of these Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of any of these Chapter 11 Cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, upon entry of the Final Order, section 506(c) of the Bankruptcy Code. If the granting of the DIP Liens against any of the DIP Collateral is in any way prohibited or restricted under any of the Debtors' organizational documents, the Debtors are authorized to make modifications to the organization documents to permit the granting of the DIP Liens.

(f)     **Superpriority Administrative Claim Status**. The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "**DIP Superpriority Claim**") of the DIP Lender and be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof; *provided, however,* that the DIP Superpriority Claim shall not have recourse to Avoidance Actions but, subject to entry of a Final Order providing for such relief, shall be payable from the proceeds of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate only to the Carve-Out. Other than with respect to the Carve-Out, the DIP Superpriority Claim shall have priority over any and all administrative expenses, adequate protection claims (if any), diminution claims (if any), and all other claims against the Debtors, now existing or hereinafter arising, including, without limitation, all administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code and professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no claims are, or will be, senior to, prior to or

*pari passu* with the DIP Superpriority Claim or any of the DIP Obligations, or with any other claims of the DIP Lender arising hereunder or under the DIP Loan Documents, including the DIP Term Sheet, or otherwise in connection with the DIP Facility.  The DIP Superpriority Claim shall be entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

3.     **Authorization and Approval to Use Proceeds of DIP Facility**.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including the DIP Term Sheet, (i) the Debtors are authorized during the Interim Period (and not beyond) to request and borrow DIP Loans and (ii) the Debtors are authorized to use proceeds of the DIP Loans, in the amounts and for the line item expenditures set forth in the DIP Budget (subject to Permitted Variances).  The DIP Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Loan Documents, including the DIP Term Sheet, and the prior written consent of the DIP Lender without further order of the Court.  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under paragraph 15(b) hereof and the Carve-Out, the Debtors' right to request or use proceeds of DIP Loans shall terminate on the Termination Date (as defined below).  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates or proceeds resulting therefrom outside the ordinary course of business.

4.     **DIP Budget**.  Attached hereto as <u>Exhibit 2</u> is the DIP Budget with expense and cash flow projections for the Debtors for the 13-week period beginning on the Petition Date, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Debtors of any material variances, to be certified by a responsible officer of the Debtors and approved in form and substance by the DIP Lender (once so approved, and subject to any update as may be

approved by the DIP Lender, the "**DIP Budget**").  With respect to the DIP Budget, the Debtors'

actual cash disbursements from operations shall each be adhered to, on a line item basis, on a

weekly basis and a cumulative basis for the DIP Budget period then ending; *provided*, *however*,

that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks until

the aggregate amount of such line item is exhausted and each line item shall be subject to the

greater of (i) 10% variance measured on a two (2) week cumulative basis, or (ii) $10,000.

5.     **DIP Lien Perfection**.  This Interim Order shall be sufficient and conclusive

evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing

or recording any financing statement, deed of trust, mortgage, or other instrument or document

which may otherwise be required under the law of any jurisdiction, or the possession or control

by the DIP Lender of, or over, any assets, or the taking of any other action to validate or perfect

the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the

foregoing, the DIP Lender may, in its sole discretion, file such financing statements, deeds of

trust, mortgages, security agreements, notices of liens and other similar documents, and is hereby

granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so,

and all such financing statements, deeds of trust, mortgages, security agreements, notices and

other agreements or documents shall be deemed to have been filed or recorded at the time and on

the date of the commencement of these Chapter 11 Cases.  The Debtors shall execute and deliver

to the DIP Lender all such financing statements, mortgages, security agreements, notices and

other documents as the DIP Lender may reasonably request to evidence, confirm, validate or

perfect, or to insure the contemplated priority of the DIP Liens.  The DIP Lender, in each case in

its sole discretion, may file a photocopy of this Interim Order as a financing statement with any

recording officer designated to file financing statements or with any registry of deeds or similar

office in any jurisdiction in which the Debtors have real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

6.      **<u>Restriction on Use of Proceeds</u>**.  No portion of the Carve-Out, the Professional Fees Escrow Account, and no proceeds of the DIP Facility, the DIP Collateral or DIP Loans, may be used for the payment of the fees and expenses of any person incurred (i) for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or (ii) to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Lender, including to commence or prosecute or join in any action against the DIP Lender with respect to or related to: (A) the claims, liens or security interest of the DIP Lender, or its rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Lender seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Lender or (z) to prevent or restrict the exercise by the DIP Lender of any of its rights or remedies under the Interim Order or the Final Order, (B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order, (C) the stipulations, if any, made by the Debtors and approved by the Interim Order and Final Order; or (D) any other action which with the giving of notice or passing of time would result in an Event of Default.

7.     **Carve-Out**.

(a)     As used in this Interim Order, the "**Carve-Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and all statutory fees payable to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with the statutory rate of interest (without regard to the notice set forth in (ii) below); (ii) to the extent allowed by the Court at any time, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals, whether by interim order, final order, procedural order or otherwise, all reasonable and documented unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by estate professionals retained by the Debtors pursuant to section 327 or 328 of the Bankruptcy Code (collectively, the "**Debtors Professionals**") and the Committee, if any (together with the Debtors Professionals, the "**Professionals**") through the date of delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iii) the Allowed Professional Fees of the Professionals incurred after the date of delivery by the DIP Lender of a Carve-Out Trigger Notice in an aggregate amount not to exceed $100,000 (the amount set forth in this clause (iii) being the "**Post Carve-Out Trigger Notice Cap**"); *provided*, *however*, that the Post Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by the Debtors and paid to the applicable Professionals after delivery of a Carve-Out Trigger Notice.  Notwithstanding anything to the contrary contained in this Interim Order, the Carve-Out shall be senior to the DIP Liens and the DIP Superpriority Claim.

(b)     For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by electronic mail (or other electronic means) by the DIP Lender to

counsel to the Debtors, the U.S. Trustee, and counsel to the Committee, if any, of the occurrence and continuation of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

8. **Professional Fees Escrow Account.** The Debtors are authorized to open a new bank account or designate an existing bank account that shall function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professionals pursuant to this Interim Order (the "**Professional Fees Escrow Account**") in the amount equal to, but not to exceed, the Allowed Professional Fees budgeted for professionals retained by the Debtor and a Committee, if any (the "**Budgeted Professional Expenses**").  Except for funding the Carve-Out from the DIP Collateral, the DIP Lender shall have no responsibility, liability, or obligation whatsoever to fund, direct payment or reimbursement of any fees or disbursements, or otherwise ensure that the Debtors fund the Professional Fees Escrow Account or that the Professional Fees Escrow Account has funds equal to the aggregate amount of the Budgeted Professional Expenses for any applicable period.  The Debtors are authorized and directed to fund the Professional Fees Escrow Account on a weekly basis in an amount up to, but not to exceed, the Budgeted Professional Expenses for that week.  Such funds shall be held in an identifiable segregated account for the benefit of the Professionals to be applied to the Allowed Professional Fees of the Professionals that are approved for payment pursuant to one or more orders of this Court.  Any Allowed Professional Fees payable to the Professionals shall be paid first out of the Professional Fees Escrow Account.  Any excess amounts in the Professional Fees Escrow Account after payment of the Professional Fees shall be subject in all respects to the DIP Liens.  The funds in the Professional Fees Escrow Account shall remain DIP Collateral (subject to the Carve-Out) unless and until such funds are paid to the Professionals.

9.      **Payment of Compensation**.  Nothing herein shall: (a) be construed as a consent to the allowance of any professional fees or expenses of any of the Debtors or the Committee (if any) or shall limit or otherwise affect the right of the DIP Lender or any other party in interest to object to the allowance and payment of any such fees and expenses; or (b) make the DIP Lender responsible for the payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with these Chapter 11 Cases or any Successor Cases.  No professional fees shall be paid absent a Court order allowing such payment, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals.  As long as a Carve-Out Trigger Notice has not been delivered, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code or compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Lender, as the same may be due and payable, and the same shall not reduce the Post-Carve-Out Trigger Notice Cap.

10.      **Section 506(c) Claims**.  Subject to the entry of the Final Order (but retroactive to the Petition Date), as a further condition of the DIP Facility and any obligation of the DIP Lender to make the DIP Loans, the Debtors (and any successor thereto or any representatives thereof, including any trustees appointed in these Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, or the DIP Collateral.

11.      **Collateral Rights; Limitations in Respect of Subsequent Court Orders**. Without limiting any other provisions of this Interim Order, until such time as all DIP

17

Obligations are indefeasibly paid in full in cash, it shall be an Event of Default under the DIP Facility for there to be entered in these Chapter 11 Cases, or in any Successor Case, any order which authorizes the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Interim Order to the DIP Lender.

12.    **Cash Management**.  The Debtors' cash management system shall at all times be maintained (i) in accordance with the terms of the DIP Loan Documents, including the DIP Term Sheet, and any order of this Court approving the maintenance of the Debtors' cash management system, and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Lender.  The DIP Lender shall be deemed to have "control" over all cash management accounts for all purposes of perfection under the Uniform Commercial Code.  All amounts collected in the cash collection accounts may be used in accordance with this Interim Order, the DIP Budget and the DIP Loan Documents, including the DIP Term Sheet.

13.    **Disposition of DIP Collateral**.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents, including the DIP Term Sheet, or as approved by the Court.

14.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Chapter 11 Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claim, and the Carve-Out shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, and Carve-Out shall maintain their respective priorities as provided by this Interim Order.

15.    **Events of Default; Rights and Remedies Upon Event of Default**.

18

(a)     Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that, upon and after the occurrence of a Termination Date, the DIP Lender shall, subject to subparagraph (b) of this paragraph, be immediately entitled to exercise all of its rights and remedies in respect of the DIP Collateral, in accordance with this Interim Order and the DIP Loan Documents, including the DIP Term Sheet, as applicable, without further notice or action by the Court.   The term "**Termination Date**" shall mean the earliest to occur of any of the following: (i) the occurrence of an Event of Default; (ii) the Debtors' failure to (a) comply with any provision of this Interim Order, (b) comply with any other covenant or agreement specified in this Interim Order or the DIP Term Sheet, or (c) comply with any of the Bankruptcy Milestones (as defined in the DIP Term Sheet); provided that any Milestone that requires the Court's action shall be subject to the Court's availability, or (iii) the occurrence of the Maturity Date (as defined in the DIP Term Sheet).

(b)     Notwithstanding the foregoing subparagraph (a) of this paragraph, immediately following the giving of notice by the DIP Lender to the Debtors, counsel to the Debtors, counsel for the Committee (if any), and the U.S. Trustee of the occurrence of an Event of Default: (i) all commitments of the DIP Lender to provide any DIP Loans shall immediately be terminated, (ii) the DIP Obligations shall become due and payable, and (iii) the Debtors shall have no right to request or use any Cash Collateral (including proceeds of any DIP Collateral) other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents, including the DIP Term Sheet, and this Interim Order; *provided* that during the Default Notice Period (defined below), the Debtors shall be permitted to continue to use Cash Collateral (including proceeds of DIP Loans): solely (x) to pay critical expenses, including payroll, in all cases in accordance with the DIP Budget and the other DIP

Loan Documents, including the DIP Term Sheet, and (y) to satisfy the Carve-Out.  The Debtors and any Committee shall be entitled to an emergency hearing before this Court within five (5) days after the giving of written notice by the DIP Lender of the occurrence of an Event of Default (such five (5) day period, the "**Default Notice Period**").   If the Debtors or the Committee (if any) or any other party in interest, does not contest the occurrence of the Event of Default within the Default Notice Period, or if there is a timely contest of the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Lender, shall automatically terminate in all respects and the DIP Lender shall be authorized to exercise all remedies available to it under the DIP Loan Documents, including the DIP Term Sheet, and at law or equity.

(c)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents, including the DIP Term Sheet, as necessary to (i) the DIP Lender to take any action necessary or appropriate to perfect the liens of the DIP Lender on the DIP Collateral and the Collateral, and (ii) permit the DIP Lender to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order.

16.     **Proofs of Claim, etc**.  The DIP Lender shall not be required to file proofs of claim in these Chapter 11 Cases or any Successor Case for any claim described herein.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in these Chapter 11 Cases or any Successor Case shall not apply to the DIP Lender.

17.     **Other Rights and Obligations**.

(a)     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  Based on the findings set forth in this Interim Order and upon the record made at the Interim Hearing, the DIP Lender has acted in good faith in connection with the DIP Facility and its reliance on this Interim DIP Order is in good faith and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Interim Order, the reversal or modification on appeal of the authorization hereunder for the Debtors to obtain the DIP Facility, or the grant hereunder of the DIP Liens, shall not affect the validity of such debt or the priority of such liens.

(b)     **Expenses**.  The Debtors will pay all expenses incurred by the DIP Lender (including, without limitation, the reasonable and documented fees and disbursements of its counsel, and any other advisors) in accordance with the DIP Loan Documents, including the DIP Term Sheet, without the necessity of filing fee applications.  The DIP Lender and its advisors and professionals shall provide reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information, as to those statements provided to any party other than the U.S. Trustee) for fees and expenses incurred after entry of this Interim Order to the Office of the U.S. Trustee, counsel for the Committee (if any), and the Debtors; *provided* that only the Debtors, the U.S. Trustee or the Committee (if any) shall be entitled to object to such fees and expenses.  Thereafter, within fourteen (14) calendar days of presentment of such statements, if no written objection to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made by the U.S. Trustee, the Committee (if any), or the Debtors, the Debtors shall pay in cash all such fees and expenses of the DIP Lender, and its advisors and professionals.  Any such objection to the payment of such fees or expenses shall

specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent such an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the objecting party and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

(c) **Credit Bidding**. In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code, the DIP Lender shall have the right to credit bid the full amount of the DIP Obligations, in whole or in part, pursuant to section 363(k) of the Bankruptcy Code, in connection with any sale or disposition of assets in these Chapter 11 Cases, a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any Debtors under section 725 of the Bankruptcy Code.

(d) **Binding Effect**. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in these Chapter 11 Cases, in any Successor Case, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(e) **No Waiver**. The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Loan Documents, including the DIP Term Sheet, or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry

of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court (i) to request conversion these Chapter 11 Cases to a case under Chapter 7, dismissal of these Chapter 11 Cases, or the appointment of a trustee in these Chapter 11 Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) on behalf of the DIP Lender, subject to the terms and conditions of this Interim Order and the other DIP Loan Documents, including the DIP Term Sheet.

(f)    **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(g)    **No Marshaling**.  Subject to the entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(h)    **Amendment**.  The Debtors and the DIP Lender may implement non-material modifications of the DIP Term Sheet without the need for notice or further approval of the Court; *provided*, *however*, that copies of such amendments will be provided to the U.S. Trustee and the Committee (if any).  The Debtors and the DIP Lender may implement material modifications of the DIP Term Sheet on at least seven (7) calendar days prior notice to the Committee (if any) and the U.S. Trustee, and any proposed material modification that is objected to within such period shall only be implemented to the extent approved by the Court; *provided further*, *however*, that upon notice and opportunity for hearing, with the consent of the DIP

23

Lender, the Debtors may seek to increase the aggregate amount of the DIP Loans should the Debtors require additional funding during the pendency of these Chapter 11 Cases.

(i)    **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any chapter 11 plan in any of these Chapter 11 Cases, (ii) converting any of these Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of these Chapter 11 Cases, (iv) withdrawing of the reference of any of these Chapter 11 Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of these Chapter 11 Cases in this Court.  The terms and provisions of this Interim Order and the DIP Loan Documents, including the DIP Liens and DIP Superpriority Claim granted pursuant to this Interim Order and the DIP Loan Documents, including the DIP Term Sheet, shall continue in full force and effect to the fullest extent provided by section 364(e) of the Bankruptcy Code.

(j)    **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(k)    **No Waivers or Modification of Interim Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.  The Debtors may not seek to modify or to alter the lien priority of the DIP Liens set forth in this Interim Order.

(l)     **Waiver of any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

(m)     **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order or the DIP Term Sheet, the provisions of this Interim Order shall govern.

18.     **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for **[●], 2024 at [●]:[●] [a/p.m.] (prevailing Eastern Time)** at the United States Bankruptcy Court for the District of Delaware.  Any party in interest objecting to the entry of the proposed Final Order shall file a written objection with the Clerk of the Court no later than **[●], 2024 at 4:00 p.m. (prevailing Eastern Time)**, which objections shall be served so that the same are received on or before such date by the Debtors and the DIP Lender.

19.     **Retention of Jurisdiction**.  The Court shall retain jurisdiction to enforce this Interim Order according to its terms.

## **EXHIBIT 1**

DIP TERM SHEET

**HOLDCO NUVO GROUP D.G. LTD.**
**DEBTOR-IN-POSSESSION FINANCING TERM SHEET**

This DIP Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order (as defined below).

| | |
|---|---|
| Borrowers: | Holdco Nuvo Group D.G. Ltd., Nuvo Group USA, Inc., and Nuvo Group Ltd. as debtors in possession (the "Company" or the "Debtors") |
| Lender: | Nuvo Investors DiP LLC or its designee (the "DIP Lender") |
| Collateral Agent: | [TBD] (the "DIP Agent") |
| Chapter 11 Case: | The voluntary Chapter 11 bankruptcy proceedings (collectively, the "Chapter 11 Case") with Case No. 24-11880 (MFW) filed by the Debtors in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") on August 22, 2024 (the "Petition Date"). |
| DIP Facility: | The postpetition, debtor in possession financing facility is a superpriority senior/junior secured multi-draw term loan facility (the "DIP Facility") in an aggregate principal amount of up to [$10] million. |
| Availability: | $[●] million (the "Initial DIP Loan") upon the Bankruptcy Court's entry of an order approving the DIP Facility on an interim basis (the "Interim Order") in form and substance acceptable to the DIP Lender, but prior to the entry of a final order approving the DIP Facility on a final basis (the "Final Order" and, together with the Interim Order, the "DIP Order", as applicable). |
| | $[●] million (together, with the Initial DIP Loan, the "DIP Loans"), which is permitted to be borrowed on a date that is on or after the date that the Bankruptcy Court has entered the Final Order. |
| Interest Rate: | Non-default: 7.0% per annum, which shall accrue and be payable upon maturity of the DIP Loans |
| | Default: 2.0% per annum, which shall be payable in cash monthly in arrears |
| DIP Fees: | The Borrower agrees to pay the DIP Lender a non-refundable origination fee equal to 5.0% of the maximum principal amount of the DIP Facility (the "DIP Origination Fee"), which origination fee shall be fully earned and payable when monies are lent. |
| | If the Debtors enter into a debtor in possession financing arrangement in lieu of the DIP Facility or as a refinancing or replacement of, in whole or in part, the DIP Facility (an "Alternative DIP Facility") and a lender |

other than the DIP Lender provides such debtor in possession financing arrangement or other credit financing to the Debtors, or if any such Alternative DIP Facility is consummated, in whole or in part, with funds of the Debtors, in lieu of some or all of the DIP Facility, and the DIP Lender does not consent to such Alternative DIP Facility, then the Debtors agree to pay (or cause to be paid) to the DIP Lender a prepayment premium (the "Prepayment Fee") in an amount equal to 20.00% of the aggregate principal amount of the DIP Loans (whether or not such DIP Loans have been advanced), immediately upon consummation of the Alternative DIP Facility.

Attorneys' Fees
and Expenses:          Subject to and in accordance with the DIP Order, the Debtors shall pall all reasonable and documented fees and expenses of the attorneys and other advisors of the DIP Lender in respect of the DIP Facility.

DIP Loan Documents:    The loan documents to be executed in forms acceptable to the DIP Lender, consistent with this DIP Term Sheet and the DIP Order shall constitute the loan documents (the "DIP Loan Documents") memorializing the DIP Facility.

Credit Bid:            The DIP Lender shall have the right to credit bid up to the full amount of the DIP Obligations (as defined below).

Maturity Date:         "Maturity Date" for the DIP Financing will be the earliest to occur of: (i) one hundred and eighty (180) days after the Petition Date; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a chapter 11 plan of reorganization that has been confirmed by the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the closing of a sale or other disposition of substantially all of the assets of the Debtors; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case; (vi) the date of acceleration of the DIP Loans, including as a result of the occurrence and continuation of an Event of Default; and (vii) the date that is thirty (30) calendar days after the Petition Date if the Final Order shall not have been entered by the Bankruptcy Court by such date.

Upon maturity of the DIP Loans, the Debtors shall repay the DIP Lender the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans and all fees and expenses and other obligations payable under the DIP Facility (together, the "DIP Obligations").

| Events of Default: | The following events are collectively referred to as the "<u>Events of Default</u>": |
|---|---|

(i)  the Bankruptcy Court shall have entered an order or the Debtors shall have filed a motion or application seeking an order (without the prior written consent of the DIP Lender) or the Debtors fail to timely contest a motion or application filed by another party seeking an order, (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(A)(3) and (4) of the Bankruptcy Code, a trustee, or a responsible officer in the Chapter 11 Case, or (iii) dismissing the Chapter 11 Case;

(ii)  the failure of the Debtors to comply with any of the Bankruptcy Milestones, unless such Bankruptcy Milestone is extended or waived with the prior written consent of the DIP Lender or the Consenting Stakeholders, as the case may be;

(iii)  the Debtors grant any liens, security interests, or encumbrances other than those existing immediately prior to the date hereof or arising under the DIP Order;

(iv)  the Interim Order or the Final Order (once entered) ceases to be in full force and effect for any reason or an order shall be entered (or the Debtors seek an order) reversing, amending, supplementing, staying, vacating, or otherwise modifying the Interim Order or the Final Order without the prior written consent of the DIP Lender;

(v)  the Debtors file or supports any plan of liquidation or reorganization in the Chapter 11 Case that is not an Acceptable Plan (as defined below);

(vi)  failure of the Debtors to make any payment under the DIP Order to the DIP Lender as and when due; and/or

(vii)  the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Debtors: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Documents; (B) to grant any lien other than Permitted Prior Liens upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender; (D) to sell any of the Collateral except to the

extent expressly permitted by the terms of the Loan Documents or with the prior written approval of the DIP Lender; (E) to the extent that any action or actions may be adverse to the DIP Lender or its rights and remedies hereunder or its interest in the Collateral; or (F) that is otherwise not reasonably satisfactory to the DIP Lender;

Use of Proceeds:    The proceeds of the DIP Loans shall be applied strictly in accordance with the Approved Budget (subject to the Permitted Variance). No part of the proceeds of any DIP Loan, the Cash Collateral, or any other of the Collateral will be used:

(i)    for any purpose that is prohibited under the Bankruptcy Code or the Interim or the Final Order; or

(ii)    to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Lender, including to commence or prosecute or join in any action against the DIP Lender with respect to or related to: (A) the claims, liens or security interest of the DIP Lender, or its rights and remedies under the Interim Order or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Lender seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Lender or (z) to prevent or restrict the exercise by the DIP Lender of any of its rights or remedies under the Interim Order or the Final Order, (B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the releases set forth in the Interim Order and the Final Order, (C) the stipulations, if any, made by the Debtors and approved by the DIP Order; or (D) any other action which with the giving of notice or passing of time would result in an Event of Default as described below.

The DIP Loans shall be used to pay the DIP Origination Fee.

DIP Collateral:    As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Lenders, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP

11

Liens")) will be granted to the Lender (all property identified below being collectively referred to as the "DIP Collateral,"), subject to and junior in all respects to the Carve-Out:

*First Lien on Unencumbered Property*

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, nonavoidable, fully perfected first priority senior security interest in and continuing lien on all of the Debtors' rights, title and interests in all of its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, insurance policies, supporting obligations and proceeds of all of the foregoing and, subject to entry of the Final DIP Order, the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 550 and 553 or any other similar state or federal law ("Avoidance Actions") but not such Avoidance Actions themselves, in each case to the extent such property is not otherwise subject to Permitted Prior Liens (as defined below).

*Liens Junior to Certain Other Liens on Encumbered Property*

Pursuant to Bankruptcy Code section 364(c)(3), valid, binding, enforceable, nonavoidable and fully-perfected security interests in and continuing liens on all of the Debtors' rights, title and interests in all of its property, whether now existing or hereafter acquired, that is subject to valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by Section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"), which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable Permitted Prior Liens.

*Cash Collateral*

All of the Debtors' cash, including any cash in deposit accounts, wherever located, whether as original collateral or proceeds of other DIP Collateral, constitutes or will constitute "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

Carve-Out:                  The sum of: (i) statutory fees required to paid pursuant to 29 U.S.C. §1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Bankruptcy Court; (ii) the allowed accrued and unpaid reasonable fees and expenses of professionals employed by the Debtors and a Committee, if any, pursuant to Sections 327 and 330 of the Bankruptcy Code, not to exceed the total amounts set forth for such professionals, on an aggregate basis, in the Approved Budget (the "Carveout").  Notwithstanding anything to the contrary contained in the DIP Order or the DIP Loan Documents, the Carve-Out shall be senior to the DIP Liens and the DIP Superpriority Claims.

DIP
Superpriority Claims:       The DIP Facility and all other liabilities and obligations, including the DIP Obligations, of the Debtors under the DIP Order or the DIP Loan Documents shall be entitled to superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code.

Conditions
of Borrowing:               *Conditions to Initial DIP Loan*
                            The date on which the following conditions are satisfied, or waived in accordance with this DIP Term Sheet, and the Initial DIP Loan is funded is the "Closing Date".  The agreement of the DIP Lender to make the Initial DIP Loan on the Closing Date shall not become effective until the date on which each of the following conditions is satisfies, or otherwise waived in writing by the DIP Lender in its sole discretion:

                            (i)     The DIP Lender's receipt of the following:

                                    a.  executed counterparts of this DIP Term Sheet and any other DIP Loan Documents; and

                                    b.  executed counterparts of that certain Restructuring Term Sheet, between the Debtors, the DIP Lender, and the Consenting Stakeholders, attached hereto as Exhibit 1 (the "RSA Term Sheet");

                            (ii)    All fees, costs and expenses of the DIP Lender then earned, due, and payable under the DIP Loan Documents (including, without limitation, the fees, costs and expenses of counsel to the DIP Lender accrued as of the Closing Date in connection with the Chapter 11 Case and the negotiation, preparation, execution and delivery of the Loan Document) shall have been paid;

                            (iii)   The RSA Term Sheet shall remain in full force and effect, and there shall be no default thereunder;

13

(iv)     The Chapter 11 Case shall have been commenced in the Bankruptcy Court;

(v)      The DIP Lender shall have received the Approved Budget in form and substance satisfactory to the DIP Lender;

(vi)     The Interim Order, in form and substance satisfactory to the DIP Lender, (a) shall have been entered by the Bankruptcy Court and be in full force and effect and shall not have been appealed, vacated, reversed, modified, amended or stayed, and (b) shall grant for the benefit of the DIP Lender a perfected lien on the Collateral by the Interim Order on the terms and conditions and, with the requisite priority, set forth herein and in the other Loan Documents;

(vii)    Immediately prior to, and after giving effect to, the making of the Initial DIP Loans, no Event of Default shall have occurred and be continuing;

(viii)   The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; and

(ix)     The making of the DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized the Interim Order.

*Conditions to Borrowing of the Final Order DIP Loan*

The obligation of the DIP Lender to make the Final Order DIP Loan is subject to satisfaction, or waiver in writing by the DIP Lender in its sole discretion, of the following conditions:

(i)      All fees, costs and expenses of the DIP Lender then earned, due, and payable under the DIP Loan Documents (including, without limitation, the fees, costs and expenses of counsel to the DIP Lender in connection with the Chapter 11 Case and the negotiation, preparation, execution and delivery of the Loan Document) shall have been paid

(ii)     The RSA Term Sheet shall remain in full force and effect, and there shall be no default thereunder;

(iii)    The Final Order, in form and substance satisfactory to the DIP Lender, shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been appealed, vacated, reversed, modified, amended or stayed.  The Debtors

14

shall be in compliance in all material respects with the Interim Order and the Final Order, as the case may be;

(iv)    Immediately prior to, and after giving effect to, the making of the Final Order DIP Loans, no Event of Default shall have occurred and be continuing;

(v)    The making of the Final Order DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; and

(vi)    The making of the Final Order DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized by the Final Order.

DIP Milestones:    Each of the following shall constitute a milestone (each, a "DIP Milestone"), which may be extended and/or waived with the prior written consent (email shall suffice) of the DIP Lender:

(i)    Within one (1) calendar day following the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the Interim Order and Final Order;

(ii)    No later than five (5) calendar days after the Petition Date, the Court shall have entered the Interim Order in form and substance acceptable to the DIP Lender;

(iii)    No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order in form and substance acceptable to the DIP Lender;

Waiver/Modification
of Automatic Stay:    The Interim Order and the Final Order shall include a customary waiver/modification of the automatic stay to permit the DIP Lender to take all actions as are necessary or appropriate to implement the terms of the Interim Order and the Final Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Lender to take any action necessary or appropriate to perfect the liens of the DIP Lender on the DIP Collateral and the Collateral.

| Approved Budget and Reporting Compliance: | A budget with expense and cash flow projections for the Debtors for the 13-week period beginning on the Petition Date, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Debtors of any material variances, to be certified by an authorized person of the Debtors and approved in form and substance by the DIP Lender (once so approved, and subject to any update as may be approved by the DIP Lender, the "Approved Budget"). The Debtors shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility in accordance with the DIP Orders. |
| --- | --- |
| Section 506(c) Waiver: | Subject to the entry of the Final Order, as a further condition of the DIP Facility and any obligation of the DIP Lender to make DIP Loans, the Debtors (and any successors thereto or any representatives thereof) shall be deemed to have waived any rights, benefits or causes of action under 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, or the DIP Collateral. |
| Marshaling: | Subject to the entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. |

[Signature Pages to Follow]

**IN WITNESS WHEREOF**, the parties below have caused this Chapter 11 Term Sheet to be executed as of the date first above written and shall be bound by the terms of the RSA Term Sheet and/or the DIP Term Sheet as set forth below .

## **DEBTORS**

Holdco Nuvo Group D.G. Ltd., being bound to the entire Chapter 11 Term Sheet

By:  _Rice Powell_

Its:  CEO

Nuvo Group USA, Inc., being bound to the entire Chapter 11 Term Sheet

By:  _Rice Powell_

Its:  CEO

Nuvo Group Ltd., being bound to the entire Chapter 11 Term Sheet

By:  _Rice Powell_

Its:  CEO

**DIP LENDER**

Nuvo Investors DiP LLC, being bound to the entire Chapter 11 Term Sheet

By: _Lawrence C. Klein_____

Its:    <u>Managing Member</u>

## CONSENTING STAKEHOLDERS


[INSERT NAME OF PREPETITION LENDER], holder of $_____ of Prepetition Loan Claims being bound to solely to the RSA Term Sheet

By:    _____

Its:    _____

Nonbinding Treatment Election:

___    Electing Prepetition Holder (equitization of claim)

___    Replacement Note

**<u>EXHIBIT 2</u>**

DIP BUDGET

**Holdco Nuvo Group DG Ltd. et. al. (consolidated)**
*As of 8/27/2024*

Week # 0 is the Cash Flow Forecast – 8/23/2024. Weeks 1–13 are Post-Petition Forecast. The last two columns are the Interim 5 Weeks Total and Post-Petition 13 Weeks Total.

| $USD — Week Ending | 0 (8/23/24) | 1 (8/30/24) | 2 (9/6/24) | 3 (9/13/24) | 4 (9/20/24) | 5 (9/27/24) | 6 (10/4/24) | 7 (10/11/24) | 8 (10/18/24) | 9 (10/25/24) | 10 (11/1/24) | 11 (11/8/24) | 12 (11/15/24) | 13 (11/22/24) | Interim 5 Wks Total | Post-Petition 13 Wks Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 28,692 | 2,878,692 | 2,061,969 | 1,391,019 | 840,029 | 392,197 | 69,414 | 1,989,076 | 1,164,743 | 564,560 | 62,627 | 2,377,270 | 1,345,985 | 582,019 | - | 28,692 |
| **Operating Receipts** | | | | | | | | | | | | | | | | |
| Receipts | - | - | - | - | - | 300 | - | - | - | 300 | - | - | - | 300 | 300 | 900 |
| VAT Refund[1] | - | - | - | - | - | - | 100,000 | - | - | - | - | - | - | - | - | 100,000 |
| **Total Receipts** | - | - | - | - | - | 300 | 100,000 | - | - | 300 | - | - | - | 300 | 300 | 100,900 |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| *Payroll Disbursements[2]* | | | | | | | | | | | | | | | | |
| US Semi-Monthly Payroll | - | (62,583) | - | - | (62,583) | - | (62,583) | - | (62,583) | - | (78,417) | - | (78,417) | - | (125,167) | (407,167) |
| US Bi-Weekly Payroll | - | (2,535) | - | (2,535) | - | (2,535) | - | (2,535) | - | (2,535) | - | (2,535) | - | (2,535) | (7,605) | (17,745) |
| Israel Monthly Payroll + Contractor | - | - | (245,000) | - | - | - | (245,000) | - | - | - | (245,000) | - | - | - | (245,000) | (735,000) |
| Ukraine Contract Payroll | - | - | (80,000) | - | - | - | (80,000) | - | - | - | (80,000) | - | - | - | (80,000) | (240,000) |
| US - Benefits | - | (1,300) | - | - | (14,700) | - | (1,300) | - | (1,300) | (13,400) | (1,300) | - | (1,300) | (13,400) | (16,000) | (48,000) |
| Past Due Social Security | - | - | (6,700) | - | - | - | (6,700) | - | - | - | (6,700) | - | - | - | (6,700) | (20,100) |
| Israel Social Security | - | - | - | - | (50,000) | - | - | - | (50,000) | - | - | - | (50,000) | - | (50,000) | (150,000) |
| Israel Taxes | - | - | - | (107,000) | - | - | - | (107,000) | - | - | - | (107,000) | - | - | (107,000) | (321,000) |
| Israel Pension | - | - | - | (76,000) | - | - | - | (76,000) | - | - | - | (76,000) | - | - | (76,000) | (228,000) |
| **Total Payroll Related Disbursements** | - | (66,418) | (331,700) | (185,535) | (127,283) | (2,535) | (395,583) | (185,535) | (113,883) | (15,935) | (86,417) | (377,535) | (262,717) | (15,935) | (713,472) | (2,167,012) |
| *Other Operating Disbursements* | | | | | | | | | | | | | | | | |
| D&O Insurance | - | (76,000) | - | - | - | - | (76,000) | - | - | - | (76,000) | - | - | - | (76,000) | (228,000) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accounts Payable (Vendors)[5] | - | - | (75,000) | (75,000) | (32,500) | (32,500) | (150,000) | (150,000) | (150,000) | (150,000) | (120,000) | (120,000) | (120,000) | (120,000) | (215,000) | (1,295,000) |
| Other Operating Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Other Operating Disbursements** | - | (76,000) | (75,000) | (75,000) | (32,500) | (32,500) | (226,000) | (150,000) | (150,000) | (150,000) | (196,000) | (120,000) | (120,000) | (120,000) | (291,000) | (1,523,000) |
| **Total Operating Disbursements** | - | (142,418) | (406,700) | (260,535) | (159,783) | (35,035) | (621,583) | (335,535) | (263,883) | (165,935) | (282,417) | (497,535) | (382,717) | (135,935) | (1,004,472) | (3,690,012) |
| **First Day Relief Payments** | | | | | | | | | | | | | | | | |
| Critical Vendor Motion | - | - | - | (23,799) | (23,799) | (23,799) | (23,799) | (23,799) | (23,799) | (23,799) | (23,799) | - | - | - | (71,396) | (190,390) |
| Wages Motion[3] | - | (289,700) | - | - | - | - | - | - | - | - | - | - | - | - | (289,700) | (289,700) |
| Insurance Motion | - | (97,855) | - | - | - | - | (97,855) | - | - | - | (97,855) | - | - | - | (97,855) | (293,566) |
| Taxes Motion | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Motion | - | - | - | (2,405) | - | - | (32,100) | - | - | - | - | - | - | - | (2,405) | (34,505) |
| **Total First Day Relief Payments** | - | (387,555) | - | (26,204) | (23,799) | (23,799) | (153,754) | (23,799) | (23,799) | (23,799) | (121,654) | - | - | - | (461,357) | (808,161) |
| **Restructuring Fees[4]** | | | | | | | | | | | | | | | | |
| Debtor Advisors (Escrow) | - | (248,750) | (226,250) | (226,250) | (226,250) | (226,250) | (235,000) | (235,000) | (235,000) | (235,000) | (235,000) | (293,750) | (293,750) | (293,750) | (1,153,750) | (3,210,000) |
| Lender Advisors | - | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (40,000) | (40,000) | (40,000) | (40,000) | (40,000) | (50,000) | (50,000) | (50,000) | (190,000) | (540,000) |
| UCC Advisors (Escrow) | - | - | - | - | - | - | (37,500) | (37,500) | (37,500) | (37,500) | (37,500) | (37,500) | (37,500) | (37,500) | - | (300,000) |
| US Trustee Quarterly Fees | - | - | - | - | - | - | - | - | - | - | (18,786) | - | - | - | - | (18,786) |
| **Total Restructuring Fees** | - | (286,750) | (264,250) | (264,250) | (264,250) | (264,250) | (312,500) | (312,500) | (312,500) | (312,500) | (331,286) | (381,250) | (381,250) | (381,250) | (1,343,750) | (4,068,786) |
| **Debt Service Fees Paid in Cash** | | | | | | | | | | | | | | | | |
| DIP Origination Fee[6] | - | - | - | - | - | - | (142,500) | (152,500) | - | - | - | (152,500) | - | - | - | (447,500) |
| **Debt Service, Interest & Fees** | - | - | - | - | - | - | (142,500) | (152,500) | - | - | - | (152,500) | - | - | - | (447,500) |
| **Total Disbursements** | - | (816,724) | (670,950) | (550,989) | (447,832) | (323,084) | (1,230,337) | (824,334) | (600,182) | (502,234) | (735,356) | (1,031,285) | (763,967) | (517,185) | (2,809,579) | (9,014,459) |
| **Net Cash Flow (Before DIP)** | - | (816,724) | (670,950) | (550,989) | (447,832) | (322,784) | (1,130,337) | (824,334) | (600,182) | (501,934) | (735,356) | (1,031,285) | (763,967) | (516,885) | (2,809,279) | (8,913,559) |
| Beginning Cash Balance | 28,692 | 2,878,692 | 2,061,969 | 1,391,019 | 840,029 | 392,197 | 69,414 | 1,989,076 | 1,164,743 | 564,560 | 62,627 | 2,377,270 | 1,345,985 | 582,019 | 28,692 | 28,692 |
| Net Cash Flow Before DIP | - | (816,724) | (670,950) | (550,989) | (447,832) | (322,784) | (1,130,337) | (824,334) | (600,182) | (501,934) | (735,356) | (1,031,285) | (763,967) | (516,885) | (2,809,279) | (8,913,559) |
| Ending Cash Before DIP | 28,692 | 2,061,969 | 1,391,019 | 840,029 | 392,197 | 69,414 | (1,060,923) | 1,164,743 | 564,560 | 62,627 | (672,730) | 1,345,985 | 582,019 | 65,134 | (2,780,586) | (8,884,866) |
| Draw | 2,850,000 | - | - | - | - | - | 3,050,000 | - | - | - | 3,050,000 | - | - | - | 2,850,000 | 8,950,000 |
| **Ending Cash Balance (After DIP)** | 2,878,692 | 2,061,969 | 1,391,019 | 840,029 | 392,197 | 69,414 | 1,989,076 | 1,164,743 | 564,560 | 62,627 | 2,377,270 | 1,345,985 | 582,019 | 65,134 | 69,414 | 65,134 |

**Notes**

All values are converted to USD

1. VAT based on historical VAT return receipts received every 2 months. Most recent receipt was July 2024
2. The Company and Teneo continue to calculate the amount of payroll and related obligations Paid in Week 1 related to pre- and post petition amounts. No incremental cash based on allocation
3. Wages Motion contains funding for payment of past due Israel Social Security (50K), Pension Fund (76K), Payroll Tax (107K), employee expenses (5K), IC's (50K)
4. Professional fees after Week 5 are subject to change due to Debtors emergence as of this date
5. Normalized Vendor run rate of $600K/mo. spread evenly throughout weeks October and forward. Assumed stub period vendor payments for August accelerated for critical payments the first two weeks of Sept, with lower run rate the last two weeks of Sept.
6. Origination Fee is 5% of the amount of the DIP drawn. First fee paid WE 10/4