IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **NUVO GROUP USA, INC.,** *et al.*,[1] | Case No. 24-11880 (MFW) |
| **Debtors.** | (Jointly Administered) |

**DECLARATION OF LORIE BEERS IN SUPPORT OF DEBTORS' SUPPLEMENTAL MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULES 2002, 4001, 6004 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO OBTAIN SECURED SUPERPRIORITY POSTPETITION FINANCING AND GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, (B) SCHEDULING A FINAL HEARING; AND (C) GRANTING RELATED RELIEF**

I, Lorie Beers, pursuant to 28 U.S.C. § 1764, hereby declare and state:

1. I am a Managing Director and the Head of Special Situations at Intrepid Investment Bankers LLC ("Intrepid"), the investment bankers to the above-captioned debtors and debtors-in-possession (the "Debtors").

2. I submit this declaration ("Declaration") in support of the *Debtors' Supplemental Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (B) Scheduling a Final Hearing;*

---

[1]. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are: Holdco Nuvo Group D.G Ltd. (5756); Nuvo Group Ltd. (3811); and Nuvo Group USA, Inc. (2727). The Debtors' mailing address for purposes of these Chapter 11 Cases is 300 Witherspoon Street, Suite 201, Princeton, New Jersey 08542.

*and (C) Granting Related Relief* (the "Motion"), which seeks approval of a postpetition financing facility (the "DIP Facility") in an amount totaling up to $7.88 million, consisting of existing DIP loans totaling $2.85 million that have previously been approved by the Court on an interim basis, plus an additional two tranches of DIP loans totaling $2.83 million and up to $2.2 million.

3. I am authorized by the Debtors to submit this Declaration. All facts and opinions set forth in this Declaration are based upon: (a) my personal knowledge or opinion; (b) information learned from my review of relevant documents regarding this matter; (c) information supplied to me or verified by the Debtors or other members of my team at Intrepid, and/or (d) my experience and knowledge concerning a variety of financial transactions, including capital-raising activities, leveraged buyouts, mergers, acquisitions and dispositions. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.

**Professional Background and Qualifications**

4. Intrepid is a specialty investment bank that provides M&A advisory, capital markets advisory, and special situations advisory services to a range of institutions including major corporations, private equity sponsors, and entrepreneur and family-owned companies, through dedicated industry banking teams and product specialists. The firm's professionals have significant knowledge and expertise within relevant industries, having advised clients on a broad range of strategic transactions. I have over 35 years of professional experience that encompasses the full spectrum of financial restructuring. Prior to joining Intrepid, I was the founder and Group Head of Special Situations Investment Banking at Cowen. I have also held senior banker roles at StormHarbour Securities, Variant Capital Advisors, Seabury Group, KPMG Corporate Finance and Gordian Group. I began my career as a bankruptcy attorney and was a partner at Kasowitz, Benson, Torres & Friedman.

5. Intrepid has a dedicated capital advisory group, whose special situations professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Intrepid's professionals have served as investment bankers and/or financial advisors in numerous chapter 11 cases, including but not limited to: *In re Restoration Forest Products Group LLC*, No. 24-10120 (KBO) (Bankr. D. Del. Jan. 29, 2024) (advising debtors); *In re Water Gremlin Company, et. al.*, No. 23-11775 (LSS) (Bankr. D. Del. Nov. 28, 2023) (advising debtors); *In re Zymergen Inc.*, No. 23-11661 (KBO) (Bankr. D. Del. Oct. 3, 2023) (advising debtors); *In re Amyris Inc.*, No. 23-11131 (TMH) (Bankr. D. Del. Aug. 9, 2023) (advising debtors); In *re Tritek Int'l, Inc.*, No. 23-10520 (TMH) (Bankr. D. Del. June 8, 2023) (advising debtor); *In re Watsonville Hospital Corp.*, No. 21-51477 (Bankr. N.D. Cal. Jan. 10, 2022) (advising debtor); *In re Aluminum Shapes, LLC*, No. 21-16520 (JNP) (Bankr. D.N.J. Oct. 8, 2021) (advising debtor); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. Feb. 5, 2021) (advising Official Equity Committee); *In re Carla's Pasta, Inc.*, No. 21-20111 (Bankr. D. Conn. Mar. 22, 2021) (advising debtors); *In re Mishti Holdings, LLC*, No. 1911813 (CSS) (Bankr. D. Del. Dec. 16, 2019) (advising debtors); *In re Sienna Biopharmaceuticals, Inc.*, No. 19-12051 (MFW) (Bankr. D. Del. Oct. 15, 2019) (advising debtor).

6. On September 10, 2024, the Debtors filed an application to retain Intrepid as its investment banker (D.I. 55), which motion was approved by the Court on September 26, 2024 (D.I. 106). Since its engagement, Intrepid has, among other things, been extensively engaged in efforts to (i) market test the Original DIP Facility, (ii) solicit alternative DIP financing, and (iii) market the Debtors' assets for a value-maximizing sale or plan bid to facilitate a successful exit

from bankruptcy for the Debtors. I understand that the Debtors anticipate filing a motion to approve bidding procedures in connection with that process in short order but require additional financing to fund operations to fund their operations and the expenses of this Chapter 11 Cases to allow for that process to proceed.

**Terms of the Debtor-In-Possession Financing**

7. The Debtors' proposed DIP Facility is a superpriority, senior secured and priming facility provided by the DIP Lender that consists of an already funded portion of interim loans totaling $2.85 million, a new second tranche of funding totaling $2.83 million and a new third tranche of funding totaling up to $2.2 million, which shall be funded in accordance with the terms of the New DIP Term Sheet. The New DIP Term Sheet also contains certain customary terms, including financial and other covenants, events of defaults, and certain milestones that the Debtors must meet throughout these Chapter 11 Cases. These features and terms of the DIP Facility—including the claim priority, liens, certain fees, and other protections—were negotiated by the Debtors and the DIP Lender as a condition to providing the New DIP Facility and are the result of extensive good faith and arm's-length negotiations. These terms are integral components of the New DIP Facility, and were required by the New DIP Lender as consideration for the extension of postpetition financing.

8. I understand that it is imperative that the Debtors obtain continued postpetition financing to allow the Debtors to fund ongoing operations and the administrative costs of these Chapter 11 Cases in order to conduct a value maximizing sale or plan process. Based on my experience and evaluation of the terms of the proposed New DIP Facility, I believe that the New DIP Facility should be approved. The proposed New DIP Facility is fair, reasonable, in the best interest of the Debtors' estates, and should provide the Debtors with the financing required for these Chapter 11 Cases on the best terms available in the market.

**The New DIP Facility was Negotiated in Good Faith and At Arm's-Length**

9. I believe the New DIP Facility is the product of extensive, good faith, arm's-length negotiations between the Debtors and the DIP Lender, each of which was represented by experienced counsel and financial advisors.

10. Currently, the New DIP Facility is the only financing option available to the Debtors. Based on my understanding of the Debtors' liquidity needs and the current operations and capital structure, it is unlikely that competitive alternative sources of financing are available to the Debtors (whether unsecured or secured) on comparable or better terms than the DIP Facility.

11. *First*, the proposed rates and fees for the New DIP Facility is market for superpriority, senior secured financing in a bankruptcy case. *Second,* I understand that the Bridge Financing Holders have not consented to the priming of their alleged security interests by a third-party financier. In light of this, any third-party DIP financing on terms other than those set forth in the New DIP Facility would require engaging in a protracted and costly priming fight or valuation dispute with the Bridge Financing Holders. The expense and disruption associated with complex litigation would seriously jeopardize the Debtors' restructuring efforts, as already strained liquidity would be required to fund such a fight, and would have a disastrous effect on the Debtors' effort to garner consensus to swiftly drive these Chapter 11 Cases to a successful conclusion. Based on our DIP marketing efforts (as more fully described below), no parties have been willing to lend on an unsecured basis.

12. It is unlikely that any third-party lender would consider this type of financing, especially with the features noted above. Based on these facts and my experience in complex finance and restructuring transactions, I believe the DIP Lender (together with its participating

members) is the most likely, if not the only, party that would be willing to consummate such a transaction on these terms with the Debtors.

13. Nevertheless, to ensure that there was no other available financing on better terms under the circumstances, Intrepid reached out to twenty-four (24) other parties to assess their willingness to provide financing. None of these parties offered to provide financing to the Debtors on better terms than the DIP Lender.

## **Terms and Conditions of DIP Facility Are Appropriate and Reasonable**

14. I believe the size, terms, and pricing of the New DIP Facility are appropriate and reasonable given the Debtors' circumstances and the current market. In my opinion, the terms of the New DIP Facility, including pricing, interest rate, fees, and the liens and priorities provided for therein are fair and reasonable, particularly when considered in the broader context of the Debtors' current financial situation and the Debtors needs during these Chapter 11 Cases.

15. Based on the foregoing, it is my belief that the proposed New DIP Facility represents an appropriate and reasonable option available to address the Debtors' immediate liquidity needs, and the terms and conditions of the New DIP Facility are reasonable and appropriate under the circumstances.

16. Accordingly, I believe that the proposed New DIP Facility should be approved on the terms described in the Motion, New DIP Loan Documents and the Supplemental Interim Order, and entry into the New DIP Facility reflects a sound exercise of the Debtors' business judgment. I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 8, 2024

Respectfully submitted,

*/s/ Lorie Beers*
Lorie Beers
Head of Special Situations,
Intrepid Investment Bankers