## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **NUVO GROUP USA, INC., *et al.*,**[1] | Case No. 24-11880 (MFW) |
| **Debtors.** | (Jointly Administered) |

**DECLARATION OF JAMES S. FELTMAN IN SUPPORT OF DEBTORS'
SUPPLEMENTAL MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO SECTIONS 105, 362, 363 AND 364 OF THE BANKRUPTCY CODE
AND RULES 2002, 4001, 6004 AND 9014 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO OBTAIN
SECURED SUPERPRIORITY POSTPETITION FINANCING AND GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, (B) SCHEDULING A
FINAL HEARING; AND (C) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, James S. Feltman, hereby declare:

1.      I am the Chief Restructuring Officer ("CRO") of Nuvo Group USA, Inc. and its affiliates that are debtors and debtors-in-possession in these proceedings (collectively, the "Debtors" or the "Company"). I am a Senior Managing Director of Teneo Capital LLC ("Teneo"), based in New York, New York. In August 2024, the Debtors engaged Teneo to provide turnaround management services, and, on September 10, 2024, appointed me as CRO of the Debtors. I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.

2.      My experience in the restructuring industry spans over 30 years and encompasses a broad range of corporate recovery services, including engagements involving business workouts and turnarounds, operational restructuring, and fiduciary and related matters.

---

1. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are: Holdco Nuvo Group D.G Ltd. (5756); Nuvo Group Ltd. (3811); and Nuvo Group USA, Inc. (2727). The Debtors' mailing address for purposes of these Chapter 11 Cases is 300 Witherspoon Street, Suite 201, Princeton, New Jersey 08542.

Before joining Teneo in March 2023, I served as a Managing Director of Duff & Phelps LLC (now known as Kroll LLC). In addition to this service, I have over two decades of experience with Big 4 accounting firms and I was previously a partner at Arthur Andersen LLP and KPMG LLP. I am a fellow of the American College of Bankruptcy, a member of the American Institute of Certified Public Accountants and Florida Institute of Certified Public Accountants, and a Certified Public Accountant in the State of Florida. From 2002-2008, I was a member of the board of directors of the American Bankruptcy Institute.

3.     I submit this declaration ("Declaration") in support of the *Debtors' Supplemental Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (B) Scheduling a Final Hearing; and (C) Granting Related Relief* (the "Motion"),[2] which seeks approval of a postpetition financing facility (the "New DIP Facility") in an amount totaling up to $7.88 million, consisting of existing DIP loans totaling $2.85 million that have previously been approved by the Court on an interim basis, plus an additional two tranches of DIP loans totaling $2.83 million and up to $2.2 million. I have reviewed the Motion, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the Chapter 11 Cases.

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision at Teneo, my discussions with the Debtors' senior management team, or my opinion based upon experience, knowledge and information concerning

---

2.   Capitalized terms not defined herein shall have the meanings given to them in the Motion.

the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      Since being retained, Teneo professionals have worked with the Debtors' management, financial staff and other professionals in the Debtors' restructuring efforts; become acquainted with the Debtors' businesses, operations, properties and finances; analyzed the Debtors' liquidity and projected cash flows; advised the Debtors in their evaluations of financing alternatives; assisted the Debtors in connection with preparations for commencement of these cases; and assisted in the Debtors' efforts to procure debtor-in-possession financing.

### THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

6.      The Debtors have exhausted borrowings under the Original DIP Facility and require immediate availability of new credit to continue operations, as the original DIP budget contemplated a five-week interim financing period that has since elapsed.  The Debtors are thus in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, pay their employees and vendors, service their customers, administer their estates, and effectuate an orderly sale or plan process.

7.      Without prompt access to additional postpetition financing, the Debtors will be unable to: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded and that the marketing process for the Debtors' assets will be robust, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, and vendors; and (d) make any necessary payments to preserve the Debtors' workforce.

8.      The Debtors presently lack sufficient liquidity not only to support their operations, including payroll obligations, but also to pursue a value-maximizing recapitalization and restructuring process.  Immediate access to the New DIP Facility is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.  The New DIP Facility thus serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly continue to operate in the ordinary course of business while facilitating a robust restructuring process.  The continued and viable operation of the Debtors' business would not be possible absent access to the New DIP Facility.

9.      The Debtors have thus concluded that they require the additional postpetition financing contemplated by the New DIP Facility to meet their ongoing working capital needs during these Chapter 11 Cases. The New DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate an orderly restructuring process.

10.      In furtherance of their cash needs, the Debtors and Teneo prepared a go-forward DIP budget that I understand is attached to the Motion.  The Debtors believe that such DIP budget is an accurate reflection of their initial funding requirements and will allow them to meet their obligations in these Chapter 11 Cases during such time period.

## ALTERNATIVE SOURCES OF FINANCING
## ARE NOT AVAILABLE ON BETTER TERMS

### I.      The Marketing Process

11.      Given the extremely limited timing within which the Debtors had to commence these Chapter 11 Cases, the Debtors did not have the ability to seek financing from

anyone other than a lender who knew the business well enough to be willing to step up on such an expedited basis without the need to conduct substantial diligence and obtain credit approval. The DIP Lender, on the other hand, is intimately familiar with the Debtors' operations. Specifically, the DIP Lender is an entity that was funded by among others, the Company's founder, Laurence Klein, and other existing lenders/investors in the Company. As a result, the DIP Lender was willing and able to step up and provide the Debtors with a lifeline by agreeing to provide the Original DIP Facility on an extraordinarily fast timeline in order to address the Debtors' urgent liquidity needs and preserve value for the Debtors' stakeholders.

12.     While the Debtors did not have time to scour the market for alternative DIP financing prior to the Petition Date, they have now spent several weeks doing so. The Debtors efforts to solicit alternative postpetition financing are described further in the declaration submitted by Lorie Beers of Intrepid Investment Bankers LLC, the Debtors' investment banker, which I understand is being filed simultaneously with this declaration. In short, as a result of those efforts, I understand that certain of the Bridge Financing Holders, most of which are third party non-insiders, have agreed to provide additional postpetition financing to the Debtors through the existing DIP Lender entity.

## II.     The New DIP Facility Has Been Heavily Negotiated

13.     The Debtors and the DIP Lender engaged in arm's length negotiations regarding the terms offered by the DIP Lender. At the conclusion of this process, the Debtors determined that the DIP Lenders offered the most viable and beneficial DIP financing terms available and the parties were able to come to an agreement on the terms of the New DIP Facility. Management and the Debtors' legal and financial advisors were actively involved throughout the negotiations with the DIP Lender for debtor-in-possession financing, which were conducted at

arm's length and in good faith.  The terms of the New DIP Facility were negotiated over the course of several weeks since the Petition Date.

14.     The Debtors and their advisors worked to negotiate the most favorable terms of the New DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing.  Ultimately, the DIP Lender was unwilling to lend on terms other than those specifically set forth in the New DIP Loan Documents.  Based on these efforts, the Debtors believe that they have obtained financing on the best available terms under the circumstances.

### III.    <u>The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable</u>

15.     The New DIP Facility contemplates certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default.  These milestones were heavily negotiated and required by the DIP Lender as a condition to providing the New DIP Facility.  I believe the milestones are reasonable under the circumstances, including the Debtors' pressing liquidity and business needs, making it likely the Debtors cannot afford a longer bankruptcy process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 8, 2024

<u>/s/ James S. Feltman</u>
James S. Feltman
Chief Restructuring Officer