IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
:
In re:                                           :       Chapter 11
:
**NUVO GROUP USA, INC.**, *et al.*,[1]           :       Case No. 24-11880 (MFW)
:
:       (Jointly Administered)
**Debtors.**                                     :
:
----------------------------------------------------------x

## GAINGELS 10X CAPITAL DIVERSITY GP I, LLC'S
## OBJECTION TO DEBTORS' SALE MOTION

Gaingels 10X Capital Diversity GP I, LLC ("<u>Gaingels 10X</u>"), by and through its undersigned counsel, hereby submits this objection (this "<u>Objection</u>") to the Sale Motion.[2] In support of this Objection, Gaingels 10X respectfully states as follows:

### PRELIMINARY STATEMENT

1. Gaingels 10X does not object in principle to the Debtors selling substantially all of their assets to Nuvo Int'l Group Inc. (as assignee of Nuvo DiP Lender LLC) (the "<u>Purchaser</u>"), nor to the headline purchase price of the sale. However, Gaingels 10X does object that the bulk of the purchase price – $7,716,000 out of $10,216,000, or 75.5% – purports to be a credit bid for a sale

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are: Holdco Nuvo Group D.G Ltd. (5756); Nuvo Group Ltd. (3811); and Nuvo Group USA, Inc. (2727). The Debtors' mailing address for purposes of these Chapter 11 Cases is 300 Witherspoon Street, Suite 201, Princeton, New Jersey 08542.

[2] *Debtors' Motion for (I) An Order Approving Bidding Procedures for the Sale of Substantially All Assets of the Debtors; (B) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; (D) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; (E) Authorizing the Debtors to Designate a Stalking Horse Bidder and Seek Expedited Approval of Bid Protections, if any; and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III) Certain Related Relief* [D.I. 147] (the "<u>Sale Motion</u>"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

that, upon information and belief, seeks to be free and clear of liens, claims and encumbrances.[3] As set forth below, there is no basis for the Purchaser, as purported assignee of the DIP Lender, to purchase substantially all of the Debtors' assets, free and clear of prepetition liens, via a credit bid.

2. The Third Interim DIP Order[4] expressly provides that the liens granted to the DIP Lender are *junior* to preexisting liens. *See* Third Interim DIP Order ¶ 2(d)(ii) (granting the DIP Lender "security interests in and continuing liens on all of the Debtors' rights, title and interests in all of their property, whether now existing or hereafter acquired, *that is subject to valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date* or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), *which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable Permitted Prior Liens*.") (emphasis added).

3. Gaingels 10X, as one of the Bridge Financing Holders (as defined below), holds such a preexisting lien with respect to the Debtors' most valuable asset – its intellectual property. As described in further detail below, that lien has been acknowledged by the Debtors in both the Debtors' multiple filings with the Securities Exchange Commission ("SEC") and in the Debtors' post-petition filings.[5]

---

[3] As of the time of the filing of this objection, the Debtors have not filed a proposed sale order—in contravention of Local Rule 6004-1(b)(ii)—nor have the Debtors provided a draft to Gaingels 10X, despite its requests.

[4] *See Third Interim Order Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (B) Scheduling a Final Hearing, and (C) Granting Related Relief* [D.I. 225] (the "Third Interim DIP Order").

[5] *See Declaration of Robert Powell, Chief Executive Officer of the Debtors, in Support of First Day Relief* [D.I. 13] (the "First Day Declaration"), at ¶ 33 ("Each Bridge Financing Note is secured by intellectual property of the Company.")

4. Accordingly, by the Debtors' own admissions and the express terms of Third Interim DIP Order, the liens of the Bridge Financing Holders (the "Senior Liens"), including the lien of Gaingels 10X, are senior to the DIP lien.

5. Yet the Purchaser, as assignee of the DIP lien, is attempting to credit bid its junior lien to purchase substantially all of the Debtors' assets, including the collateral of the Bridge Financing Holders, and the sale order will presumably provide that the sale is free and clear of the Senior Liens. There is no basis, in the Bankruptcy Code or otherwise, to permit such a result.

6. Accordingly, the Court should only approve a sale if the structure is changed in one of two possible ways. First, the Court could order that the sale is *not* free and clear of the Senior Liens, and to the contrary, that the Senior Liens continue to attach to the intellectual property after the sale. Alternatively, the Court could require the Purchaser and/or the DIP lender to pay the aggregate Purchase Price ($10.216 million) to the Bridge Financing Holders in cash.[6] If the Purchaser is unwilling to close under one of these two structures, the Court should deny entry of the sale order.

## BACKGROUND

**A.    General Background**

7. On August 22, 2024 (the "Petition Date"), the above-captioned debtors-in-possession (the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

8. No trustee, examiner or creditors' committee has been appointed in these cases.

---

[6] While the existing terms of the sale includes the payment of $2.5 million of cash, the Debtors propose (as described below) that all of the cash be used to pay their investment banker and DIP lender fees, leaving none to pay Bridge Financing Holders.

B. **The Prepetition Secured Bridge Financing**

9. Prior to the Petition Date, in November 2023, the Debtors issued secured convertible bridge notes (the "Bridge Financing Notes") to various holders, including Gaingels 10X (the "Bridge Financing Holders"). According to the Debtors, they had issued approximately $12.5 million in principal amount of Bridge Financing Notes and, as of the Petition Date, the outstanding amount of all Bridge Financing Notes, including interest, totaled approximately $12.8 million.[7]

10. Gaingels 10X holds a Bridge Financing Note in the principal amount of $1,000,000, pursuant to that certain convertible note dated as of January 2, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Gaingels Secured Note"). As of the Petition Date, the outstanding amount of the Gaingels Secured Note, including interest, totals approximately $1,097,080.

11. Pursuant to the Gaingels Secured Note, Nuvo Group Ltd. granted to Gaingels 10X a security interest in and to all Intellectual Property (as such term is defined in the Gaingels Secured Note), including all of its copyrights, patents, trademarks and other similar property, including the proceeds thereof. A copy of the Gaingels Secured Note is attached hereto as **Exhibit A**.

C. **The Senior Liens Are Senior to the DIP Liens Under the Third Interim DIP Order**

12. The Debtors have repeatedly admitted that the Senior Liens are senior secured liens. Prior the Petition Date, the Debtors, in several of their SEC filings, publicly disclosed that the Bridge Financing Notes are secured by the Company's intellectual property.[8] In addition, the "first

---

[7] *See* First Day Declaration, at ¶ 34.

[8] *See* Proxy Statement of Holdco Nuvo Group D.G Ltd. filed March 1, 2024 ("[e]ach Bridge Financing Note is being secured by all of Nuvo's intellectual property…"); Form 20-F of Holdco Nuvo Group D.G Ltd. filed May 8, 2024 ("[e]ach Bridge Financing Note is being secured by all of Nuvo's intellectual property…"); Form F-1 of Holdco Nuvo Group D.G Ltd. filed June 28, 2024 ("[e]ach Bridge Financing Note is being secured by all of Nuvo's intellectual property…").

day" declaration of the Debtors' Chief Executive Officer, as well as the Debtors' DIP Motion,[9] each disclose that "Each Bridge Financing Note is secured by intellectual property of the Company."[10]

13. The Senior Liens remain senior to the liens held by the Debtors' DIP lender. Indeed, consistent with the Debtors' representations in the DIP Motion that "the DIP Facility will be secured by substantially all of the Debtors' assets *on a non-priming basis*,"[11] the Third Interim DIP Order provides that the DIP lender's liens will be *junior* to preexisting liens. Pursuant to that order, the DIP lender was granted:

> Liens Junior to Certain Other Liens. Pursuant to Bankruptcy Code section 364(c)(3), valid, binding, enforceable, nonavoidable and fully-perfected security interests in and continuing liens on all of the Debtors' rights, title and interests in all of their property, whether now existing or hereafter acquired, *that is subject to valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date* or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), *which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable Permitted Prior Liens*.[12]

14. Thus, pursuant to the express terms of the Third Interim DIP Order, the Senior Liens remain *senior* to the liens of the DIP lender.

---

[9] *See Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 363, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (B) Scheduling a Final Hearing, and (C) Granting Related Relief* [D.I. 12] (the "DIP Motion")

[10] *See* First Day Declaration, at ¶ 34; *see also* DIP Motion, at ¶ 9.

[11] *See* DIP Motion, at ¶ 32 (emphasis added); *see also id.* at pp. 10-11 (chart which quotes DIP Order).

[12] Third Interim DIP Order ¶ 2(d)(ii) (emphasis added); *See also* DIP Motion ¶ 23.

**D.     The Purchaser Seeks to Credit Bid the DIP Lender's Junior Lien**

15.     On October 11, 2024, the Debtors filed the Sale Motion, seeking to sell substantially all of the Debtors' assets. On October 21, 2024, the Court entered the Bidding Procedures Order.[13]

16.     On November 21, 2024, the Debtors filed the *Second Notice of Designation of Successful Bid* [D.I. 242] (the "Successful Bid Notice").

17.     Attached to the Successful Bid Notice is a term sheet (the "Term Sheet") summarizing the principal terms and conditions of the sale of the Debtors' assets to the Purchaser.[14] The Term Sheet indicates that the Purchaser will acquire the Purchased Assets (as defined in the Term Sheet)—which include all intellectual property of the Debtors—for an aggregate consideration of (a) $2,500,000 cash, and (b) "$7,716,000 NIDLLC assigned credit bid" (together, the "Purchase Price").[15]

18.     Curiously, Footnote 1 of the Term Sheet, in the description of the Purchase Price, contains a "Note to Draft" stating as follows:

> NTD: Cash portion of Purchase Price must be not less than the amount needed to pay the DIP Lender any and all amounts outstanding (including, without limitation, interest, default interest (as applicable, fees, expenses and other amounts) under the DIP Facility; plus cash equal to the amount of any transaction fee due to the Debtors' investment banker, that would be payable on account of the consummation of a sale based on the value of the bid.

---

[13] *Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets of the Debtors; (B) Approving Procedures for the Assumption and Assignment or Rejection of Designated Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; (D) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; (E) Authorizing the Debtors to Designate a Stalking Horse Bidder and Seek Expedited Approval of Bid Protections, if any (F) Granting Related Relief* [D.I. 170] (the "Bidding Procedures Order").

[14] Successful Bid Notice, Exhibit A.

[15] *Id.*

Thus, it is clear from the footnote that the parties intend to pay the DIP loan's fees and interest and certain of the Debtors' professional fees in full in cash, but do not intend to satisfy the Debtors' obligations to the Bridge Financing Holders even though those obligations are senior to all of the obligations they intend to satisfy.

**OBJECTION**

A. **The Debtors' Intellectual Property Cannot be Sold Free and Clear of the Senior Liens**

19. As described above, there is no dispute that (a) the Senior Liens held by Gaingels 10X and the other Bridge Financing Holders are senior secured liens, and (b) pursuant to the Third Interim DIP Order, the prepetition liens held by the Bridge Financing Holders are senior to the liens held by the DIP lender.

20. Accordingly, the Purchaser must purchase the assets subject to the Senior Liens, unless the Debtors can show that an enumerated exception under section 363(f) of the Bankruptcy Code is met.

21. Section 363(f) of the Bankruptcy Code would permit the sale of the Debtors' assets free and clear of the Senior Liens only if the Debtors can satisfy one of the enumerated subsections of section 363(f)(1)-(5). *In re Ferris Properties, Inc.*, 2015 WL 4600248 at *2 (Bankr. D. Del. July 30, 2015). It is the Debtors' burden to demonstrate one of the conditions can be satisfied. *See In re Flour City Bagels, LLC*, 557 B.R. 53, 76 (Bankr. W.D.N.Y. 2016).

22. Section 363(f) of the Bankruptcy Code provides that a Debtor may sell property free and clear of any interest in such property only if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4) such interest is in bona fide dispute; or

    (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

23. Any attempt to sell the assets free and clear of the Senior Liens must fail because the Debtors have not met, and cannot meet, their burden of demonstrating that any of the prerequisites of Sections 363(f)(1)-(5) have been met.

24. **First**, under Section 363(f)(1), neither the Debtors nor the Purchaser has identified any nonbankruptcy law that would permit the sale of such property free and clear of the Senior Liens, and Gaingels 10X is aware of no such authority.

25. **Second**, under Section 363(f)(2), Gaingels 10X does not consent to a sale free and clear of its Senior Lien.

26. **Third**, under Section 363(f)(3), neither the cash portion ($2,500,000) of the Purchase Price, nor the aggregate cash and Credit Bid ($10.216 million) Purchase Price, is greater than the aggregate value (approximately $20.5 million)[16] of secured liens on the Debtors' assets or even just the amounts due to the Bridge Financing Holders ($12.8 million).

27. **Fourth**, under Section 363(f)(4), the Gaingels' Senior Lien is not subject to a *bona fide* dispute. In fact, the Debtors have affirmed Gaingels 10X's status as a secured lender at every turn. *See supra* ¶ 12.

28. **Fifth**, under Section 363(f)(5), the Debtors have not met and cannot meet their burden to show the existence of a "legal or equitable proceeding" that could compel Gaingels to accept money in satisfaction of its interest, and they do not in any event propose to provide any such money to Gaingels 10X.

---

[16] There is approximately $12.8 million in secured debt owed to the Bridge Financing Holders and at least $7.716 million owed to the DIP Lender (as estimated by the amount of the Credit Bid).

29. For the foregoing reasons, the Debtors have not met their burden to sell the Debtors' intellectual property free and clear of the Senior Liens pursuant to Section 363(f) of the Bankruptcy Code.

**B.** **Cause Exists Under Section 363(k) to Deny the Purchaser the Right to Credit Bid**

30. If the Purchaser does not agree to purchase the assets with the liens continuing to attach to the IP in the hands of the purchaser, it should not be permitted to credit bid. The right to credit bid under section 363(k) of the Bankruptcy Code is not absolute. *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315 (3d Cir. 2010). Rather, "a secured lender has the right to credit bid 'unless the court for cause orders otherwise.'" *Id*. Here, cause clearly exists to deny the Purchaser the right to credit bid, as the Purchaser seeks to improperly subordinate and violate the rights of the Bridge Financing Holders.

31. It is well-settled that junior lienholders cannot credit bid without satisfying senior lienholders. *See In re Banyan Cay Resort & Golf, LLC*, 2023 WL 8519356, *4 (Bankr. S.D. Fla. Dec. 7, 2023) (stating that it is "relatively obvious" that junior lienholders cannot credit bid unless provision is made for senior lienholders); *United States Sec. & Exch. Comm'n v. Equitybuild, Inc.*, 2019 WL 10371626, *2 (N.D. Ill. July 9, 2019) (recognizing that junior lenders seeking to credit bid may have to pay cash to senior lienholders); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) ("In purchasing property by credit bid under § 363(k), the credit bidding creditor must pay the mortgages and liens (if any) which have priority senior to its mortgage.").

32. Here, the Term Sheet attached to the Successful Bid Notice makes clear that the Debtors do not intend to pay the Bridge Financing Holders any proceeds of the sale and, presumably, the Debtors will seek to sell the Bridge Financing Holders' collateral free and clear

of the Senior Liens without the Bridge Financing Holders' consent. This blatant disregard for the Bridge Financing Holders' senior position contravenes the express terms of the Third Interim DIP Order and well-established law, and should not be permitted by this Court. This constitutes "cause or otherwise" for an order denying credit bidding rights.[17]

C.    **Alternatively, Gaingels 10X is Entitled to Adequate Protection of its Senior Lien**

33.    Alternatively, in the event that this Court finds that (a) the Debtors somehow have satisfied an enumerated exception in Section 363(f), such that the intellectual property can be sold free and clear of the Senior Liens, and (b) the Purchaser is permitted to credit bid a junior lien, this Court must order that, as a condition to approval of the sale, the Debtors, the Purchaser and/or the DIP lender must provide the Bridge Financing Holders adequate protection of their Senior Liens pursuant to Section 363(e).[18] Here, the form of such adequate protection can only be paying to the Bridge Financing Holders cash in the amount of the aggregate Purchase Price, *i.e.* $10.216 million.

34.    Certainly, the most typical form of adequate protection is the attachment of the creditor's lien to the proceeds of a sale.[19] However, where, as here, the Purchaser is acquiring assets via a credit bid, such adequate protection would be completely meaningless because there would be *no* cash proceeds to which the Senior Liens can attach. Instead, the Purchaser and/or the DIP lender—which, under the Debtors' proposal, would receive value on account of its junior DIP

---

[17] There are additional grounds to deny the Purchaser a right to credit bid. The Purchaser seeks to credit bid the DIP lender's claims and liens even though they were granted in an *interim* order and have not been allowed on a final basis by this Court. Until they have been allowed on a final basis, such liens and claims remain subject to dispute and disallowance. Section 363(k) permits a credit bid only if the Purchaser's claim is an "allowed claim." *See* 11 U.S.C. § 363(k). Therefore, pending a final determination of the allowance of such claims and liens, the Purchaser should not be permitted to credit bid.

[18] 11 U.S.C. § 363(e) ("Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, **shall** prohibit or condition such use, sale, or lease as is necessary **to provide adequate protection of such interest**.") (emphasis added).

[19] *See* H.R. Rep. No. 95-595 (1978); *see also In re Old Cold, LLC*, 976 F.3d 107, 118 (1st Cir. 2020) ("The Bankruptcy Code itself plainly protects a security interest even when the assets to which the interests attach are sold in a section 363(f) sale, 11 U.S.C. § 363(e), which often means that those security 'interests attach to the proceeds of the sale.'").

liens in contravention of the Third Interim DIP Order and in violation of the Bridge Financing Holders' senior position—should be required to pay to the Bridge Financing Holders cash in the amount of the aggregate Purchase Price, *i.e.* $10.216 million.[20] No other form of relief could possibly provide adequate protection because the Debtors will be left with no operating business and no cash, so it would be literally impossible for them to pay the Bridge Financing Holders.

35. Other courts, under similar circumstances, have fashioned similar remedies to satisfy a preexisting lienholder's right to adequate protection. *See In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW), 2021 WL 2828916, at *11 (Bankr. D. Del. July 7, 2021), *aff'd,* 633 B.R. 124 (D. Del. 2021) (concluding that lenders were "required to provide payment of [creditor's disputed] secured claim in full, post a letter of credit, create an escrow sufficient to cover its claim, or grant a replacement lien for that claim") (citing *River Road Hotel Partners, LLC*, 2010 WL 6634603, at *2 (Bankr. N.D. Ill. Oct. 5, 2010) (noting that "courts have required secured creditors to put cash in escrow, pay a portion of the bid in cash, or furnish a letter of credit when the amount and validity of an alleged senior lien is in dispute")).

36. Similarly, here, to the extent that the Debtors' intellectual property can be sold free and clear of the Senior Liens, Gaingels 10X requests that the Court deny entry of any sale order unless it requires the Purchaser and/or the DIP lender to pay the Purchase Price, in cash, to the Bridge Financing Holders.

37. For all of the foregoing reasons, the Court should only approve a sale if either (a) the sale order provides that the sale is *not* free and clear of the Senior Liens, and to the contrary, that the Senior Liens continue to attach to the intellectual property after the sale, or (b) the

---

[20] *In re Daufuskie Island Props.*, LLC, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) ("In purchasing property by credit bid under § 363(k), the credit bidding creditor must pay the mortgages and liens (if any) which have priority senior to its mortgage."); *see also* 3 Collier on Bankruptcy P 363.09 (16th 2021) ("If the creditor has a junior lien, the creditor will be required to pay off or otherwise settle with the senior lienors in the sale.").

Purchaser and/or the DIP lender are required to pay the aggregate Purchase Price ($10.216 million) to the Bridge Financing Holders <u>in cash</u>. If the Purchaser is unwilling to close under one of these two structures, the Court should deny the Purchaser's right to credit bid and deny entry of the sale order.

## **RESERVATION OF RIGHTS**

38. Gaingels 10X reserves all rights to supplement this Objection and raise additional objections in connection with the Sale Motion or any filed Sale Order, as may be necessary, once a draft of the sale order is filed.

## **CONCLUSION**

39. For the foregoing reasons, Gaingels 10X respectfully request that the Court deny the Sale Motion unless one of the forms of relief described herein is granted, and grant such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

Dated: November 26, 2024
Wilmington, Delaware

/s/ *Russell C. Silberglied*
Russell C. Silberglied (No. 3462)
Matthew P. Milana (No. 6681)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Email: silberglied@rlf.com
milana@rlf.com

-and-

Alexander J. Nicas (admitted *pro hac vice*)
Barry Z. Bazian (*pro hac vice* application pending)
James Lathrop (No. 6492)
Alec Weinberg (No. 7281)
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 813-8800
Email: anicas@goodwinlaw.com
jlathrop@goodwinlaw.com
aweinberg@goodwinlaw.com

*Counsel to Gaingels 10X Capital Diversity Fund I, LP*