**<u>Exhibit A</u>**

**Gaingels Secured Note**

**CONVERTIBLE NOTE**

**US$1,000,000**

**Issuance Date:**

**January 2, 2024**

**FOR VALUE RECEIVED**, on the Issuance Date set forth above, Nuvo Group Ltd., a company organized under the laws of the State of Israel (the "**Company**"), hereby unconditionally promises to pay to the order of Gaingels 10X Capital Diversity Fund I LP, a Delaware limited (the "**Holder**"), or his/her/its assigns, the aggregate principal sum of ONE MILLION DOLLARS as such sum is advanced or was advanced to Company by Holder pursuant to the terms hereof (the "**Principal Amount**"), together with interest on the unpaid principal balance of this convertible promissory note (this "**Note**") from the date of advance to the date of full payment or conversion of such principal balance, at a rate equal to fifteen percent (15.00%) (computed on the basis of the actual number of days elapsed in a 360-day year) per annum (the "**Interest Rate**"). Interest shall accrue from the date hereof and shall continue to accrue on the outstanding principal balance of this Note until paid in full or converted as provided herein. In no event shall any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law and if any such payment is paid by the Company, then such excess sum shall be credited by the Holder as a payment of principal.

1.  <u>Definitions</u>. Unless the context otherwise requires, when used herein the following terms shall have the meanings indicated:

"**AOA**" means the Company's Amended and Restated Articles of Association (as amended and restated from time to time).

"**De-Spac Transaction**" means a transaction by which the Company goes public by merging with a special-purpose acquisition company (e.g., with LAMF Global Ventures Corp. I or any of its affiliates).

"**IPO**" means an initial public offering of securities.

"**Material Funding Event**" means a De-Spac Transaction, an IPO or a Qualified Financing.

"**Maturity Date**" means the earlier of (i) twelve months from the Issuance Date, (ii) the closing of the De-SPAC Transaction, (iii) the closing of an IPO, or (iv) the closing of a Qualified Financing.

"**Outstanding Balance**" means all outstanding principal under this Note actually received by the Company together with any accrued but unconverted interest thereon (i.e., except to the extent the Holder voluntarily forfeits such interest, in which case the Outstanding Balance shall solely mean the principal amount contemplated under this Note).

"**Person**" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

"**Qualified Financing**" means a bona fide financing of the Company for the principal purpose of raising capital, through the sale of Company securities in whatever form or type (whether debt or equity) that

raises in excess of $10,000,000 in gross proceeds not including the total amount raised under the Convertible Notes and any accrued interest or any other amounts owing on all Convertible Notes).

2.    Payment Terms; Interest.

(a)    Payment of Principal. The Holder shall remit the Principal Amount immediately following the Company's delivery of this Note to the Holder and following confirmation that the Company has secured other investors who are deemed acceptable to the Company (the "**Additional Holders,**" and together with the Holder, the "**Note Holders**") to fund at least another $2,000,000 in additional investments thereby resulting in the Company receiving at least $3,000,000 in total investment proceeds (the "**Minimum Investment Amount**"). Together with the amount issued to the Holder, the Company may issue convertible notes to Additional Holders totaling between US$3,000,000 and US$4,000,000, with the Company reserving the right to increase the aggregate bridge round financing up to a maximum of US$5,000,000 (the "**Additional Notes**", and together with this Note, the "**Convertible Notes**"). The Company shall not use any portion of the Principal Amount paid to it pursuant to this Note until such time as the Company receives the Minimum Investment Amount. If the Minimum Investment Amount is not received by the Company within thirty (30) days from the Issuance Date, the Principal Amount shall be returned to the Holder in full.

3.    Transfer. This Note is transferable and assignable by the Holder to any Person approved, in writing, by the Company, which such approval shall not be unreasonably withheld. The Note shall be transferable, without such approval, to the members of the Holder and/or their family members or family investment entities for family or estate planning purposes or any limited liability company which is controlled and/or affiliated with any of the principals of the Holder as of the Issuance Date or person controlled by, controlling or under common control with the Holder; provided, however, that the Holder shall not transfer this Note and/or permit the transfer of this Note to any third party charged or otherwise convicted of a felony, or a third party in which one or more members, directors, or controlling parties thereof was charged and/or convicted of any felony. The Company agrees to issue from time to time a replacement Note in the form hereof to facilitate such approved or permitted transfers and assignments. In addition, after delivery of a customary indemnity in form and substance reasonably satisfactory to the Company, the Company also agrees to issue a replacement Note if this Note is lost, stolen, mutilated or destroyed.

4.    Advisory Services. Attached as **Exhibit A** hereto is an advisory services agreement between the Holder and the Company for the provision of services, the consideration for which will be a warrant in the form attached to the advisory services agreement.

5.    Conversion.

(a)    Conversion. On the Maturity Date, the Company will pay the Holder all accrued interest on this Note up to the date of payment or conversion and the Holder in its sole discretion, may choose to either (i) receive the Principal Amount in cash; or (ii) convert the Principal Amount into ordinary shares of the Company at a price per share of $7.0265 (the "**Conversion Shares**").

(b)    Satisfaction due to Conversion. If the Principal Amount is converted in full pursuant to Section 5(a) hereof, then the Principal Amount shall be deemed to have been paid in full by the Company on the date of such conversion.

(c)    Conversion Mechanics. In connection with the conversion of this Note pursuant to

DocuSign Envelope ID: 126E7DAD-27E3-48A2-A648-096CD0410925

Section 5(a), the Holder shall surrender the Note, duly endorsed without recourse, representation or warranty, at the principal office of the Company in exchange for a certificate or certificates, prepared and issued by the Company at its expense, for the equity securities (bearing such legends as may be required).

(d)     Payment Process. All payments to be made by the Company shall be made without set-off, recoupment or counterclaim and free and clear of and without any deduction of any kind for any taxes, levies, fees, deductions, withholdings, restrictions or conditions of any nature.

6.   Rights as a Shareholder

(a)     The Holder receiving actual as Conversion Shares shall have the rights granted to all holders of ordinary shares of the Company as provided in the AOA.

(b)     The Conversion Shares will be entitled to registration rights (subject to the terms of the definitive agreements).

7.   IP Security Interest.

(a)     As collateral security for the prompt and complete payment and performance of the Holder's Outstanding Balance, the Company hereby grants a security interest to the Holder, as security, in and to all Intellectual Property presently owned by the Company, as well as all Intellectual Property acquired by the Company following the Issuance Date (the "**Collateral**").  For purposes of this Note, the "**Intellectual Property**" shall be defined as:

(i) Any and all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof or of any other country;  all registrations, applications and recordings in the United States Copyright Office or in any similar office or agency of the United States, and State thereof or any other country;  all continuations, renewals, or extensions thereof; and any registrations to be issued under any pending applications (collectively, the "**Copyrights**");

(ii) All letters patent of, or rights corresponding thereto in, the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto in, the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country;  all reissues, continuations, continuations-in-part or extensions thereof;  all petty patents, divisionals, and patents of addition; and all patents to be issued under any such applications, (collectively, the "**Patents**");

(iii) All trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political

subdivision thereof, and  reissues, extensions or renewals thereof, and the entire goodwill of the business of Grantor connected with and symbolized by such trademarks (collectively, the "**Trademarks**");

(iv) Any and all claims for damages by way of past, present and future infringement of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

(v) All licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights;

(vi) All amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and

(vii) All proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

(b)      All registered Patents and registered Trademarks held by the Company as of the Issuance Date are listed in **Exhibit B** hereto.

(c)      This Note shall constitute a security agreement for purposes of applicable law and the Holder as a secured party shall have all rights and remedies with respect to the Collateral as provided by such laws and regulations. The Company's obligation to pay this Note is secured by all of the Collateral. The Company hereby authorizes the Holder to file all necessary deeds of pledge and other documents and instruments to perfect the Holder's security interest in those patents registered in the United States and Israel.

(d)      Appended to **Exhibit C** hereto is the form of deed of pledge and collateral assignment which the Company will file with the Israeli Companies Registrar (i.e., Rasham) and United Stated Patent and Trademark Office, respectively, perfecting the foregoing security interest within five (5) business days following the Issuance Date or the Company's confirmed receipt of payment of the Principal Amount, whichever occurs later (and as may be updated thereafter in connection with subsequent closings).

(e)      Appended to **Exhibit D** attached hereto is the Company's request to the Israeli National Authority for Technological Innovation (the "**Authority**") for approval of the security interest granted hereunder for the benefit of Holder which has been submitted to the Authority, and a form of that certain undertaking to the Authority to be submitted within five (5) business days following the Issuance Date or the Company's confirmed receipt of the Principal Amount, whichever occurs later (and as may be updated thereafter in connection with subsequent closings).  The Company hereby agrees to undertake its commercial best efforts to procure the Authority's approval as soon as practicable.

(f)      The Company will notify the Holder of any Collateral which the Company obtains or creates subsequent to the Issuance Date and file new or amended deeds or other instruments to perfect the security interest of the Holder in such additional Collateral.

(g)      While any Convertible Notes are outstanding, each Convertible Note shall be pari passu among all Note Holders, and the Company and Note Holders agree to appoint the Holder as the Note Holders' representative to exercise all rights on behalf of the Note Holders against the Collateral; provided that the Holder shall not exercise any such rights without the consent of the Note Holders

DocuSign Envelope ID: 126E7D4D-27E3-48A2-A648-096CF90410925

holding a majority of the Outstanding Balance paid to and received by the Company from all Note Holders participating in the bridge financing contemplated hereby. Each Note Holders' security interest in and to the Collateral shall expire upon the sooner to occur of the repayment of the Note Holder's Convertible Note or its conversion into ordinary shares of the Company as described above.

(h)      Upon full payment of all principal and interest on this Note, or, upon conversion of this Note into Conversion Shares, the security interests held by the Holder in the Collateral shall be released. Upon the occurrence of a release of such security interests, the Company shall be permitted to file all necessary financing statements and other documentation to document the release of the Holder's security interest in the Collateral.

8.   <u>Event of Default</u>. The occurrence of any of the following events shall constitute an "**Event of Default**" hereunder:

(a)      the failure of the Company to make any payment of principal or interest on this Note when due, whether at Maturity, upon acceleration or otherwise and within twenty (20) days' from the Company's receipt of written notice of breach following Maturity;

(b)      (i) the Company makes a determination to discontinue (or does cease to conduct) business, makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; (ii) an order, judgment or decree is entered adjudicating the Company as bankrupt or insolvent; (iii) any order for relief with respect to the Company is entered under the U.S. Bankruptcy Code or any other applicable bankruptcy or insolvency law; (iv) the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company or of any substantial part of the assets of the Company or there commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or (v) any such petition or application in (iv) above is filed, or any such proceeding is commenced, against the Company and as those commenced against the Company, either (x) the Company by any act indicates its approval thereof, consents thereto or acquiesces therein or (y) such petition, application or proceeding is not dismissed within sixty (60) days.

(c)      Except as provided in Section 8(a) to the contrary or unless waived in writing by the Holder, if the Company fails to observe or perform in any material respect any of its covenants or any other terms, conditions or obligations of the Company contained in the Note and such failure continues for more than thirty (30) days after delivery of written notice thereof by the Holder; or

(d)      the material breach by the Company of any representation or warranty made herein, which breach is not cured within thirty (30) days' from the Company's receipt of written notice in respect of such breach.

Upon the occurrence of any Event of Default, the Outstanding Balance under this Note shall become immediately due and payable upon election of the Holder and following a written demand notice sent to the Company. Upon the occurrence of any Event of Default, the Holder may, in addition to declaring all amounts due hereunder to be immediately due and payable, pursue any available remedy, whether at law or in equity, including, without limitation, exercising its/her/his rights under this Note, and all of the Holder's costs and expenses incurred in connection with the enforcement of the Holder's rights under this Note following the occurrence of an Event of Default, whether in any action, suit or litigation, any

bankruptcy, insolvency or similar proceeding affecting creditors' rights generally, or otherwise (including without limitation the reasonable fees and expenses of counsel) will be borne by the Company and promptly reimbursed to the Holder.

9.   <u>Amendments in Writing</u>. Any term of this Note may be amended, modified (including, without limitation, any extension of the Maturity Date, to change the conversion price or to cause the Note to be pre-payable) or waived upon the written consent of the Company, on the one hand, and the Holder, on the other hand. No such waiver or consent in any one instance shall be construed to be a continuing waiver or a waiver in any other instance unless it expressly so provides.

10.   <u>Waivers</u>. The Company hereby forever waives presentment, demand, presentment for payment, protest, notice of protest, notice of dishonor of this Note and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note.

11.   <u>Governing Law; Jurisdiction; Venue</u>. This Note, and all matters arising directly and indirectly herefrom (the "**Covered Matters**"), shall be governed in all respects by the laws of the State of Israel as such laws are applied to agreements between parties in the State of Israel. The Company irrevocably submits to the personal jurisdiction of the courts of Tel Aviv/Jaffa for the purpose of any suit, action, proceeding or judgment relating to or arising out of the Covered Matters. Service of process on the Company in connection with any such suit, action or proceeding may be served on the Company anywhere in the world by the same methods as are specified for the giving of notices under this Note. The Company irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. The Company irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

12.   <u>Notices</u>. All notices and other communications given or made pursuant to this Note shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified; (b) when sent by confirmed electronic mail if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Holder at the address set forth on the signature block to this Note or at such other place as may be designated by the Holder in writing to the Company in accordance with the provisions of this Section 12, and to the Company at the Company's principal place of business set forth on the signature block to this Note, or to such e-mail address or address as subsequently modified by written notice in accordance with the provisions of this Section 12.

13.   <u>Holder Representations and Warranties</u>. The Holder hereby represents and warrants to the Company that: (a) the Holder is an accredited and sophisticated or professional, as defined in Rule 501(a) of Regulation D promulgated pursuant to the Securities Act of 1933, by virtue of the fact that the Holder meets the qualifications set forth in the foregoing regulation; (b) the Holder has such knowledge and experience in financial and business matters that the Holder is capable of evaluating the merits and risks of its/her/his investment in the Company and is able to bear such risks, and has obtained, in the Holder's judgment, sufficient information from the Company or its authorized representatives to evaluate the merits and risks of such investment; (c) the Holder has evaluated the risks of investing in the Company and has determined independently that an investment in the Company is a suitable investment for

it/her/him; (d) the Holder is solely responsible to consult with its/her/his tax professional in respect of the investment contemplated herein; (e) the Holder, if a corporation, partnership, trust or other form of business entity (i) is authorized and otherwise duly qualified to make the investment contemplated hereunder, and to acquire the shares in the Company that would be issued upon any of the conversion events described in this Note, subject to the terms and conditions set forth hereunder, and (ii) has not been formed for the specific purpose of making the investment contained in this Note; and (f) the Holder is making the investment contemplated hereunder, and upon any conversion of the Principal Balance, would be acquiring shares in the Company for its/her/his own account, and not with a view to the resale or distribution of all or any part thereof, or on behalf of another third party that has not made the representations and warranties contained in this Section 13.

14. <u>Company Representations and Warranties</u>. The Company hereby represents and warrants to the Holder that: (a) the Company is a private limited company validly existing and in good standing under the laws of the State of Israel and is duly qualified to do business in, and in good standing under the laws of, Israel; (b) the execution, delivery and performance of this Note require no consent, approval or action by any third party or if such consents and approvals are required the same have been obtained by the Company, have been duly and validly authorized, and do not conflict with the Company's AOA or any agreement to which the Company is a party or by which it is bound, or any law, rule, regulation, order, or decree of any court or governmental authority to which the Company is subject; (c) when duly and validly executed and delivered by the Company and the Holder, this Note shall constitute the valid and binding agreements of the Company, enforceable against the Company in accordance with the terms of the Note; (d) all corporate and other actions on the part of the Company for the issuance of the Note and the issuance of the shares issuable upon conversion of the Note have been taken; (e) the shares upon conversion of the Note when issued will be validly issued, fully paid and non- assessable and free of any liens or encumbrances; (f) the Company is not party to any action, suit, proceeding or, to its knowledge, investigation pending threatened, that affects or might affect its ability to issue this Note or perform its obligations hereunder; (g) all rights to the Company's Intellectual Property have been transferred to the Company by its inventors and are owned directly by the Company and not retained or licensed by any third party, and all technical and key employees of the Company have entered into work for hire, confidentiality /non-disclosure and similar agreements transferring all intellectual property rights to the Company; (h) there is no pending, nor to the knowledge of the Company threatened, claim or action of infringement or which attacks or challenges the validity of, any Company Intellectual Property; (i) the Company is in compliance with all applicable federal, state, local and foreign laws and regulations in all material respects; (i) the Company's assets are free and clear of all liens, claims, encumbrances, security interests, pledges and mortgages; (j) the Company has in full force and effect cybersecurity and privacy technology and policies in compliance with industry standards and applicable laws and regulations, and except as previously publicly reported, has not suffered any hacking, cyber attacks, data, system or security breaches, and (k) the Company is not a party or subject to any consent order, administrative decree, regulatory restriction, debarment or suspension with any federal, state, local or foreign government agency.

15. <u>Reimbursement</u>. The Company agrees to reimburse the Holder for actual fees and reasonable transaction-related out-of-pocket costs in connection with this Note, including, without limitation, reasonable attorneys' fees in connection with the transactions contemplated herein, to be capped at $30,000 plus VAT and direct and substantiated disbursements in the aggregate.

16. <u>Taxes</u>. The Holder acknowledges and hereby authorizes the Company to remit such withholding taxes on any amounts payable to the Holder under this Note if required under applicable law.

17. <u>Most Favored Nation.</u> The Company shall not negotiate or issue more favorable terms to any Additional Holder for any Convertible Note or other convertible securities than those expressly provided to the Holder in this Note.

18. <u>Use of Proceeds.</u> The proceeds of this Note shall be used towards general working capital needs of the Company, and will not be used to make any payments to shareholders of the Company.

19. <u>Successors and Assigns</u>. This note shall be binding upon the successors or assigns of the Company and shall inure to the benefit of the successors and permitted assigns of the Holder.

**IN WITNESS WHEREOF**, the Company has executed this Convertible Note as of the Issuance Date.

**NUVO GROUP LTD.**

By: _Kelly Londy_

Name: Kelly Londy

Title: CEO

Address: 300 Witherspoon, Suite 201, Princeton NJ 08542

ACKNOWLEDGED AND AGREED AS OF THE ISSUANCE DATE:

**GAINGELS 10X CAPITAL DIVERSITY FUND I LP**

By:  GAINGELS 10X CAPITAL DIVERSITY FUND I, GP, General Partner

_Paul Grossinger_

Paul Grossinger

Authorized Signatory

Address:  3 Main Street, Suite 214

Burlington VT 05401

paulgrossinger@gaingels.com

**EXHIBIT A**

**FORM OF ADVISORY SERVICES AGREEMENT**

**-Appended Hereto-**

DocuSign Envelope ID: 126E7D4D-2ZE3-4848-AC48-006ED041093E

**EXHIBIT B**

**REGISTERED INTELLECTUAL PROPERTY**

**A.   REGISTERED PATENTS**

| | | | |
|---|---|---|---|
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | United States of America | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | United States of America | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | China | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Switzerland | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Germany (Federal Republic of) | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Denmark | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Spain | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | France | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | United Kingdom | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Netherlands | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | European Patent | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Australia | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Canada | Gran |
| Nuvo Group Ltd. | SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | Korea, Republic of (KR) | Gran |
| Nuvo Group Ltd. | BELT | United States of America | Gran |

| Nuvo Group Ltd. | BELT | China | Gra |
| Nuvo Group Ltd. | BELT | European Union | Gra |
| Nuvo Group Ltd. | BELT | United Kingdom | Gra |
| Nuvo Group Ltd. | BELT | Korea, Republic of (KR) | Gra |
| Nuvo Group Ltd. | MUSICAL MATERNITY BELT | United States of America | Gra |

| Nuvo Group Ltd. | MUSICAL MATERNITY BELT | United States of America |
| Nuvo Group Ltd. | ACOUSTIC SENSORS FOR ABDOMINAL FETAL CARDIAC ACTIVITY DETECTION | United States of America |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | United States of America |
| Nuvo Group Ltd. | ELECTRODES FOR ABDOMINAL FETAL ELECTROCARDIOGRAM DETECTION | United States of America |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | United States of America |

| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | United States of Amer |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | United States of Amer |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | China |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | Germany (Federal Re |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | European Patent |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | China |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | European Patent |

| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Switzerland |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Germany (Federal Re |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Denmark |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | France |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | United Kingdom |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Netherlands |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Norway |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Sweden |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | Australia |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | Canada |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | Korea, Republic of (K |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Australia |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Canada |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Israel |

| | | |
|---|---|---|
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Japan |
| Nuvo Group Ltd. | CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | Korea, Republic of (K |
| Nuvo Group Ltd. | BELT | United States of Ame |
| Nuvo Group Ltd. | BELT | China |
| Nuvo Group Ltd. | BELT | European Union |
| Nuvo Group Ltd. | BELT | United Kingdom |
| Nuvo Group Ltd. | SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | United States of Ame |
| Nuvo Group Ltd. | SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | United States of Ame |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | Germany (Federal Re |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | France |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | United Kingdom |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | Netherlands |
| Nuvo Group Ltd. | SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | European Patent |
| Nuvo Group Ltd. | SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | United States of Ame |
| Nuvo Group Ltd. | SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | Australia |
| Nuvo Group Ltd. | SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | Japan |

| Nuvo Group Ltd. | SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | United States of Amer |
| Nuvo Group Ltd. | FUSION SIGNAL PROCESSING FOR MATERNAL UTERINE ACTIVITY DETECTION | United States of Amer |

## B. Registered Trademarks

| TRADEMARK | TERRITORY | REG. NO. |
|---|---|---|
| **NUVO** | **UK** | 28-Jan-2022 UK00003656383 |
| **NUVO** | **ISRAEL** | 03-Mar-2019 295654 |
| **NUVO** | **INTERNATIONAL** | 27-Jul-2017 1398200 |
| **NUVO** | **CHINA** | 27-Jul-2017 1398200 |
| **NUVO** | **EU** | 02-Mar-2021 1398200 |
| **NUVO** | **USA** | 24-Dec-2019 5940493 |
| **INVU BY NUVO** | **ISRAEL** | 02-Jul-2019 309279 |
| **INVU BY NUVO** | **INTERNATIONAL** | 12-May-2020 1547992 |
| **INVU BY NUVO** | **INTERNATIONAL** | 12-Dec-2021 1547992 |
| **INVU BY NUVO** | **UK** | 14-Jun-2022 WO000000015479 92 |
| **INVU BY NUVO** | **EU** | 20-Jan-2021 1547992 |
| **INVU BY NUVO** | **USA** | 11-Jan-2022 6610124 |

|  | ISRAEL | 02-Jul-2019 309280 |
|  | ISRAEL | 02-Jul-2019 309281 |
|  | ISRAEL | 01-Dec-2020 327409 |
|  | INTERNATIONAL | 08-Nov-2020 1571075 |
|  | CHINA | 11-Jul-2022 1571075 |

| | | EU | 10-Jun-2021<br>1571075 |
|---|---|---|---|
| | | UK | 19-Aug-2021<br>WO00000015710<br>75 |
| | | JAPAN | 16-Dec-2022<br>1571075 |
| | | USA | 01-Feb-2022<br>6630836 |

**EXHIBIT C**

**FORM OF PLEDGE**

**-Appended Hereto-**

## Notice of Grant of Security Interest in Patents

NOTICE OF GRANT OF SECURITY INTEREST IN PATENTS, dated as of January 2, 2024 (this "Notice"), made by **NUVO GROUP LTD.**, a company organized under the laws of the State of Israel (the "Borrower"), in favor of **GAINGELS 10X CAPITAL DIVERSITY FUND I, LP**, as "Collateral Agent".

Reference is made to that certain convertible note entered into by and between the parties, dated as of January 2nd, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "Convertible Note"), among the Borrower and Gaingles 10X Capital Diversity Fund I, L.P. (together with its successors and assigns) in such capacity as Collateral Agent for the Note Holders  (as defined therein). The parties hereto agree as follows:

SECTION 1. *Terms.* Capitalized terms used in this Notice and not otherwise defined herein have the meanings specified in the Convertible Note.

SECTION 2. *Grant of Security Interest.* As security for the payment and performance, as the case may be, in full of the secured obligations in the Convertible Note, the Borrower pursuant to the Convertible Note did, and hereby does, pledge and grant to the Collateral Agent, its successors and permitted assigns, for the benefit of the Note Holders, a continuing security interest in all of such Pledgor' s right, title and interest in, to and under any and all of the following assets now owned or at any time hereafter acquired by Borrower or in which Borrower now has or at any time in the future may acquire any right, title or interest (collectively, but excluding any Excluded Property, the "Patent Collateral"): all Patents of the United States of America and all Trademarks of the United States, including those listed on Schedule I;

SECTION 3. *Convertible Note.* The security interests granted to the Collateral Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Collateral Agent pursuant to the Convertible Note. Borrower hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Patent Collateral are more fully set forth in the Convertible Note, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Notice and the Convertible Note, the terms of the Convertible Note shall govern.

SECTION 4. *Counterparts.* This Notice may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract. Delivery of an executed counterpart to this Notice by facsimile or other electronic transmission shall be as effective as delivery of a manually signed original.

SECTION 5. *Governing Law.* THIS NOTICE AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTICE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS NOTICE SHALL BE CONSTRUED IN ACCORDANCE

DocuSign Envelope ID: 126E7D1D-2ZE3-4848-AC48-006C0041093E

WITH AND GOVERNED BY THE LAWS OF DELAWARE, WITHOUT REGARD TO ANY PRINCIPLE OF CONFLICTS OF LAW THAT COULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

IN WITNESS WHEREOF, the parties hereto have duly executed this Notice as of the day and year first above written.

NUVO GROUP LTD.

**By: _____**

**Name**

**Title**

SCHEDULE I

A.   PATENTS

| Title | Filing Date | Application/Patent No. | Country |
|---|---|---|---|
| SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | 3/10/2015 | | United States of America |
| SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | 10/23/2015 | 9,392,952 | United States of America |
| SYSTEMS, APPARATUS AND METHODS FOR SENSING FETAL ACTIVITY | 7/8/2016 | 10,111,600 | United States of America |
| APPARATUSES FOR TRACKING PHYSIOLOGICAL PARAMETERS OF MOTHER AND FETUS DURING PREGNANCY | 10/29/2018 | | United States of America |
| APPARATUSES FOR TRACKING PHYSIOLOGICAL PARAMETERS OF MOTHER AND FETUS DURING PREGNANCY | 12/4/2020 | | United States of America |
| METHODS AND SYSTEMS FOR TRACKING PHYSIOLOGICAL PARAMETERS OF MOTHER AND FETUS DURING PREGNANCY | 8/23/2022 | | United States of America |
| BELT | 11/13/2015 | D793,027 | United States of America |
| MUSICAL MATERNITY BELT | 8/7/2006 | | United States of America |
| MUSICAL MATERNITY BELT | 8/6/2007 | 8,396,229 | United States of America |
| Auditory Stimulation to Change Fetal Location, Heart Beat or Waking State | 11/27/2014 | | United States of America |
| MUSICAL MATERNITY BELT | 8/14/2008 | D614,377 | United States of America |
| Continuous Non-Invasive Fetal/Mother Monitoring Using Fixed Location Sensors | 10/28/2014 | | United States of America |
| SYSTEMS AND METHODS FOR HIGH RISK PREGNANCY AND ABNORMAL BIOMEDICAL ACTIVITY MONITORING AND DETECTION | 3/16/2015 | | United States of America |
| ACOUSTIC SENSORS FOR ABDOMINAL FETAL CARDIAC ACTIVITY DETECTION | 3/16/2016 | 9,713,430 | United States of America |

| SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | 3/16/2016 | 9,642,544 | United States of America |
|---|---|---|---|
| ELECTRODES FOR ABDOMINAL FETAL ELECTROCARDIOGRAM DETECTION | 3/16/2016 | 9,763,583 | United States of America |
| CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | 3/16/2016 | 9,572,504 | United States of America |
| SPECIALLY PROGRAMMED COMPUTER PLATFORM TO MONITOR/TRACK/ANALYZE BIG DATA RELATED TO MACRO AND MICRO ENVIRONMENTS OF A CARRYING MOTHER AND A FETUS, AND METHODS OF USE THEREOF | 3/16/2016 | | United States of America |
| CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | 12/23/2016 | 10,039,459 | United States of America |
| SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | 2/22/2017 | 10,213,120 | United States of America |
| A SPECIALLY PROGRAMMED COMPUTER PLATFORM TO MONITOR/TRACK/ANALYZE BIG DATA RELATED TO MACRO AND MICRO ENVIRONMENTS OF A CARRYING MOTHER AND A FETUS, AND METHODS OF USE THEREOF | 3/8/2017 | | United States of America |
| ACOUSTIC SENSORS FOR ABDOMINAL FETAL CARDIAC ACTIVITY DETECTION | 6/16/2017 | | United States of America |
| ELECTRODES FOR ABDOMINAL FETAL ELECTROCARDIOGRAM DETECTION | 8/22/2017 | | United States of America |
| A SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/8/2018 | | United States of America |
| CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | 8/3/2018 | | United States of America |
| SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/7/2019 | | United States of America |
| SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/6/2020 | | United States of America |

| | | | |
|---|---|---|---|
| SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/5/2021 | | United States of America |
| CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | 9/17/2020 | | United States of America |
| A SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/4/2022 | | United States of America |
| CONTINUOUS NON-INVASIVE MONITORING OF A PREGNANT HUMAN SUBJECT | 6/17/2022 | | United States of America |
| A SPECIALLY PROGRAMMED COMPUTER PLATFORM TO GENERATE NEW DATA RELATED TO A CARRYING MOTHER AND METHODS OF USE THEREOF | 3/3/2023 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 1/17/2017 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 3/6/2018 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 12/13/2018 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 3/5/2019 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 12/12/2019 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 12/14/2020 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 12/15/2021 | | United States of America |
| METHODS FOR ASSESSING AMNIOTIC FLUID VOLUME USING BIOIMPEDANCE TOMOGRAPHY | 12/15/2022 | | United States of America |
| BELT | 6/6/2017 | D880,701 | United States of America |
| WET ELECTRODE FOR ABDOMINAL FETAL ELECTROCARDIOGRAM DETECTION | 2/19/2018 | | United States of America |

| | | | |
|---|---|---|---|
| WET ELECTRODE FOR ABDOMINAL FETAL ELECTROCARDIOGRAM DETECTION | 2/19/2019 | | United States of America |
| SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | 2/19/2018 | | United States of America |
| SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | 2/19/2019 | 10,617,355 | United States of America |
| SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | 4/13/2020 | 11,534,109 | United States of America |
| SYSTEM AND METHOD FOR MAINTAINING SENSOR CONTACT | 12/23/2022 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/19/2018 | | United States of America |
| SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY | 2/12/2018 | | United States of America |
| SYSTEMS, APPARATUSES AND METHODS FOR SENSING FETAL ACTIVITY ("Improved PCG Algorithm") | 2/11/2019 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY | 8/1/2018 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 10/26/2018 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 8/1/2019 | 10,772,568 | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 9/14/2020 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/3/2022 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/5/2020 | | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/5/2021 | 11,284,833 | United States of America |
| SYSTEMS AND METHODS FOR MATERNAL UTERINE ACTIVITY DETECTION | 8/4/2022 | | United States of America |
| FUSION SIGNAL PROCESSING FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/5/2020 | | United States of America |
| FUSION SIGNAL PROCESSING FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/5/2021 | | United States of America |

| | | | |
|---|---|---|---|
| FUSION SIGNAL PROCESSING FOR MATERNAL UTERINE ACTIVITY DETECTION | 5/19/2021 | 11,324,437 | United States of America |
| FUSION SIGNAL PROCESSING FOR MATERNAL UTERINE ACTIVITY DETECTION | 2/15/2023 | | United States of America |
| SYSTEM, DEVICE, AND METHOD FOR PRENATAL CLINICAL DECISION SUPPORT | 1/28/2022 | | United States of America |
| SYSTEMS, DEVICES, AND METHODS UTILIZING BIO-POTENTIAL DATA OBTAINED BY A PLURALITY OF BIO-POTENTIAL SENSORS FOR PRENATAL TRACKING | 1/30/2023 | | United States of America |

**B.  TRADEMARKS**

| TRADEMARK | TERRITORY | REG. NO. |
|---|---|---|
| **NUVO** | **USA** | 24-Dec-2019<br><br>5940493 |
| **INVU BY NUVO** | **USA** | 11-Jan-2022<br><br>6610124 |
|  | **USA** | 01-Feb-2022<br><br>6630836 |

**EXHIBIT D**

**AUTHORITY UNDERTAKING**

**-Appended Hereto-**

To:    The Research Committee

The National Authority for Technological Innovation (previously known as Office of the Chief Scientist) (the "**Authority**")

Jerusalem

**Relating to projects that have been financed by the Authority (previously known as Office of the Chief Scientist of the Ministry of Industry, Trade and Labor (the "OCS")), project numbers _____ (the "Projects").**

## Undertaking

We, the undersigned, Gaingels 10X Capital Diversity Fund I LP, a corporation incorporated, organized and existing under the laws of the State of Delaware and whose registered office is at PO Box 927, Burlington, VT 05402 having, by an agreement dated January 2, 2024, committed to make certain loans to Nuvo Group Ltd. (the "**Company**"), which shall be secured, among others, by a first ranking fixed charge over intellectual property assets of the Company to be executed with Gaingels 10X Capital Diversity Fund I LP (the "**Fixed Charge**");

Recognizing that the Company's research and development Projects have been financially supported by the Government of the State of Israel, through the Authority under and subject to the provisions of The Research, Development and Technological Innovation Law 5744-1984 (the "**R&D Law**") and the regulations, rules and procedures promulgated there under;

Recognizing that the R&D Law places strict constraints on the transfer of know-how and/or production rights, making all such transfers subject to the absolute discretion of the Authority's research committee (the "**Research Committee**"), acting in accordance with the aims of the R&D Law and requiring that any such transfer receive the prior written approval of the Research Committee;

**Hereby declare and undertake:**

In the event of realization of the Fixed Charge with respect to any intellectual property of the Company which was developed as part of the Project, to observe strictly, all the requirements of the R&D Law and the regulations, rules and procedures promulgated there under, as applied to the Company and as directed by the Research Committee, in particular those requirements stipulated by the R&D Law relating to the prohibitions on the transfer of know-how and/or production rights.

_____

Date

_____

Name (block letters) and signature of Authorized Company Representative and Company Seal

By: _____

Title: _____