ASSET PURCHASE AGREEMENT
by and among

Nuvo Group USA, Inc., and

Nuvo Group Ltd.

("**Sellers**")

and

Nuvo Int'l Group Inc.

("**Purchaser**")

## TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;
 ASSUMPTION OF ASSUMED LIABILITIES ................................................5

 1.1 Purchase and Sale of the Acquired Assets ...........................................5
 1.2 Excluded Assets ...................................................................................6
 1.3 Assumption of Certain Liabilities ........................................................7
 1.4 Excluded Liabilities .............................................................................7
 1.5 [Reserved] ............................................................................................7

ARTICLE II CONSIDERATION; CLOSING ................................................................7

 2.1 Consideration .......................................................................................7
 2.2 Deposit .................................................................................................8
 2.3 Closing .................................................................................................9
 2.4 Closing Deliveries by Sellers ..............................................................9
 2.5 Closing Deliveries by Purchaser ..........................................................9
 2.6 Withholding ........................................................................................10

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS .............10

 3.1 Organization and Qualification ..........................................................10
 3.2 Authorization of Agreement ...............................................................10
 3.3 Conflicts; Consents ............................................................................11
 3.4 [Reserved] ..........................................................................................11
 3.5 [Reserved]...........................................................................................11
 3.6 Litigation ............................................................................................11
 3.7 Permits; Compliance with Laws .........................................................12
 3.8 Intellectual Property ...........................................................................12
 3.9 Employees ..........................................................................................13
 3.10 Disclaimer of Other Representations and Warranties...........................14

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ......14

 4.1 Organization and Qualification...........................................................14
 4.2 Authorization of Agreement ...............................................................15
 4.3 Conflicts; Consents ............................................................................15
 4.4 Financing ............................................................................................15
 4.5 Brokers ...............................................................................................16
 4.6 No Litigation ......................................................................................16
 4.7 Certain Arrangements .........................................................................16
 4.8 No Additional Representations or Warranties ......................................16
 4.9 Diligence ............................................................................................16

ARTICLE V BANKRUPTCY COURT MATTERS ....................................................16

 5.1 Bankruptcy Actions ............................................................................16
 5.2 Cure Costs ..........................................................................................17
 5.3 Bankruptcy Court Filings....................................................................17

5.4     Approval .................................................................................................18

ARTICLE VI COVENANTS AND AGREEMENTS....................................................18

6.1     Access to Information ............................................................................18
6.2     Employee Matters ..................................................................................19
6.3     Regulatory Approvals ............................................................................20
6.4     Reasonable Efforts; Cooperation ..........................................................20
6.5     Further Assurances ................................................................................20
6.6     Insurance Matters ..................................................................................21
6.7     Notice of Certain Matters; Supplementing Disclosure Schedules........21
6.8     Receipt of Misdirected Assets ..............................................................22
6.9     Assets Incapable of Transfer .................................................................22
6.10    Acknowledgment by Purchaser .............................................................22

ARTICLE VII CONDITIONS TO CLOSING .............................................................23

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers......23
7.2     Conditions Precedent to the Obligations of Purchaser .........................23
7.3     Conditions Precedent to the Obligations of the Sellers ........................24
7.4     Frustration of Closing Conditions..........................................................24

ARTICLE VIII TERMINATION ..................................................................................25

8.1     Termination of Agreement......................................................................25
8.2     Effect of Termination .............................................................................26

ARTICLE IX TAXES ...................................................................................................26

9.1     Transfer Taxes .......................................................................................26
9.2     Allocation of Purchase Price..................................................................27
9.3     Cooperation............................................................................................27
9.4     Preparation of Tax Returns and Payment of Taxes ..............................27
9.5     Employment Tax Reporting Responsibility ...........................................28

ARTICLE X MISCELLANEOUS .................................................................................28

10.1    Non-Survival of Representations and Warranties and Certain
        Covenants; Certain Waivers ..................................................................28
10.2    Expenses ................................................................................................28
10.3    Notices ...................................................................................................29
10.4    Binding Effect; Assignment....................................................................30
10.5    Amendment and Waiver .........................................................................30
10.6    Third Party Beneficiaries .......................................................................30
10.7    Severability ............................................................................................30
10.8    Construction ...........................................................................................30
10.9    Schedules ...............................................................................................30
10.10   Complete Agreement ..............................................................................31
10.11   Specific Performance .............................................................................31
10.12   Jurisdiction and Exclusive Venue...........................................................32
10.13   Governing Law; Waiver of Jury Trial .....................................................32
10.14   Counterparts and PDF............................................................................33

10.15    Bulk Sales Laws................................................................................33
10.16    Fiduciary Obligations .......................................................................33

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE
          MATTERS ....................................................................................34

11.1     Certain Definitions............................................................................34
11.2     Index of Defined Terms ....................................................................42
11.3     Rules of Interpretation ......................................................................42

INDEX OF EXHIBITS

EXHIBIT A FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
          AGREEMENT
EXHIBIT B FORM OF IP ASSIGNMENT AGREEMENTS

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (collectively with the Exhibits and Schedules referred to herein, this "Agreement"), dated as of [●], 2024, by and among Nuvo Int'l Group Inc., a [●] ("Purchaser"), Nuvo Group Ltd., a limited liability company established under the laws of Israel and Nuvo Group USA, Inc., a Delaware corporation (each a "Seller", and collectively, the "Sellers" or the "Company").  Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used in herein shall have the meanings set forth herein or in Article XI.

WHEREAS, the Sellers are engaged in the Business;

WHEREAS, on August 22, 2024 (the "Petition Date"), Sellers commenced the Bankruptcy Cases;

WHEREAS, Sellers intend to seek approval of and authorization for a sale and transfer of Sellers' assets used in the conduct of the Business in a process approved by the Bankruptcy Court (the "Sale Process"), and to be consummated pursuant to and in accordance with the Bid Procedures, the Bid Procedures Order and the Sale Order;

WHEREAS, Purchaser desires to purchase from Sellers the Acquired Assets through the Sale Process (the "Sale"), in exchange for the Purchase Price and Purchaser's assumption of the Assumed Liabilities, and Sellers desire to sell, convey assign and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale subject to approval by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (the "Bankruptcy Rules"), all on the terms and subject to the conditions set forth in this Agreement and entry of the Sale Order;

WHEREAS, Sellers and Purchaser each acknowledge and agree that the transactions contemplated by this Agreement and the Related Agreements (collectively, the "Transactions") will be consummated pursuant to and in accordance with the Bid Procedures, the Bid Procedures Order and the Sale Order, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser each agree as follows.

# ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     <u>Purchase and Sale of the Acquired Assets</u>.[1]  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to all of the assets, properties, interests and rights of the Sellers (other than such assets, properties, interests and rights that are explicitly included in Excluded Assets) (the "<u>Acquired Assets</u>"), free and clear of all Encumbrances other than Permitted Encumbrances, including the following,:

(a)     all Accounts Receivable of Sellers existing on the Closing Date to the extent exclusively related to the Business;

(b)     all code, source code and operating systems associated with the Sellers or the Business, in each case to the extent (i) owned by a Seller or (ii) owned by a third-party and licensed by a Seller (in the case of this clause (ii), solely to the extent transferable by the applicable Seller);

(c)     all Trade Secrets associated with the Sellers or the Business;

(d)     the Acquired Tangible Personal Property;

(e)     to the extent their transfer is permitted under applicable Law and/or by the applicable Governmental Body, all Permits held by Sellers listed on <u>Schedule 1.1(e)</u> (the "<u>Transferred Permits</u>")

(f)     all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent exclusively related to the Business;

(g)     all Inventory exclusively used or held for use in the Business;

(h)     all Business Intellectual Property owned by a Seller, including all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing (collectively, the "<u>Purchased Intellectual Property</u>") and all Business Intellectual Property owned by a third-party and licensed by a Seller solely to the extent transferable by the applicable Seller (the "<u>Licensed Intellectual Property</u>");

(i)     (i) copies of all Documents to the extent exclusively related to the Business and (ii) to the extent permitted by applicable Law, the employee and personnel records of the Transferred Employees, in each case, excluding historical emails; <u>provided</u> that Sellers may retain copies of any Documents transferred pursuant to this <u>Section 1.1(i)</u>; and

---

[1]     **Note to Purchaser**:  Parties to explore in good faith sale structure that is tax efficient for Purchaser.

(j)      all customer data, customer lists, and information related to customer purchases and exclusively related to the Business (excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other personally identifiable information the transfer of which would contravene applicable Privacy and Data Security Laws) (the "Customer Information").

Other than the Permitted Encumbrances and Assumed Liabilities, all mortgages or other Liens on the Acquired Assets securing Indebtedness shall attach to the net proceeds of the Sale so that the Acquired Assets will be sold free and clear of such Liens and other Interests. At the Closing, the sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment, the Intellectual Property Assignment Agreement, the Sale Order and other instruments of transfer described in Section 2.4.

1.2      Excluded Assets.    Notwithstanding anything to the contrary in this Agreement, including the generality of Section 1.1, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under all assets, properties, interests and rights of such Sellers not expressly included in the Acquired Assets (collectively, the "Excluded Assets"), including:

(a)      all Accounts Receivable of Sellers existing on the Closing Date to the extent not exclusively related to the Business;

(b)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(c)      all real estate and all interests in real estate all tangible assets (including Equipment) owned by Sellers that are not used in the Business;

(d)      all Contracts of Sellers (the "Excluded Contracts");

(e)      all goodwill not identified as an Acquired Asset set forth in section 1.1(f) herein;

(f)      all Inventory that is not used in the Business;

(g)      all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, except as may be designated as Acquired Assets prior to Closing pursuant to this Agreement;

(h)      all current and prior insurance policies of any of Sellers, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; and

6

(i)    Sellers' claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof.

1.3    <u>Assumption of Certain Liabilities</u>.    On the terms and subject to the conditions set forth herein and in the Sale Order, on terms to be reasonably negotiated with the parties involved and subject to satisfactory negotiation of terms reasonably acceptable to Purchaser, effective as of the Closing, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>"), <u>provided</u> that, for the avoidance of doubt, in accordance with Section 5.2, Purchaser shall have the right to negotiate Cure Costs;

(b)    the accounts payable arising after the Petition Date and existing on the Closing Date relating to the Business, specifically set forth on Schedule X (collectively, the "<u>Post-Petition Payables</u>"); and

(c)    all Liabilities to the extent arising out of events or circumstances to the extent occurring from and after the Closing, respect of or in connection with the failure by Purchaser or any of its Affiliates to comply with any Law or Order in respect of the Acquired Assets or the Business on or following the Closing Date;

1.4    <u>Excluded Liabilities</u>.    Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>").

1.5    [Reserved]

ARTICLE II

CONSIDERATION; CLOSING

2.1    <u>Consideration</u>.

(a)    The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) a credit bid (the "<u>Credit</u>

7

Bid"), on a dollar for dollar basis, of the full amount of the DIP Obligations pursuant to Section 363(k) of the Bankruptcy Code through an assignment from the DIP Lender to Purchaser; (ii) the cash payment of two million five hundred thousand dollars ($2,500,000) (which amount, for the avoidance of doubt, includes the amount of the Deposit paid into the Deposit Escrow Account by Purchaser) (the "Cash Payment"), (iii) the payment of three hundred thousand four hundred twenty dollars ($300,420) of the specific Post Petition Payables liabilities identified on Schedule X attached hereto and (iv) the assumption of the Assumed Liabilities and payment in cash of all Cure Costs that are Assumed Liabilities related to Purchaser's assumption and assignment of Sellers' contracts and leases, as determined and accepted by Purchaser in a written document duly adopted and authorized by an authorized officer of Purchaser, if any, before, at, or after the Closing Date in Purchaser's sole discretion. Anything herein to the contrary notwithstanding, Purchaser's agreement hereunder (whether listed in a schedule or in a separate document) to pay a portion of any particular debts or liabilities of Debtors owing to any third party or Purchaser's actual payment of any such debts or liabilities shall not render Purchaser liable to such third party for other debts or liabilities that may be owing to them by Debtors or liable to other parties who did not receive any such payments from Purchaser.

(b)      At the Closing, Purchaser shall deliver, or cause to be delivered, to the Company the Cash Payment less the Deposit (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

2.2      Deposit.

(a)      Purchaser has, on or prior to the date hereof, made an earnest money deposit with Epiq Corporate Restructuring, LLC (the "Escrow Agent") in the amount of two hundred and fifty thousand dollars ($250,000) (together with any interest, dividends, gains and other income earned with respect to such earnest money deposit, the "Deposit"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "Deposit Escrow Account"), established pursuant to the escrow agreement. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser and shall be applied against payment of the Cash Payment on the Closing Date.

(b)      If this Agreement has been terminated by the Company pursuant to Section 8.1(e) or Section 8.1(g) , then the Company shall retain the Deposit together with all received investment income, if any; provided, however, that if the Purchaser asserts in writing that the Agreement has not been properly terminated by the Company pursuant to Section 8.1(e) or Section 8.1(g), then the Parties shall submit such dispute to a court of competent jurisdiction (for the avoidance of doubt, in compliance with Sections 10.12 and 10.13) for notice and a hearing on such dispute before the Company shall retain such Deposit.

(c)      If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)    The Parties agree that the Company's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to the Company.

2.3    Closing.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Payment, the assumption of the Assumed Liabilities and the consummation of the other Transactions (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Hughes Hubbard & Reed LLP, located at One Battery Park Plaza, New York, NY 10004 1482) at 10:00 a.m. New York time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree (the date on which Closing actually occurs, the "Closing Date").  Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of [12:01 a.m. (New York time) on the Closing Date].

2.4    Closing Deliveries by Sellers.  At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Sellers;

(b)    the IP assignment agreement substantially in the form of Exhibit B (the "IP Assignment Agreement"), duly executed by Sellers party thereto;

(c)    a copy of the Sale Order, as entered by the Bankruptcy Court;

(d)    a duly executed IRS Form W-9 with respect to each Seller;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in Sections 7.2(b) and 7.2(c) have been satisfied; and

(f)    a joint written instruction, duly executed by Sellers, instructing the Escrow Agent to release the Deposit to the Company by wire transfer of immediately available funds.

2.5    Closing Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to (or at the direction of) the Company:

(a)    the Closing Date Payment;

(b)    a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Acquired Assets, in form and substance reasonably satisfactory to Seller;

(c)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)    each IP Assignment Agreement, duly executed by Purchaser;

(e)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a), 7.3(b) and 7.3(c) have been satisfied; and

(f)    a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release the Deposit to the Company by wire transfer of immediately available funds, the Deposit.

2.6    <u>Withholding</u>.  Purchaser shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except in the case of a payment to a Seller to the extent resulting from such Seller's failure to satisfy its obligations under Section 2.4(d).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) set forth in the Schedules delivered by the Company concurrently herewith (as described further in Section 10.9), and subject to the terms, conditions and limitations set forth in this Agreement, Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date:

3.1    <u>Organization and Qualification</u>.  Each of the Sellers (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, in the case of (b) and (c), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2    <u>Authorization of Agreement</u>.  The execution, delivery, and performance of this Agreement by each Seller, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this

Agreement by such Seller.  Subject to requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by such Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (the "Enforceability Exceptions").

3.3    Conflicts; Consents.

(a)    Assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3(b) are made, given or obtained (as applicable), (y) the requirements of the HSR Act and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Body ("Competition Laws") are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Sellers of this Agreement and the consummation by Sellers of the Transactions, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent Organizational Documents of the Company; (ii) violate any Law applicable to the Company or by which any property or asset of the Company is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any property or asset of the Company under, any Assigned Contracts; except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body in connection with the execution, delivery and performance by Sellers of this Agreement or the consummation by Sellers of the Transactions, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under any Competition Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not and would not, individually or in the aggregate, reasonably be expected to be material to the Business, or (v) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

3.4    [Reserved].

(a)

3.5    [Reserved].

3.6    Litigation.  Other than the Bankruptcy Case, as of the date hereof, there are no pending or, to the Company's Knowledge, written threatened Actions against or by the Company with respect to the Business or any of the Acquired Assets, at law or in equity, or before

11

or by any Governmental Body.  Other than in connection with the Bankruptcy Case, the Company is not subject to any outstanding Order.

        3.7        <u>Permits; Compliance with Laws</u>.

        (a)        The Company is in compliance, in all material respects, with all Transferred Permits.  The Transferred Permits constitute all Permits that are necessary with respect to the operation of the Business or the ownership or operation of the Acquired Assets, in each case as operated or as owned and operated, respectively, on the date of this Agreement.  All of the Transferred Permits are valid and in full force and effect.

        (b)        The Company is, and has been during the prior fourteen (14) months, in compliance, in all material respects, with all Laws applicable to the operation of the Business and the ownership and operation of the Acquired Assets, and during the prior fourteen (14) months, the Company has not received any written notice of any action or proceeding against it alleging any failure to comply in any material respect with any such Laws, except in each case as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Assets, taken as a whole.  No investigation by any Governmental Body with respect to the Company is pending or, to the Company's Knowledge, threatened, and during the prior fourteen (14) months, the Company has not received any written notice of any such investigation.

        3.8        <u>Intellectual Property</u>.

        (a)        <u>Schedule 3.8(a)</u> sets forth a correct and complete list of all registered Purchased Intellectual Property, and all applications for registrations of Business Intellectual Property filed with any Governmental Body, in each case that is owned by the Company (collectively, "<u>Registered Purchased Intellectual Property</u>").

        (b)        Seller is the sole legal owner, and with respect to Registered Purchased Intellectual Property, record owner, of all right, title and interest in and to the Purchased Intellectual Property, free and clear of all Encumbrances (except Permitted Encumbrances).  The Purchased Intellectual Property and the Licensed Intellectual Property constitute all of the Intellectual Property exclusively used or held for use in the operation of the Business as conducted in the Ordinary Course.

        (c)        All of the Purchased Intellectual Property is, to the Knowledge of the Company, valid and enforceable. All Registered Purchased Intellectual Property is subsisting and in full force and effect and has not expired or been abandoned.  Sellers have not received any written communications alleging that any of the Purchased Intellectual Property is not valid and enforceable, or that any Registered Purchased Intellectual Property is not subsisting and in full force and effect, except as noted on Schedule 3.8(a).

        (d)        No Seller nor, to the Knowledge of the Company, any other party to any IP Contract is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of or default under or to withhold its consent in connection with a transfer to Purchaser (as required pursuant to the Transactions) of, any IP Contract.

(e)     To the Knowledge of the Company, Sellers own or otherwise have a valid right to use all Intellectual Property currently exclusively used or held for use in the operation of the Business as conducted in the Ordinary Course.

(f)     To the Knowledge of the Company, the conduct of the Business by Sellers in the Ordinary Course, including the use of the Purchased Intellectual Property and Licensed Intellectual Property in connection therewith, does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person. There are no pending or, to the Knowledge of the Company, threatened, Actions by or before any Governmental Body (including any oppositions, cancellations, revocations, reviews, challenges or other proceedings) (i) alleging any infringement, misappropriation, dilution or other violation with respect to the Business by Sellers or by any product or service of Sellers (or use thereof) of the Intellectual Property of any Person; or (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Purchased Intellectual Property or any Seller's right, title, or interest in or to any Purchased Intellectual Property (excluding ordinary course patent and trademark prosecution communications and actions). Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) relating to any Purchased Intellectual Property, that does, or could reasonably be expected to, restrict, impair or otherwise affect the ownership, use or value of any Purchased Intellectual Property.

(g)     To the Knowledge of the Company, none of the Purchased Intellectual Property is being infringed, misappropriated or otherwise violated by any Person, and no claims asserting such infringement, misappropriation or other violation are pending or threatened in writing against any Person by Sellers.

(h)     The Company has used efforts that are reasonable under the circumstances, including actions common in the industry, to maintain, protect, preserve and enforce the Trade Secrets included in the Business Intellectual Property, including implementation and maintenance of appropriate and reasonable security measures. This Section 3.8 contains the sole and exclusive representations and warranties of the Company with respect to Intellectual Property.

3.9     Employees.

(a)     To the Knowledge of the Company during the prior three (3) years, with respect to all employees of the Seller (the "Business Employees"), the Company is in compliance with all applicable Laws relating to the employment of labor, including provisions thereof relating to wages, hours, overtime, wage payment laws, equal opportunity, collective bargaining, layoffs and immigration compliance withholding and timely transmission to the required Governmental Body of all required payroll taxes and employee withholdings.  With respect to the Business Employees, there are no administrative charges or court complaints pending or, to the Company's Knowledge, threatened against the Company before the U.S. Equal Employment Opportunity Commission, United States Department of Labor or any other Governmental Body concerning alleged employment discrimination or any other matters relating to the employment of labor, in each case. Seller has not been cited, fined, served with a notice of Intent to Fine or with a Cease and Desist Order nor has any action or administrative proceeding been initiated or, to the knowledge of Seller, threatened against Seller, by reason of any actual or

13

alleged failure to comply any of the above mentioned laws or any other laws, regulations or ordinances which regulate the employment relationship.

(b)      There is no unfair labor practice charge or complaint pending or, to the Company's Knowledge, threatened against the Company before the National Labor Relations Board or any similar foreign, state or local body with respect to any Business Employees.  To the Knowledge of the Company, during the prior two (2) years, the Company has not experienced any union organizing or decertification activities, work stoppage, slowdowns or other labor disputes with respect to Business Employees, and, to the Knowledge of the Company, no such activities or disputes are underway or threatened.

3.10    Disclaimer of Other Representations and Warranties.

NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO PURCHASER OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR ADVISORS OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA), EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III, NO AFFILIATE OF ANY SELLER OR THEIR RESPECTIVE ADVISORS OR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THIS AGREEMENT, THE TRANSACTIONS (INCLUDING ANY CONSENTS OR APPROVALS REQUIRED IN CONNECTION THEREWITH), THE ACQUIRED ASSETS, THE BUSINESS, THE ASSUMED LIABILITIES, THE BUSINESS, OR ANY INFORMATION PROVIDED OR MADE AVAILABLE TO PURCHASER IN CONNECTION THEREWITH (INCLUDING ANY FORECASTS, PROJECTIONS, ESTIMATES OR BUDGETS), INCLUDING ANY WARRANTY WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date:

4.1     Organization and Qualification.  Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, in the case of (b) and (c) except as would not, individually or in the aggregate, reasonably be expected to have, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the Transactions.

14

4.2    <u>Authorization of Agreement</u>.  The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Transactions, have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement by Purchaser.  This Agreement has been duly and validly executed and delivered by Purchaser, and, assuming this Agreement is a valid and binding obligation of Sellers, this Agreement constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as limited by the Enforceability Exceptions.

4.3    <u>Conflicts; Consents</u>.

(a)    Assuming that (x) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), (y) the requirements of the HSR Act and any other applicable Competition Laws are complied with and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the Transactions, do not: (i) violate the Organizational Documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which any property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any property or asset of Purchaser under, any Contract; except, in the case of clauses (ii) and (iii), for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the Transactions.

(b)    [2]Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Body or other Person in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any filings required to be made under the Competition Laws, (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the Transactions.

4.4    <u>Financing</u>.[3] Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of all fees, expenses of, and other amounts required to be paid by Purchaser in connection with the Transactions (including, for the avoidance of doubt, the Purchase Price).  Purchaser is and

---

<u>Note to Draft</u>: Purchaser to schedule any Competition Law requirements to which Purchaser is subject in connection with the transaction.

[3]    <u>Note to Draft</u>: Purchaser to provide detail of its financing resources and commitments.

shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5    <u>Brokers</u>.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the Transactions based on any arrangement or agreement made by or on behalf of Purchaser or its Affiliates that would be the obligation of any Seller or its Affiliates after the Closing.

4.6    <u>No Litigation</u>.  As of the date hereof, there are no Actions pending against or by Purchaser that will adversely affect Purchaser's performance under this Agreement or the consummation of the Transactions.

4.7    <u>Certain Arrangements</u>.  As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management or board of directors (or applicable governing body) of the Company, any holder of equity or debt securities of the Company, or any lender or creditor of the Company, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the other Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such Transactions.

4.8    <u>No Additional Representations or Warranties</u>.  Except for the representations and warranties contained in this <u>Article IV</u>, each Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to any Seller by Purchaser.

4.9    <u>Diligence</u>.  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business, and in entering into the Transaction, is relying on, among other things, its due diligence as well as including reliance on the representations and warranties made by Sellers to Purchaser in <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>").

ARTICLE V

<u>BANKRUPTCY COURT MATTERS</u>

5.1    <u>Bankruptcy Actions</u>.

(a)    The Seller will file with the Bankruptcy Court a supplement (the "<u>Supplement</u>") that will identify, among other things: (a) that the Purchaser is the Successful Bidder for the Acquired Assets; (b) the amount and form of consideration to be paid by the Purchaser for the Acquired Assets; (c) the Assumed Liabilities to be assumed by the Purchaser; (d) the Executory Contracts to be assumed by the Seller and assigned to the Purchaser, or the Seller's rights and interests therein to be sold and transferred to the Purchaser, as the case may be; and (e) the Executory Contracts designated to be rejected by the Seller. In addition, the Seller will

16

file with the Bankruptcy Court: (i) the proposed or revised proposed Sale Order approving the sale to the Purchaser; (ii) a copy of this Agreement; and (iii) any additional information or documentation relevant to the sale to the Purchaser. The Seller will file the Supplement on the docket for the Chapter 11 Case as promptly as is reasonably practicable prior to the Sale Hearing.

(b)     Purchaser shall promptly take all actions as are reasonably requested by the Company to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the Transactions as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

5.2     Cure Costs.  Subject to entry of the Sale Order, Purchaser shall negotiate the Cure Costs and, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), or on such other date as may be negotiated between the Purchaser and the counterparties to the Assigned Contracts, pay the Cure Costs and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     Bankruptcy Court Filings.  Sellers shall use reasonable best efforts to obtain entry of the the Sale Order.  The Sale Order shall, among other things, (a) approve and direct, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize, empower and direct Sellers to assume and assign to Purchaser the Assigned Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; (f) find that Purchaser shall have no Liability for any Excluded Liability; and (g) find that there was no violation of section 363(n) of the Bankruptcy Code. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m)

of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.4    Approval. The Parties' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

ARTICLE VI

COVENANTS AND AGREEMENTS

6.1    Access to Information.

(a)    Until the earlier of the termination of this Agreement pursuant to Article VIII and the Closing, the Company (in its sole discretion) will provide Purchaser and its authorized Advisors with reasonable access, upon reasonable advance notice and during regular business hours, to the books and records of the Company, in order for Purchaser and its authorized Advisors to access such information regarding the Company as Purchaser reasonably deems necessary in connection with effectuating the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of the Company, (ii) such access will occur in such a manner as the Company reasonably determines to be appropriate to protect the confidentiality of the Transactions and (iii) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to the Company if the Transactions are not consummated, (B) would require the Company to disclose any financial or proprietary information of or regarding the Affiliates of the Company or otherwise disclose information regarding the Affiliates of the Company that the Company deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws (including any Competition Laws) or the provisions of any Contract to which the Company is bound or would violate any fiduciary duty; provided that, in the event that the Company withholds access or information in reliance on the foregoing clause (C) or (D), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)    All information provided pursuant to this Section 6.1 will be used solely for the purpose of effecting the Transactions, and shall be treated as "Confidential Information" pursuant to the terms and conditions of the Confidentiality Agreement, the provisions of which are by this reference hereby incorporated herein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Neither the Company nor any of Sellers makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.1, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

18

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser, solely for the limited purpose of better understanding the books and records.  Unless otherwise consented to in writing by the Company, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to the Company such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.  From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

6.2     <u>Employee Matters</u>.

(a)     Purchaser may, in Purchaser's sole discretion, extend to any Business Employees an offer of employment on terms and conditions of employment including compensation and benefits to be determined in the sole discretion of the Purchaser ("<u>Transfer Offer</u>") that, if accepted, shall become effective upon the Closing.  Business Employees who accept such Transfer Offers and begin employment with Purchaser in accordance with this <u>Section 6.2(a)</u> shall be referred to herein as "<u>Transferred Employees</u>."  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the Business Employees will accept the offer of employment from Purchaser or will continue in employment with Purchaser following the Closing.  Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to Purchaser or its Affiliates of each such Transferred Employee who has accepted that offer.  Effective as of the Closing, each Transferred Employee shall cease to be an employee of Sellers or their Affiliates and shall cease to be an active participant in any Seller Plan.  Sellers intend that for purposes of any Seller Plan providing severance or termination benefits, or any comparable plan, program, policy, agreement or arrangement of Sellers, the transactions contemplated by this Agreement shall not constitute a termination of employment of any Transferred Employee prior to or upon the consummation of such transactions.

(b)     Purchaser and its Affiliates shall be responsible for compliance with the requirements of Section 4980B of the Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation Section 54.4980B-9.

(c)     The provisions of this <u>Section 6.2</u> are for the sole benefit of the Parties to this Agreement and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any Business Employees or Transferred Employees), other than the Parties and their respective permitted successors and

assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this <u>Section 6.2</u> or under or by reason of any provision of this Agreement).  Nothing contained herein, express or implied shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement.

6.3    <u>Regulatory Approvals</u>.

(a)    Subject to <u>Section 6.4</u>, Sellers will (i) make or cause to be made all filings and submissions required to be made by Sellers under any applicable Laws for the consummation of the Transactions, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)    Subject to <u>Section 6.4</u>, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances.

6.4    <u>Reasonable Efforts; Cooperation</u>.

(a)    Subject to the other terms of this Agreement provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper, advisable or permitted under applicable Law to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

(b)    The obligations of the Company pursuant to this Agreement, including this <u>Section 6.4</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bid Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.5    <u>Further Assurances</u>.  From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.6     <u>Insurance Matters</u>.  Purchaser agrees and acknowledges that:

(a)     upon Closing, all nontransferable insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies; and

(b)     to the extent any insurance policies of Purchaser, Sellers or any of their respective Affiliates cover any loss, Liability, claim, damage or expense relating to any Acquired Assets and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser and Sellers (as applicable) shall cooperate with the other, as applicable, in good faith in submitting and pursuing such claims for the benefit of the party bringing such claim.

6.7     <u>Notice of Certain Matters; Supplementing Disclosure Schedules</u>.

(a)     If at any time, (i) Purchaser becomes aware of any breach by Sellers of any representation, warranty, covenant, obligation or agreement contained herein and such breach is capable of being cured by Sellers, or (ii) Sellers become aware of any breach by Purchaser of any representation, warranty, covenant, obligation or agreement contained herein and such breach is capable of being cured by Purchaser, in each case, the Party becoming aware of such breach shall promptly notify the other Party in writing of such breach (in accordance with the notice procedures set forth in <u>Section 10.3</u>).  Upon such notice of breach, the breaching Party shall have until the earlier of (A) ten (10) days after receiving such notice, and (B) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

(b)     Each Party shall promptly notify the other of any Action that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of the Transactions. Seller shall promptly notify Purchaser, and Purchaser shall promptly notify Seller, of any Actions or investigation that may be threatened, brought, asserted or commenced against the other which would have been listed in <u>Schedule 3.6</u> or would be an exception to <u>Section 3.6</u> if such Action or investigation had arisen prior to the date hereof.

(c)     Seller shall promptly notify Purchaser of (i) any notice or other written communication from any Person alleging that the consent of such Person may be required in connection with the consummation of the Transactions, and (ii) any written communication from any Governmental Body in connection with or relating to the Transactions.

(d)     Sellers may, prior to Closing, from time to time, but in no event later than three (3) Business Days prior to the Closing, supplement or amend the Schedules with respect to any event, circumstance or matter (each a "<u>New Matter</u>"), that is required to be set forth or described in such Schedules (a "<u>Disclosure Update</u>") to make such Schedules true and correct as of the Closing Date. Any such Disclosure Update will not cure any breach or inaccuracy of any representation or warranty made in this Agreement for any purpose or diminish the rights or remedies of Purchaser with respect thereto, nor shall any such notification affect any conditions to the obligations of the parties hereunder.

21

6.8    <u>Receipt of Misdirected Assets</u>.  From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred.  From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such right, property or asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.9    <u>Assets Incapable of Transfer</u>.  To the extent that any (a) Assigned Contract or (b) Transferred Permit is not assignable or transferable without the consent of another Person and such consent requirement is not made unenforceable by the Bankruptcy Code, this Agreement will not constitute an assignment or transfer thereof, an attempted assignment or transfer thereof, or an agreement to effect such an assignment or transfer, if such assignment or transfer, attempted assignment or transfer, or agreement would constitute a breach thereof. Sellers, upon the reasonable request by Purchaser, will use their commercially reasonable efforts to obtain the consent of such other Person to the assignment or transfer of any such Assigned Contract and/or Transferred Permit to Purchaser in all cases in which (a) such consent is or may be required for such assignment or transfer and (b) such consent requirement is not made unenforceable by the Bankruptcy Code<u>.  Purchaser shall cooperate with Sellers in their efforts to obtain such consents,</u>. Without limiting the generality of the foregoing, at Closing the beneficial interest in and to the Assigned Contracts and the Transferred Permits that the Parties intend to transfer in connection with the Transaction shall pass to Purchaser to the fullest extent permitted by the relevant Assigned Contract or Transferred Permit and applicable Law.

6.10    <u>Acknowledgment by Purchaser</u>.

(a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it (i) is acquiring the Acquired Assets on an "as is, where is" basis, without any representations or warranties other than those expressly set forth herein, and (ii) has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of the Company and of the Acquired Assets, the Assumed Liabilities and the Business, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except to the extent expressly set forth in the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).  Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither the

Company, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Company or any of its assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)        Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Company, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of the Company, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections").  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of the Company, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    Conditions Precedent to the Obligations of Purchaser and Sellers.  The respective obligations of each Party to this Agreement to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)        no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the Transactions; and

(b)        the Bankruptcy Court shall have entered the Sale Order.

7.2    Conditions Precedent to the Obligations of Purchaser.  The obligations of Purchaser to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)        (i) each of the representations and warranties made by Sellers in Article III (other than Sections 3.1 and 3.2) shall be true and correct at and as of the date hereof

23

and at and as of the Closing Date, as if made at and as of such date, except in the case of representations and warranties that speak as of an earlier date, which shall be true and correct at and as of such earlier date (disregarding for these purposes all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations and warranties to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect and (ii) the representations and warranties set forth in Sections 3.1 and 3.2 shall be true and correct in all material respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date, except in the case of representations and warranties that speak as of an earlier date, which shall be true and correct in all material respects at and as of such earlier date (disregarding for these purposes all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein);

(b)     Sellers shall have performed and complied in all material respects with all of the obligations, covenants and agreements required by this Agreement to be performed by Sellers on or prior to the Closing Date; and

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of the Sellers.  The obligations of Sellers to consummate the Transactions are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date, except in the case of representations and warranties that speak as of an earlier date, which shall be true and correct in all material respects at and as of such earlier date (disregarding for these purposes all qualifications or limitations as to "materiality" and words of similar import set forth therein);

(b)     Purchaser shall have performed and complied in all material respects with all of the obligations, covenants and agreements required by this Agreement to be performed by Purchaser on or prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4     Frustration of Closing Conditions.  Purchaser may not rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by Purchaser's failure to comply with the terms of this Agreement. Sellers may not rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by any Seller's failure to comply with the terms of this Agreement.

ARTICLE VIII

TERMINATION

8.1     Termination of Agreement.  This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated at any time prior to the Closing:

(a)       by the mutual written consent of the Company and Purchaser;

(b)       by written notice of either Purchaser or the Company to the other Party, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the Transactions or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Order was caused by the breach or action or inaction of such Party;

(c)       by written notice of either Purchaser or the Company to the other Party, if the Closing shall not have occurred on or before December 13, 2024 (the "Outside Date");

(d)       by written notice of either Purchaser or the Company to the other Party, if the Bankruptcy Case is dismissed or converted to a case or cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(e)       by written notice from the Company to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue in any material respect, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b)  would not be satisfied; provided that (i) if such breach is curable by Purchaser then the Company may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to the Company at any time that the Company is in material breach of, any covenant, representation or warranty hereunder such that the conditions set forth in Section 7.2(b) or 7.2(c) would not be satisfied at such time;

(f)       by written notice from Purchaser to the Company, upon a material breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any Seller will have become untrue in any material respect, in each case, such that the conditions set forth in Section 7.2(b) or 7.2(c)  would not be satisfied; provided that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant,

representation or warranty hereunder such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied at such time;

(g)      by written notice from the Company to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(h)      by written notice from the Company to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; or

(i)      by written notice of either Purchaser or the Company to the other Party, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder.

8.2      Effect of Termination.   In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that this Section 8.2 and Article X shall survive any such termination; provided, further, that no termination will relieve the Company or Purchaser from any Liability for damages (including damages based on the loss of the economic benefits of the Transactions to Sellers), losses, costs, or expenses (including reasonable legal fees and expenses) resulting from any actual fraud or willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by the Company or Purchaser to consummate the Closing at the time required by Section 2.3 if and when it is obligated to do so hereunder).

ARTICLE IX

TAXES

9.1      Transfer Taxes.   Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser. The Party required by Law to file a Tax Return with respect to such Transfer Taxes shall timely prepare, with the other Party's cooperation, and file such Tax Return. Purchaser and each Seller each shall timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any such Transfer Taxes. Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2    <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other items treated as part of the purchase price for applicable income Tax purposes) among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "<u>Allocation Methodology</u>"). As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as Purchase Price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "<u>Allocation</u>"). If Sellers deliver a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection. Any resolution by Sellers and Purchaser shall be conclusive and binding on the Parties once set forth in writing (any such conclusive and binding Allocation, the "<u>Final Purchase Price Allocation</u>"). If Sellers and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Sellers' objection, each of Purchaser and Sellers may separately determine the allocation of the Purchase Price, and there shall be no Final Purchase Price Allocation. The Parties and their respective Affiliates shall file all Tax Returns in accordance with the Allocation Methodology, and if any, the Final Purchase Price Allocation. None of the Parties shall take any Tax related action inconsistent with the Final Purchase Price Allocation, if any, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3    <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)    Except as otherwise provided by <u>Section 9.1</u>, Sellers shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing other than with respect to any Assumed Tax and (ii) all income Tax Returns of Sellers. Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this <u>Section 9.4</u> is otherwise reflected as an adjustment to Purchase Price or constitutes an Assumed Liability, Sellers shall be responsible for paying any Taxes reflected on any Tax Return that Sellers are obligated to prepare and file under this <u>Section 9.4(a)</u>.

(b)    Purchaser shall prepare and timely file all other Tax Returns with respect to the Acquired Assets that are not addressed by <u>Section 9.4(a)</u>. With respect to any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Sellers with a draft of such Tax Returns at least thirty days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Sellers with respect to such Tax Returns. Purchaser shall be responsible for paying any Taxes reflected on any Tax Return that Purchaser is obligated to prepare and file under this <u>Section 9.4(b)</u>.

(c)    Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing,

unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes.  Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return.  In the event Sellers disagree with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand. The determination of such independent national accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

9.5    <u>Employment Tax Reporting Responsibility</u>.  Purchaser and Sellers agree to follow, and/or to cause their respective Affiliates to follow, the alternate procedure for employment tax withholding as provided in Section 5 of Rev. Proc. 2004-53, I.R.B. 2004-35.  Accordingly, Purchaser shall have employment tax reporting responsibilities for the wages and other compensation that Business Employees receive in the calendar year in which the Closing Date occurs.

ARTICLE X

<u>MISCELLANEOUS</u>

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants;</u> <u>Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.  Purchaser and Sellers Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing, and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>.  Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (b) all Cure Costs will be paid by Purchaser.

      10.3   <u>Notices</u>.   Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) on the date sent by e-mail (so long as no "bounceback" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 pm (Eastern Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a non-Business Day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, e-mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Nuvo Int'l Group Inc.
[_____]
[_____]
Attention:     Roman Rogol
Email:          rrogol@outlook.com

with a copy to (which shall not constitute notice):

Foley & Lardner LLP
90 Park Avenue
New York, NY 10016

Attention:     Kay Gordon
Email:          kay.gordon@foley.com

And

Attention: Alissa Nann
Email:          anann@foley.com

<u>Notices to Sellers:</u>

Nuvo-Group USA, Inc.
c/o Teneo
280 Park Avenue, 4th Floor
New York, NY 10017
Attention:     James S. Feltman, Chief Restructuring Officer
Email:          james.feltman@teneo.com

with a copy to (which shall not constitute notice):

Hughes Hubbard & Reed LLP
One Battery Park Plaza

29

New York, NY 10004
Attention:    Kathryn A. Coleman
              Chris Gartman
Email:        katie.coleman@hugheshubbard.com
              chris.gartman@hugheshubbard.com

10.4    <u>Binding Effect; Assignment</u>.    This Agreement shall be binding upon Purchaser and, subject to the terms of the Bid Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    <u>Amendment and Waiver</u>.    Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Company or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.    No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    <u>Third Party Beneficiaries</u>.    Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Severability</u>.    Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.8    <u>Construction</u>.    The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.    The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.9    <u>Schedules</u>.    The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>however</u>, each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules to the extent it is reasonably apparent on the face of the disclosure that such other information applies to such section of the Schedules.    Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement.    The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits

30

is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, Updated Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Schedules will be deemed to broaden in any way the scope of the parties' representations and warranties.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.10    Complete Agreement.  This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.11    Specific Performance.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions.  It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.12 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.11 will not be required to

31

provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.11 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. In no event will this Section 10.11 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

10.12   Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Transactions brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

10.13   Governing Law; Waiver of Jury Trial.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Transactions will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF

OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.14   <u>Counterparts and PDF</u>.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument.  Any counterpart, to the extent signed and delivered by means of a facsimile machine, portable document format (.PDF) or other electronic transmission (including electronic signatures produced via DocuSign, .PDF or similar technology), will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature.  At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission (including electronic signatures produced via DocuSign, .PDF or similar technology) to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission (including electronic signatures produced via DocuSign, .PDF or similar technology) as a defense to the formation of a Contract and each such party forever waives any such defense.

10.15   <u>Bulk Sales Laws</u>.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.16   <u>Fiduciary Obligations</u>.  Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.  For the avoidance of doubt, Sellers retain

the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

ARTICLE XI

ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

"Accounts Receivable" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that have not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Action" means any Order, action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.  Notwithstanding the foregoing, under no circumstances shall the Purchaser and the Seller be deemed Affiliates of one another unless and until the Transactions have been consummated, notwithstanding the possession by the Purchaser (whether or not exercised) of any rights of control with respect to the Seller prior to such consummation (if any).

"Alternative Transaction" means any transaction or series of related transactions (other than pursuant to this Agreement), whether direct or indirect, and whether effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by the Seller, pursuant to which the Seller: (a) accepts a Qualified Bid, other than that of the Purchaser or its Affiliates, as the highest or otherwise best offer for any or all of the Acquired Assets; or (b) sells, transfers,

leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in the Seller or other interests in the Acquired Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, any or all of the Acquired Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than the Purchaser or its Affiliates; provided, however, that the foregoing shall not include sales of Inventory in the Ordinary Course.

"Auction" has the meaning ascribed to such term in the Bid Procedures Order.

"Bid Procedures Order" means the *Order (A) Approving Bidding Procedures for the Sale of Substantially All Assets of Debtors; (B) Approving Procedures for the Assumption and Assignment, Assignment or Rejection of Designated Executory Contracts and Unexpired Leases;(C) Scheduling the Auction and Sale Hearing; (D) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; (E) Authorizing the Debtors to Designate a Stalking Horse Bidder and Seek Expedited Approval of Bid Protections, If Any; and, Granting Related Relief* entered by the Bankruptcy Court on October 21, 2024 (Docket No. 170).

"Business" means the business of the Sellers, including developing, marketing and selling maternal and fetal monitoring technologies and devices.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

"Business Intellectual Property" means all Intellectual Property exclusively used in the Business.

"Business Software" means all Software owned or otherwise Controlled by Seller that is primarily used or primarily held for use by Seller in the operation of the Business, excluding commercial "off-the-shelf" Software licensed on standardized terms from third parties.

"Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Code" means the United States Internal Revenue Code of 1986.

"Confidentiality Agreement" means that certain letter agreement, dated as of November [  ], 2024, by and between the Company and Purchaser.

"Consent" means any approval, consent, ratification, permission, waiver or other authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, Lease, sublease, mortgage, agreement, guarantee, purchase order, license, collective bargaining agreement, or other agreement that is binding upon a Person or its property.

"Controlled" or "Controls" means, solely when used in reference to any item of or rights in or to Intellectual Property, ownership or other enforceable legal authority or right of Sellers (whether by license or otherwise) to grant the right to use such item, or a license or sublicense under such Intellectual Property, to any other Person, or with respect to Trade Secrets or other confidential proprietary information, the right to disclose such Trade Secrets or other confidential information to a third party without breaching the terms of any Contract to which any Seller is a party.

"COVID-19" means SARS-CoV-2 or COVID-19, any evolutions thereof or related or associated epidemics, pandemics or disease outbreaks and any future epidemics, pandemics or disease outbreaks.

"DIP Lender" means Nuvo Investors DiP LLC, together with any of its successors and assigns, and any agent appointed to act on behalf of the foregoing entities with respect to the DIP Obligations.

"DIP Obligations" means $7,716,000 as provided for in the *Third Interim Order Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (A) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (B) Scheduling a Final Hearing, and (C) Granting Related Relief*, entered by the Bankruptcy Court on November 14, 2024 (Docket No. 225).

"Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements.

"Environmental Laws" all applicable Laws including any common law cause of action concerning (a) pollution or protection of the environment, or worker health and safety (relating to exposure to Hazardous Substances) or (b) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Substances.

"Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, supply inventory, vehicles and all other fixed assets.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"FDA" means the U.S. Food and Drug Administration.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Governmental Authorization" means any Permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

"Governmental Body" means any: (i) nation, region, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal); (iv) multinational organization exercising judicial, legislative or regulatory power; (v) court or arbitrator (public or private) of applicable jurisdiction; or (vi) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature of any federal, state, local, municipal, foreign or other government (including, for the avoidance of doubt, the FDA and any similar health and/or safety regulatory authority).

"Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"Intellectual Property" means all intellectual property rights anywhere in the world arising under or associated with: (a) patents and patent applications; (b) trademarks, service marks, trade dress, trade names, logos, slogans, domain names, and other designations of origin, and all registrations and applications for registration therefor, together with all goodwill associated therewith; (c) copyrights (and any other equivalent rights in works of authorship (including rights in Software as a work of authorship)); (d) trade secrets and industrial secrets, and rights in know-how and other confidential or proprietary business or technical information in each case that derive independent economic value from not being generally known ("Trade Secrets"); (e) rights in domain names, uniform resource locators, social media identifiers and other names and locators associated with Internet addresses and sites; (f) all mask works, mask work registrations and mask work applications and all other corresponding rights and (g) other similar or equivalent intellectual property rights anywhere in the world."Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Sellers in connection with the Business.

"IP Contract" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases and permissions granting any

rights with respect to Intellectual Property to which any Seller is a party, beneficiary or otherwise bound, and that are used exclusively in the conduct of the Business.

"Knowledge of the Company", "Company's Knowledge" and words of similar import mean the actual knowledge of Robert "Rice" Powell and Douglas Blankenship.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Material Adverse Effect" means any event, change, occurrence, or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, has had, or would reasonably be expected to have, a material adverse effect on (x) the financial condition or results of operations of the Business, taken as a whole or (y) the condition or value of the Acquired Assets and Assumed Liabilities, taken as whole; provided, however, that none of the following, and no Effect arising out of, or resulting from, the following, shall constitute, or be taken into account, individually or in the aggregate, in determining whether or not there has been, a Material Adverse Effect: (a) Effects in, arising from or relating to general business or economic conditions affecting the industry in which the Company operate, (b) Effects in, arising from or relating to national or international political or social conditions, including rioting, domestic disturbance or the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States, (c) Effects in, arising from or relating to financial, banking, or securities markets (including (i) any disruption of any of the foregoing markets, (ii) any change in currency exchange rates, (iii) any decline or rise in the price of any security, commodity, Contract or index and (iv) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions), (d) Effects in, arising from or relating to changes in GAAP, (e) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body, (f) Effects in, arising from or relating to (i) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (ii) the failure to take any action if such action is prohibited by this Agreement, (iii) the negotiation, announcement or pendency of this Agreement or the Transactions or the identity, nature or ownership of Purchaser, including the impact thereof on the relationships, contractual or otherwise, of the business of the Company with employees,

customers, lessors, suppliers, vendors or other commercial partners; or (iv) any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of the Agreement, (g) any failure, in and of itself, of the Business to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (h) (i) the commencement or pendency of the Bankruptcy Case; (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the Transactions, (B) the reorganization of Sellers, or (C) the assumption or rejection of any Assigned Contract; and (iii) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith, or (m) any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including COVID-19), including any Law, directive, pronouncement or guideline issued by a Governmental Body, the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, "sheltering-in-place", curfews or other restrictions that relate to, or arise out of, a national health concern, epidemic or pandemic (including COVID-19) or any change in such Law, directive pronouncement or guideline thereof following the date of this Agreement or any material worsening of such conditions threatened or existing as of the date of this Agreement or any quarantine or trade restrictions related thereto or any other *force majeure*.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Order" means any award, decision, stipulation, determination, writ, declaration, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Ordinary Course" means the ordinary and usual course of operations of the business of the Business in substantially the same manner as conducted as of the date of this Agreement, consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Case.

"Organizational Documents" means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, articles of organization, certificate of formation, regulations, operating agreement, certificate of limited partnership, limited liability company agreement or partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments thereto.

"Permits" means all licenses, licenses, permits, certificates, orders, authorizations, approvals, clearances, registrations, franchises and similar consents granted or issued by any Governmental Body (including, for the avoidance of doubt, any clearance by the FDA in connection with a Section 501(k) premarket notification of intent or similar action by the FDA in connection with a premarket approval application).

"Permitted Encumbrances" means (a) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of the Transferred Real Property, as applicable, (b) licenses granted on a non-exclusive basis, (c) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion, and (d) any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"Personal Information" means personally identifiable information of Seller's employees, other personnel, agents, officers, directors, contractors, customers, potential and prospective customers, suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Privacy and Data Security Laws" means all applicable privacy, security, data collection, data protection, data sharing, direct marketing, consumer protection, location tracking, customer tracking, behavioral marketing, and workplace privacy Laws, in each case, of any applicable jurisdiction, including with respect to the collection, processing, storage, protection and disclosure of Personal Information.

"Projections" has the meaning set forth in Section 6.10(b).

"Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

"Qualified Bid" means competing bids that are submitted in accordance with the Bid Procedures and Bid Procedures Order.

"Related Agreements" means all agreements, certificates, instruments or other documents required to be executed and/or delivered pursuant to or in connection with, this Agreement by any Person, including the Bill of Sale and Assignment and Assumption Agreement and the IP Assignment Agreement.

"Sale Order" means the order of the Bankruptcy Court to be entered by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, which order, amongst other approvals, approves the sale of the Acquired Assets to Purchaser free and clear of all

Encumbrances and Liabilities pursuant to section 363(f) of the Bankruptcy Code other than the Assumed Liabilities as set forth herein.

"SEC" means the U.S. Securities and Exchange Commission.

"Seller Parties" means Sellers and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"Seller Plan" means each (a) "employee benefit plan" within the meaning of Section 3(3) of ERISA, other than any Multiemployer Plan, (b) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (c) employment, severance, retention or other similar agreement, or (d) bonus, incentive, deferred compensation, profit-sharing, post- termination health or welfare, vacation, severance or termination pay or other material compensation or benefit plan, program, policy, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by the Company for the benefit of Business Employees, in all cases, other than any plan or arrangement sponsored or maintained by a Governmental Body.

"Software" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including associated data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"Straddle Period" means any Tax period beginning on or before, and ending after, the Closing.

"Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"Systems" means computers, computer systems, servers, hardware, firmware, middleware, networks, servers, workstations, routers, hubs, switches, data communication equipment and lines, telecommunications equipment and lines, co-location facilities and equipment, and all other information technology equipment and related items of automated or computerized systems, including any outsourced systems and processes (e.g., hosting locations) and all associated documentation.

"Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value

added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

"<u>Tax Return</u>" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

11.2    <u>Index of Defined Terms</u>.

Acquired Assets .......................................... 5
Agreement.................................................. 4
Allocation................................................... 27
Allocation Methodology ........................... 27
Assignment and Assumption Agreement.. 10
Assumed Liabilities .................................... 7
Bankruptcy Rules........................................ 4
Cash Payment............................................. 8
Chosen Courts ........................................... 33
Closing ......................................................... 9
Closing Date................................................ 9
Closing Date Payment................................ 8
Company ...................................................... 4
Competition Laws ..................................... 11
Confidential Information ........................... 19
Credit Bid.................................................... 8
Cure Costs ................................................... 7
Customer Information ................................. 6
Deposit ......................................................... 9
Deposit Escrow Account............................ 9
Disclosure Update .................................... 22
Effect........................................................... 39
Enforceability Exceptions......................... 11
Escrow Agent.............................................. 9
Excluded Assets .......................................... 6
Excluded Contracts ..................................... 6
Excluded Liabilities ................................... 8

Express  Representations .......................... 17
Final Purchase Price  Allocation.............. 27
IP Assignment Agreement ....................... 10
Licensed Intellectual Property ................... 5
Material Adverse Effect............................ 24
New Matter ............................................... 22
Outside Date.............................................. 26
Parties........................................................... 4
Party ............................................................. 4
Petition Date................................................ 4
Post-Petition Payables................................ 7
Projections................................................. 24
Purchase Price ............................................. 8
Purchased Intellectual Property ................. 5
Purchaser...................................................... 4
Registered Intellectual Property............... 13
Sale............................................................... 4
Sale Process ................................................. 4
Seller ............................................................ 4
Sellers........................................................... 4
Supplement ............................................... 17
Trade Secrets............................................. 38
Transactions ................................................ 4
Transfer Offer ........................................... 20
Transfer Taxes ........................................... 27
Transferred Employees ............................ 20
Transferred Permits..................................... 5

11.3    <u>Rules of Interpretation</u>.    Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement.  Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item (i) is included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at the Company's offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)　　Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)　　All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(n)　　A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(o)　　The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(p)　　This Agreement is in the English language, and while this Agreement may be translated into other languages, the English language version shall control.  All notices, demands, requests and other documents or communications under or in connection with this Agreement will be in English or will be accompanied by a certified English translation (in which case the English version will prevail in the event of a conflict except to the extent the communication contains or consists of an official document issued by a Governmental Body in a language other than English).

[*Signature page(s) follow.*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

NUVO INT'L GROUP INC.

By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

NUVO GROUP LTD.


By: _____
Name:
Title:


NUVO GROUP USA, INC.


By: _____
Name:
Title:

*Signature Page to Asset Purchase Agreement*

## SCHEDULE 3.8(A)

### INTANGIBLES AND INTELLECTUAL PROPERTY OF THE SELLERS

[*TBC*]

**EXHIBIT A**

**FORM OF BILL OF SALE AND
ASSIGNMENT AND ASSUMPTION AGREEMENT**

## **EXHIBIT B**

## **FORM OF IP ASSIGNMENT AGREEMENTS**