UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                              .  Chapter 11
IN RE:                        .
                              .  Case No. 24-11880(MFW)
NUVO GROUP USA INC, et al,    .
                              .  824 Market Street
                              .  Wilmington, Delaware 19801
                Debtors. .
. . . . . . . . . . . . . . . Tuesday, January 7, 2025
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:  (On the Record)

```
For the Debtors:              Derek C. Abbott, Esq.
                              MORRIS, NICHOLS, ARSHT
                               & TUNNELL, LLP
                              1201 North Market Street
                              16th Floor
                              Wilmington, Delaware 19899

                              Kathryn A. Coleman, Esq.
                              HUGHES, HUBBARD & REED, LLP
                              One Battery Park Plaza
                              New York, New York 10004

For the U.S. Trustee:         Timothy J. Fox, Jr., Esq.
                              OFFICE OF THE U.S. TRUSTEE
                              844 King Street, Suite 2207
                              Wilmington, Delaware 19801
```

(Appearances Continued)

```
Audio Operator:               Electronically Recorded
                              by Lesa Neal, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For Gaingels 10X Capital
Diversity Fund I, LP:                Russell C. Silberglied, Esq.
                                     RICHARDS, LAYTON & FINGER, PA
                                     One Rodney Square
                                     920 North King Street
                                     Wilmington, Delaware 19801

                                     Alexander J. Nicas, Esq.
                                     GOODWIN PROCTER, LLP
                                     The New York Times Building
                                     620 Eighth Avenue
                                     New York, New York 10018


Also Appearing:                      James S. Feltman, Chief
                                      Restructuring Officer
                                     TENEO

## INDEX

PAGE

Debtors' Motion for Entry of Interim and Final Orders      4
(I) Authorizing the Debtors to (A) Continue to Maintain
Their Existing Cash Management System, Bank Accounts,
and Business Forms, (B) Honor Certain Prepetition
Obligations Related Thereto, and (C) Continue to Perform
Ordinary Course Intercompany Transactions, (II) Granting
Administrative Expense Status to Ordinary Course
Post-petition Intercompany Claims and (III) Granting
Related Relief

STATUS CONFERENCE RE:

Notice of Filing of Wind-Down Budget                      5

1          (Proceedings commence at 11:30 a.m.)

2          THE COURT:  Good morning.  This is Judge Walrath.

3     We're here in the Nuvo case.

4          And I will turn it over to counsel for the debtor

5     to tell us where we are.  Mr. Abbott.

6          MR. ABBOTT:  Thank you, Your Honor, very much.

7     Derek Abbott from Morris Nichols, here for the debtors.

8          Your Honor, we have a status conference at the end

9     of the agenda that Ms. Coleman will handle.

10          The only other matter on the agenda for today is

11     the debtors' further motion for cash management, and it's

12     only a portion of cash management.  It goes to the 345

13     criteria, Your Honor.  And we have agreed with the U.S.

14     Trustee to submit, I believe, sixth interim order extending

15     the time on the 345 waiver, Your Honor, for another 30 days.

16          If it would please the Court, we would expect to

17     submit that under certificate shortly, we're in that process

18     now.

19          THE COURT:  All right.  Mr. Fox, do you want to say

20     anuything?

21          MR. FOX:  Good morning, Your Honor.  May it please

22     the Court, Tim Fox on behalf of the United States Trustee.

23          Mr. Abbott's representations are correct.  Again,

24     with the pending sale, I think this issue ultimately resolves

25     without further need in this hopefully last thirty-day

1    window.  But we will continue to work through the issue and

2    appreciate the Court's accommodation and the debtors' efforts

3    to address the U.S. Trustee's concerns regarding the cash

4    management system.  Thank you.

5                 THE COURT:  All right.  Thank you.

6                 All right.  Well, you may file it under

7    certification of counsel then and I'll enter the order.

8                 MR. ABBOTT:  Thank you, Your Honor.

9                 I'll turn it over to Ms. Coleman.

10                MS. COLEMAN:  Thank you, Mr. Abbott.

11                Your Honor, Kathryn Coleman of Hughes, Hubbard &

12   Reed for the debtors.

13                As Mr. Abbott noted, this was scheduled as a status

14   conference, and the subject of the status conference is the

15   wind-down budget that we have filed with the Court, it's at

16   Docket 339.

17                I just want to note, Your Honor, the wind-down

18   budget we have presented has very few fixed costs in it, it

19   has some.  But there are two payroll-related expenses; there

20   are U.S. Trustee fees; the D&O insurance premium for going

21   forward for Mr. Feltman and Mr. Powell, who remains the --

22   remains on the board and is the only remaining board member;

23   and the cost of providing the bar date notice, which was sent

24   out last Friday, and notice was completed of that.

25                Most of the other expenses are estimates.  They may

1   come in higher; they may come in lower.

2          One example that we already know of, of a departure

3   from the submitted amount, is that the Israel payroll and

4   social benefits that we had estimated at 60,000 came in

5   closer to 70,000 actual, the employment -- the employees have

6   now all been terminated, but there were some payments that

7   were required to be made.

8          So, Your Honor, as the Court knows, following entry

9   of the bar date order last week -- which thank you for that -

10  - we now have a bar date of February 3rd.  That will give us

11  quite a bit more certainty about the amount of the

12  administrative claims than we have today.  That's one reason

13  why we went with a shorter initial wind-down budget that we

14  will be anticipate -- anticipate updating as future needs and

15  expenses come into some greater clarity.

16         So, for that reason, Your Honor, the Gaingels

17  limited objection doesn't really present an issue for today

18  because the initial wind-down budget ends up with funds far

19  in excess of the full asserted amount of Gaingels' claims,

20  which has obviously not been determined, so the merits of

21  those legal issues can be left for another day.

22         Now, as Your Honor knows, and I'm not going to

23  belabor it, but those issues are significant.  We have

24  already made the debtors' position clear, which is that

25  Gaingels does not have a valid secured claim in the case.

1    But even it did, the issues regarding the value of the

2    collateral, the application of 506(c) would have to be

3    determined, and they will be.

4         We anticipate, in the near future, we will be

5    presenting the Court with process by which the Gaingels

6    concerns can be addressed in an efficient way, which is

7    obviously the key here.  We don't have a lot of money to

8    distribute to creditors, and so we want to get everything

9    buttoned up, so that we know how much we do have to

10   distribute as fast as possible.  So we will be coming to the

11   Court with a process that we're working out with Mr. Feltman

12   for an orderly conclusion.

13        But again, even if there were certainty today as to

14   those matters, and even if there were a right to adequate

15   protection, the simple math is just that, even assuming that

16   the full amount of the wind-down budget that you have before

17   you is spent, the funds left in the estate would

18   substantially exceed the full amount of Gaingels' claim,

19   anyway.  So there can be no better adequate protection than

20   funds sitting in an escrow account that can't be -- that

21   can't be accessed.

22        No other creditors, Your Honor, have objected to

23   the wind-down budget, other than Gaingels.  As a result, we

24   believe that the budget appropriately balances the concerns

25   they have raised with the need for the debtors to pay certain

1  needed wind-down costs, and we ask that the Court would

2  approve that and let Mr. Feltman go forward with those

3  expenses.  Thank you.

4          THE COURT:  Does anybody else wish to be heard?

5          MR. NICAS: Yes, Your Honor, at the appropriate --

6  oh, sorry, Mr. Silberglied.

7          MR. SILBERGLIED:  No, I was just going to introduce

8  you.  But Nicas has already been admitted *pro hac vice*, Your

9  Honor.

10          THE COURT:  Understood.

11          All right, Mr. Nicas.

12          MR. NICAS:  Thank you, Your Honor.  Alexander Nicas

13  from Goodwin Procter on behalf of Gaingels 10X.

14          Your Honor, we did file a limited objection to the

15  notice of the wind-down budget last Thursday.  Our objection

16  is at Docket 351 and the wind-down budget is at Docket 339.

17          We do raise a couple of issues in our limited

18  objection.  The first issue is whether the debtor should be

19  allowed to disburse any of the 2.5 million until the claims

20  process has run its course.  Our objection now, which was

21  attached to the limited objection, has been on file for

22  almost 2 weeks, no objection has yet been filed, and we

23  understand Ms. Coleman indicates that one may be forthcoming.

24  And we welcome a discussion with the debtors on a briefing

25  schedule and discovery and expert testimony when that

1    objection is filed.  The bar date has been set for February

2    3rd.  So, in less than a month, we will understand the

3    universe of filed claims.

4          But the main -- one of the main issues raised in

5    our objection is that we see confirmation that no amounts

6    will be disbursed until the universe of allowed claims is

7    known.  We think that's consistent with the discussion on the

8    record at the sale hearing, where debtors' counsel said that

9    they were not -- that they were going to commence the claims

10   process, which they've now done, and that Mr. Feltman won't

11   pay anything until he knows what the universe of allowed

12   claims is.

13         Ms. Coleman, in particular, on the record at the

14   sale hearing, in a few different -- at a few different times,

15   indicated that that was the case and what the debtors

16   intended to do.  Those citations, Your Honor, hearing

17   transcript at Page 157, 11 to 20, Lines 11 to 20.  Ms.

18   Coleman indicated that, until Mr. Feltman, quote:

19         "-- knows what the universe of allowed claims is,

20   he's not going to pay anything because there may not be

21   enough money to spread across all of them."

22         Again, at Page 7 -- Pages 170 and 171, Ms. Coleman

23   indicated that Mr. Feltman is not going to do anything

24   without an order of the Court, and if comes back and asks you

25   to pay 1.25 million to the investment banker, you're going to

1  say no, and guess what, he's not going to come and ask you

2  for that.

3       And then I think, most importantly, at Page 173 of

4  the hearing transcript, Lines 5 through 10, Ms. Coleman

5  indicated that, if the debtors can come back to the Court

6  within a specified, short amount of time with a wind-down

7  budget and a commitment that no claims will paid until the

8  bar date has passed and the universe of allowed claims is

9  assert, I would ask the Court to consider that, instead of

10  imposing an escrow.

11       I understand Your Honor and we respect Your Honor's

12  ruling regarding an escrow and the wind-down budget process.

13  But at this point, there's no indication from the debtors

14  that they intend to actually hold the 2.5 million until the

15  universe of allowed claims is known.  What's clear by the

16  wind-down budget is they actually intend to disburse over

17  $800,000 of the 2.5 in available cash, and that raises an

18  issue from our perspective as it relates to adequate

19  protection, Your Honor.

20       And really, it dovetails with the second issue that

21  we raised in the limited objection, and that is the issue of

22  adequate protection under 363(e).  And it's really about,

23  from our perspective, Your Honor, consistency with Your

24  Honor's ruling at the sale hearing.  There was much

25  discussion about reserving 1.5 -- and I think that was to

1    cover Gaingels 10X and another noteholder -- of the 2.5.

2    There's actually about 1.6 or so in the wind-down budget that

3    is reserved.

4           But to date, as of at least last week,

5    approximately $2.5 million of noteholder claims, in addition

6    to Gaingels 10X's claims, which is in the amount of 1.148,

7    have been filed.  This includes at least one noteholder who

8    consented to the sale.  Now that the bar date is set, we

9    assume that other noteholders will file claims, but we'll

10   only know that after the bar date passes.

11          So, from Gaingels 10X's perspective, Your Honor, we

12   believe that 363(e) mandates that only those noteholder who,

13   one, objected to the sale; and, two, have allowed secured

14   claims should be entitled to recover from the $2.5 million

15   that is available under the wind-down -- the wind-down

16   budget, and just as the cash proceeds from the sale.  We

17   think, Your Honor, that's the only logical result that's

18   consistent with Your Honor's ruling at the sale hearing, and

19   really, they go hand in hand.

20          First, we think, again, the whole 2.5 million

21   should be reserved until the claims universe is known, not

22   necessarily that all are allowed, but at least we know what

23   claims exist and have been filed.

24          And then, second, Your Honor, we reiterate my point

25   that, from the perspective of who should be able to share in

1    the recovery, Ms. Coleman indicates that there's 1.1 or two

2    million dollars that's available for Gaingels to share.  But

3    if other noteholders are entitled to recover from the cash

4    proceeds from the sale, assuming they have allowed secured

5    claims, assuming that Gaingels 10X has an allowed secured

6    claim, we're not actually adequately protected, consistent

7    with 363.

8         So those are the only two limited objection points

9    that I wanted to raise to Your Honor.

10         THE COURT:  All right.  Ms. Coleman, do you want to

11   respond?

12         MS. COLEMAN:  Yes, I would like to, Your Honor,

13   thank you.

14         Your Honor, as to the -- as to the second point in

15   the objection, I did not address that because that's clearly

16   an issue as between Gaingels -- who was supposed to be acting

17   as collateral agent and there's to whether they did or

18   didn't.  I am not going to address that because it's not the

19   debtors' issue right now, as to who gets to participate in

20   the sale proceeds, to the extent that anybody has a security

21   -- a valid security interest, so I'm not going to -- I'm not

22   going to get into that.  I think it's a confused and

23   confusing issue that has not yet been fully briefed and is

24   not before the Court.

25         But it is very clear that nobody has established a

1    right to adequate protection because you can't get adequate

2    protection until you've established that you have an actual

3    interest that is entitled to adequate protection.

4           Moreover, again, there is much more than Gaingels'

5    amount, and they're the only ones who are even asserting a

6    security claim, and that's for their claim of a million

7    dollars.  They're the only ones who are even asserting that

8    perfection has been attempted.  So the fact that other of the

9    noteholders have filed claims is kind of irrelevant.  And

10   again, those claims have not yet been -- have not yet been

11   objected to or otherwise dealt with.

12          But going to the point of payment, I think Mr.

13   Nicas is conflating a couple of different issues:

14          Number one, absolutely no pre-petition claims and

15   no administrative claims will be paid until -- including

16   professional fees, will be paid by Mr. Feltman until we know

17   how much the universe is.  As I said at the hearing on

18   December 11th, how could we possibly pay anything other than

19   employees and things like D&O insurance, which are

20   administrative claims?  But the things that are going to be

21   filed as administrative claims and are not simply the costs

22   of keeping -- you know, keeping the lights on, aside from the

23   professional fees incurred in doing so, we can't pay anything

24   like that because, again, Mr. Feltman would not know how much

25   to -- you know, what percentage, if it's a hundred percent or

1  something less than that, to pay to any particular

2  administrative claim.

3         So I stand by what I said, that Mr. Feltman is not

4  going to pay any professional fees, he's not going to pay any

5  -- I can't think of anything else, other than professional

6  fees, honestly.  He's not going to pay any of that because,

7  A, they haven't been allowed; and, B, again, we don't know --

8  I mean, obviously, the -- he's not going to ask to pay the

9  investment banker's fee -- banker fees because we don't know

10  if there's going to be enough to pay all of the professionals

11  in full.

12         THE COURT:  Well, I'm confused.  I'm confused then.

13  There are some items that you're requesting --

14         MS. COLEMAN:  Yes.

15         THE COURT:  -- that I approve be paid --

16         MS. COLEMAN:  Yes.

17         THE COURT:  -- and they are administrative

18  expenses.

19         MS. COLEMAN:  They are, Your Honor.  But they are

20  things like the forty-thousand-dollar D&O premium, so that

21  Mr. Feltman can continue to work and we can continue to have

22  a director, Mr. Powell, who has agreed -- who has agreed to

23  stay on.  So we are asking for those things.

24         We're asking for -- I have to make you smaller, so

25  I can look at the budget.  But we are asking for -- and I may

ask for Mr. Feltman to give me the actual detail, I believe

he's on the phone.  But we are asking to pay $1,250 next week

to Mr. Powell as a director fee.  We are asking to pay -- we

are asking to pay the U.S. Trustee payment of $40,000.

Actually, I think that's -- I'm sorry.  I'm looking at the --

yeah, it's $40,000.  And then we're asking to pay the D&O

insurance, which is $40,000.

So, when we say "total disbursements," that

includes some payroll amounts that are estimated, and we're

not sure what those completely are.  But when you look and

see company professional fees escrow of $485,655, those

monies have already been escrowed and those are pre-sale,

already escrowed professional fees.  We're not asking to pay

any of those out of the sale proceeds.

So the -- if you want -- and I'm not facile enough

to do it on the fly here.  But there are some small

disbursements that we are asking authority to make.  And

again, we are asking for the Court's authority.  I'm not

telling you Mr. Feltman is just going to go out and start

writing checks.  And you know, Mr. Nicas correctly referred

to my statement on the record that everything we are asking

to be paid, we're asking the Court for approval to do.  You

know, again, this is the full transparency boat here.

But it would be very surprising to me if there were

-- if a -- essentially, a pre-petition, un -- you know, not

1    yet allowed claim could be allowed to stand in the way for --

2    a million dollars could be allowed to stand in the way of

3    payment of D&O insurance and things like that, to allow Mr.

4    Feltman to do his job and wind down the -- and wind down the

5    company.

6            Another example is that we're going to have to get

7    Israeli counsel to go through a wind-down process, the legal

8    wind-down process in Israel, so that we don't get claims

9    against these companies from Israeli creditors who are just

10   disregarding the Chapter 11 process.  We have to do a wind-

11   down in Israel, and that's something that's going to have to

12   be paid out of the -- that will have to be paid out of the

13   sale proceeds, just like the D&O insurance.

14           THE COURT:  Well, I'm not approving -- I'm not

15   approving that today.

16           MS. COLEMAN:  We're not asking -- yeah, and we're

17   not asking you to --

18           THE COURT:  All right.  Let's limit it to what

19   you're asking me for.

20           MS. COLEMAN:  Absolutely.  Absolutely.  But we

21   would ask for that.  And again, we are --

22           THE COURT:  All right.  Of the eight hundred

23   thousand, four hundred and eight -- of the eight hundred and

24   ninety-six, four hundred and eighty-five is not coming out of

25   sale proceeds.

1            MS. COLEMAN:  That's correct, Your Honor.

2            THE COURT:  The rest is.

3            MS. COLEMAN:  Yeah.  So the November 24th payment -

4    - and I may ask Mr. Feltman for some help here.  So, if you

5    look over on the total, on the total line, go down to -- so

6    we go down to director fees, that's $8,750 for Mr. Powell.

7    He's -- you know, that's obviously a very low amount that

8    we're paying him to serve as the director.

9            And I will also represent to the Court that Mr.

10   Powell, until the sale occurred, did not make -- just like

11   the rest of the board, none of the board got paid anything

12   during the pendency of the case.  But we do need -- we do

13   need to have one director, and Mr. Powell has graciously

14   agreed to stay on in that capacity.  And Mr. Feltman felt

15   that $5,000 per month was, while a fraction of what

16   independent directors usually get, which he is now because

17   now he's not an officer of the company anymore, it's a

18   fraction, but at least it's something to compensate to him

19   for not in amount -- insignificant amount of time he's going

20   to spend.  So that's $5,000 a month, which totals, for this

21   budget, to $8,750.

22           Skip over the next number because that's not coming

23   out of sale proceeds, that's money that was already escrowed.

24           And then you've got the Israeli social benefits of

25   one ninety-two four twenty-nine.  Mr. Feltman can correct me

1    if I'm wrong.  I believe that that has already been paid.

2            Is that correct, Mr. Feltman?  I'm sorry to put you

3    on the spot.

4            MR. FELTMAN:  Good afternoon, Your Honor -- or good

5    morning, Your Honor.  James Feltman, the Chief Restructuring

6    Officer.

7            Those amounts were already funded at or around the

8    time of the prior hearing.  And we -- the funds that were

9    available in the bank account, the operating account, were

10    used to cover those costs.

11            This represents the equivalent of withholding taxes

12    and social benefits and some payroll for employees who worked

13    through the date of termination of the company's operations.

14            MS. COLEMAN:  Thank you, Mr. Feltman.

15            And then the next number is an estimate.  We don't

16    know what that total amount is going to be.  Obviously, you

17    know, we have to be in coordination with the priority caps

18    and all of that.  But the next number of 112,369 is related

19    to December '24 payroll.

20            So the employees were all terminated as of December

21    6th.  Some few employees were asked to stay on since the

22    closing wasn't actually until the 13th, because the hearing

23    was moved until the 11th, so there are some amounts that are

24    going to be owed.  We don't -- again, we don't know what

25    those are.  That is just -- that is just an estimate.

1    Then you go down to the other category.  We have

2    the U.S. Trustee payment estimated of 40,000 in the upcoming

3    week, and then 17,261 in the second half, for the second half

4    of January.  Again, those are estimates for Q4 of 2024 and Q1

5    of 2025.

6    And then we've got the forty-thousand-one-hundred-

7    and-twenty-dollar D&O payment, which, again, covers Mr.

8    Feltman and Mr. Powell, and is a tiny fraction of what the

9    company was paying for D&O before, it's a much reduced -- a

10   much reduced policy.  And the former D&O is in run-off.

11   THE COURT:  All right.  Mr. Nicas, with the

12   explanation of those items, do you still object to any

13   disbursement?

14   MR. NICAS:  Your Honor, I mean, if we're talking

15   about -- and just so we can narrow it down and look at the

16   budget.  If we're talking about Mr. Powell's director fees in

17   the amount of 8,750, we're talking about employee-related

18   costs of $304,798, and we're talking about the other -- total

19   other line item of 97,381, those three line items, I'm not in

20   -- I have no objection to the disbursement of those amounts.

21   I'm not in the business of making my objection for

22   purposes of withholding amounts for employees who have worked

23   for the company and understand there's some *de minimis*

24   amounts for Mr. Powell, D&O insurance, and then the U.S.

25   Trustee fees.  Those three line items, in particular, are

1    okay from my perspective, and we will -- we would withdraw

2    our objection if those are the only amounts that are paid.

3         I -- there was a little bit of confusion, Your

4    Honor, and I apologize.  I just -- it was a little bit

5    confusing to me.  There was one line item in the 304,798

6    total operations-related line that was -- I believe indicated

7    was already paid and wouldn't be paid out of escrow proceeds

8    or not escrowed proceeds, but the proceeds of the sale.  Is

9    that -- was that correct?  I apologize to have this

10   discussion on the record, I -- it was confusing to me, so I

11   just wanted to clarify that.

12        MR. FELTMAN:  Your Honor, may I address the Court

13   and seek to clarify Mr. Nicas' concern?

14        THE COURT:  Yes.

15        MR. FELTMAN:  Thank you, Your Honor.

16        The -- during the pendency of the case, there were

17   funds that were paid out of the company's operating account

18   into an escrow account that was set up to satisfy

19   professional fee payments and then any awards that were made

20   by Your Honor.  There is an amount that remains in that

21   account of approximately two hundred and fifty, two hundred

22   and maybe sixty thousand dollars that are funds that are --

23   I'm led to understand are not currently property of the

24   estate.  That is the only source of funds remaining from

25   which professional fees could be satisfied, once Your Honor

1   is satisfied that the amounts are appropriate.  But no sale

2   proceeds are contemplated to be used to pay any professional

3   fees in the category and discussion taking place in court

4   today, Your Honor.

5            THE COURT:  Well, that's a different category,

6   that's the 485,000.  Are you saying there's only 250,000 in

7   the escrow?

8            MR. FELTMAN:  About that amount, Your Honor,

9   correct.

10           THE COURT:  All right.  I think Mr. Nicas' question

11   related to the employee payments that Ms. Coleman said were

12   paid on or about the last hearing, and that they came from

13   the company's operating account, not the proceeds of sale.

14   Is that correct, Mr. Feltman?

15           MR. FELTMAN:  Yes, I can confirm that, as well,

16   Your Honor.  All of the sale proceeds remain, in full, in the

17   escrow account; they have not been used for any purpose that

18   we have discussed on the call today.

19           THE COURT:  Well, the question is:  Do any -- which

20   of these employee amounts that are on the budget remain due

21   and would come from the sale proceeds?  Would the entire

22   300,000, or, as suggested by Ms. Coleman, only the

23   approximate -- I'm not sure how much, but 112,000?

24           Is that what you suggested, Ms. Coleman?

25           MS. COLEMAN:  Your Honor, I think we're a little

1    bit -- and I apologize.  The nature of this is -- it would be

2    better if we were all in the room together.  But I think

3    that, actually, Mr. Feltman said that the one ninety-two

4    number has -- was already funded at or around the time of the

5    sale, not out of the sale proceeds.

6              THE COURT:  Well, is that --

7              MS. COLEMAN:  And the one --

8              THE COURT:  Is that correct, Mr. Feltman?

9              MR. FELTMAN:  I am reasonably sure that it is

10   correct.  But I am also aware that there's about $300,000 or

11   so of current obligations that remain unsatisfied that would

12   require use of some -- of part of the sale proceeds, since

13   the company's cash resources have been exhausted at this

14   point.

15             MS. COLEMAN:  So that might indicate that the

16   192,429 was not -- so I'm -- I apologize if I created this

17   problem, Your Honor.  So maybe the 192,429 was not satisfied

18   out of -- it was not satisfied at or around the time of the

19   sale, so that three-hundred-thousand-dollar number might, in

20   fact, be what -- well, part of it is an estimate, the

21   112,369, as I understand it, is an estimate because it says

22   "estimate" over on the left side of the budget.  And the

23   192,429, which was -- it looked here as if it was budgeted to

24   be paid 12/21, in the week of 12/21 to 12/27, and I thought -

25   - but Mr. Feltman is also correct that the entire 2.5 million

1    remains in escrow and has not been touched.

2              So, if that amount hasn't been funded or has only

3    been partially funded, I think we may just -- rather than

4    taking everybody's time on this call, I think we may have to

5    come back to the Court before actually disbursing any sale

6    proceeds for that, to just indicate whether the entire one

7    ninety-two was -- whether any of that has been funded so far.

8              So I'm very sorry for creating the confusion.  I

9    thought Mr. Feltman had said that that was funded at or

10   around the time of the sale.

11             MR. NICAS:  Your Honor, may I make a suggestion?

12             THE COURT:  Yes, Mr. Nicas.

13             MR. NICAS:  Your Honor, we certainly intend to work

14   collaboratively with the debtors to resolve these issues.  If

15   it makes the most sense, from the Court's perspective, it may

16   be helpful for us to collaborate offline on a revised version

17   of this wind-down budget, understanding Your Honor's

18   indications regarding Mr. Powell's director fees, wages and

19   benefits to employees, and then the other line items, U.S.

20   Trustee and the D&O insurance.  If we could work with the

21   debtors and have the debtors and have the debtors provide us

22   with a revised wind-down budget, we may potentially be able

23   to file that under certification of counsel with no objection

24   from us, and that may be the most efficient use of our time

25   today for the remainder of this status conference and also

1    just over the next day or so.

2            MS. COLEMAN:  That's, of course, fine with us, Your

3    Honor.

4            THE COURT:  All right.  I think that's wise.  It

5    looks like, since the professional escrow's amount is a major

6    portion of that, and that has already been escrowed, that's

7    no longer at issue.  But I think, Mr. Nicas, you are aware

8    that certain costs of liquidating the collateral need to be

9    covered, and particularly employees and Mr. Feldman.  So why

10   don't you work on that?  And I'll look for a proposed budget

11   under certification of counsel then.

12           MR. NICAS:  Thank you, Your Honor.

13           MS. COLEMAN:  Thank you very much, Your Honor.

14           THE COURT:  Ms. Coleman or Mr. Abbott, when is our

15   next hearing in this case?

16           MS. COLEMAN:  That is a good question that I do not

17   have the answer to.  Mr. Abbott, do you know?

18           MR. ABBOTT:  Your Honor, it's not clear to me that

19   we have one scheduled at this point, given what's been, you

20   know, largely big issues resolved.  We'll work with Ms. Capp

21   to schedule some as needed.

22           THE COURT:  Okay.  All right.  Then we'll -- I'll

23   look forward for that COC.  And hopefully, things can move

24   forward.

25           MR. ABBOTT:  Thank you, Your Honor.

1       THE COURT:  All right.  Anything else then for

2  today?  I think not.

3       MR. ABBOTT:  No, Your Honor.  That concludes the

4  agenda.  Thank you.

5       THE COURT:  All right.  Thank you.  We can stand

6  adjourned.

7       MS. COLEMAN:  Thank you, Your Honor.

8       MR. NICAS:  Thank you, Your Honor.  Happy New Year.

9       THE COURT:  Happy New Year.

10     (Proceedings concluded at 11:59 a.m.)

11                      * * * * *

12                    CERTIFICATION

13       I certify that the foregoing is a correct

14  transcript from the electronic sound recording of the

15  proceedings in the above-entitled matter to the best of my

16  knowledge and ability.

17

18

19

20

21

22  _____        January 9, 2025

23  Coleen Rand, AAERT Cert. No. 341

24  Certified Court Transcriptionist

25  For Reliable